**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

        -against-                  18 Cr. 567 (VSB)

CHRISTOPHER COLLINS,
CAMERON COLLINS, and
STEPHEN ZARSKY,

                        Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF CHRISTOPHER COLLINS'**
**MOTION TO COMPEL LIMITED PRODUCTION OF MATERIALS**
**<u>BEARING ON THE SPEECH OR DEBATE CLAUSE OF THE CONSTITUTION</u>**

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111

*Attorneys for Christopher Collins*

**<u>TABLE OF CONTENTS</u>**

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    RELEVANT BACKGROUND ....................................................................2

    A.    Congressman Collins' Relationship with Innate, and the Congressional Inquiry Spurred by Complaints Derived from that Relationship ...........................................................................................2

    B.    The Government's Investigation and Its Intersection with Congressman Collins' Office, Staff, and the Activities of the House of Representatives.............................................................................3

III.   ARGUMENT ................................................................................................6

    A.    The Speech or Debate Clause Protects the Legislature Against Invasion by the Executive and Shields Legislative Activities from Discovery .....................................................................................................6

    B.    The Speech or Debate Clause Provides for Both Immunity from Suit and a Non-Disclosure Privilege........................................................8

    C.    The Prosecution's Investigation Was Furthered, In Part, on the Basis of Protected Materials ...................................................................11

    D.    The Prosecution Relied On Speech or Debate Clause Protected Activities to Bring the Charges Alleged in the Indictment....................17

        1.    OCE Testimony and Proceedings Fall Squarely Under Protections of the Speech or Debate Clause ...............................18

        2.    Prior "Publication" of the Testimony Has no Part in the Calculus...................................................................................20

    E.    The Constitutional Violations Give Rise to Grave Concerns ..............21

IV.   RELIEF REQUESTED.................................................................................22

    A.    An Order Mandating Production is Warranted by the Government's Refusal to Produce Information Necessary to Enable Congressman Collins to File Effective Motions Regarding Speech or Debate Violations..................................................................22

V.    CONCLUSION............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown & Williamson Tobacco Corp. v. Williams,*
  62 F.3d 408 (D.C. Cir. 1995) ..........................................................................8, 9, 21

*Doe v. McMillan,*
  412 U.S. 306 (1973) ...........................................................................................9, 21

*Eastland v. United States Servicemen's Fund,*
  421 U.S. 491 (1975) ...........................................................................................7, 14

*In re Fattah,*
  802 F.3d 516 (3d Cir. 2015) ............................................................................10, 11

*Favors v. Cuomo,*
  285 F.R.D. 187 (E.D.N.Y. 2012) ..........................................................................11

*Fields v. Office of Johnson,*
  459 F.3d 1 (D.C. Cir. 2006) .................................................................................7, 9

*In re Grand Jury Subpoena,*
  571 F.3d 1200 (D.C. Cir. 2009) ..............................................................................19

*In re Grand Jury Subpoenas,*
  454 F.3d 511 (6th Cir. 2006) ..................................................................................16

*Gravel v. United States,*
  408 U.S. 606 (1972) ...............................................................................7, 8, 11, 19

*Howard v. Office of Chief Admin. Officer of U.S. House of Reps.,*
  720 F.3d 939 (D.C. Cir. 2013) .................................................................................9

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880) .................................................................................................9

*Rangel v. Boehner*
  20 F. Supp. 3d 148 (D.D.C. 2013), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015) ................20

*Ray v. Proxmire,*
  581 F.2d 998 (D.C. Cir. 1978) ................................................................................19

*Securities and Exchange Comm'n v. Committee on Ways and Means of the U.S.
  House of Reps.*
  161 F. Supp. 3d 199 (S.D.N.Y. 2015) ................................................................10, 11

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Tohono O'odham Nation v. Ducey*,
  No. cv-15-1135, 2016 WL 3402391 (D. Ariz. June 21, 2016) ...............................................11

*United States v. Bradshaw*,
  No. cr. 108-107, 2008 WL 4724691 (S.D. Ga. Oct. 24, 2008)...............................................26

*United States v. Brewster*,
  408 U.S. 501 (1972).................................................................................................7, 22

*United States v. Campagnuolo*,
  592 F.2d 852 (5th Cir. 1979) .....................................................................................25

*United States v. Doe*,
  455 F.2d 753 (1st Cir. 1972).......................................................................................8

*United States v. Durenberger*,
  Crim. No. 3-93-65, 1993 WL 738477 (D. Minn. Dec. 3, 1993)..............................................19

*United States v. Eilberg*,
  465 F. Supp. 1080 (E.D. Pa. 1979) .............................................................................19

*United States v. Green*,
  144 F.R.D. 631 (W.D.N.Y. 1992)................................................................................26

*United States v. Helstoski*,
  442 U.S. 477 (1979).........................................................................................9, 21, 22, 26

*United States v. Helstoski*,
  576 F.2d 511 (3d Cir. 1978).......................................................................................21

*United States v. Johnson*,
  383 U.S. 169 (1966)........................................................................................7, 8, 9, 22

*United States v. Myers*,
  635 F.2d 932 (2d Cir. 1980)........................................................................................7

*United States v. Rayburn House Office Building*
  497 F.3d 654 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1295 (2008) .............................. *passim*

*United States v. Renzi*,
  651 F.3d 1012 (9th Cir. 2011), *cert. denied*, 565 U.S. 1157 (2012)...................................10, 11

*United States v. Rose*,
  28 F.3d 181 (D.C. Cir. 1994)..................................................................................19, 20

*United States v. Rostenkowski*,
  59 F.3d 1291 (D.C. Cir. 1995)....................................................................................26

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Stevens*,
    985 F.2d 1175 (2d Cir. 1993).........................................................................27

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)............................................................................26

*United States v. Swindall*,
    971 F.2d 1531 (11th Cir. 1992) ...................................................................21

*United States v. Valona*,
    834 F.2d 1334 (7th Cir. 1987) .....................................................................25

**Rules**

Fed. R. Crim. P. 2 .............................................................................................27

Fed. R. Crim. P. 7(c)(1) ....................................................................................21

Fed. R. Crim. P. 12 ...............................................................................2, 22, 25

Fed. R. Crim. P. 12(b)(1) ..................................................................................25

Fed. R. Crim. P. 12(b)(3)(A)(v) ........................................................................25

Fed. R. Crim. P. 12(b)(3)(C) .............................................................................25

Fed. R. Crim. P. 12(b)(3)(E) .............................................................................25

Fed. R. Crim. P. 16 ......................................................................2, 22, 24, 25

Fed. R. Crim. P. 16(a)(1)(E) .............................................................................25

**Other Authorities**

The Federalist No. 47 (James Madison, 1788) ............................................11

The Federalist No. 48 (James Madison, 1788) ..............................................7

U.S. Const. art. I, § 5, cl. 2...............................................................................18

U.S. Const. art. I, § 5, cl. 3...............................................................................21

U.S. Const. art. I, § 6, cl. 1................................................................................6

I.    **INTRODUCTION**

The constitutional mandate of the Speech or Debate Clause is intended to protect and further the independence of the legislative branch. It is the product of a deliberate choice by the Framers to impose an additional — and absolute — safeguard on the delicate separation of powers that fundamentally buttresses and defines our system of governance. This safeguard operates as a shield, held by the Legislature, to protect against invasion by the Executive. The shield provides distinct protections including a bar against using information about legislative acts to further a claim or prosecution as well as a non-disclosure privilege.

Here, despite repeated warnings from defense counsel, the Executive Branch prosecutors and FBI agents (the "government") proceeded recklessly and forged ahead without appropriate regard to the applicable constitutional mandates and without following such simple prudent steps as working through the Office of the General Counsel of the U.S. House of Representatives. Even based on the incomplete discovery provided by the government thus far, it is clear that it took investigative steps that infringed upon the Legislature's constitutional protections. More troubling, the government committed a separate violation of the privilege when it charged this case by interjecting matters which the Constitution places squarely and solely within the jurisdiction of Congress — and therefore within the protections of the Speech or Debate Clause — into the indictment.

Although Congressman Collins believes that these constitutional violations are already evident, the government has refused to produce fulsome discovery necessary to assess the complete scope and severity of the government's abuses and the extent to which those infringements have tainted the evidence or indictment in this case. It is imperative that the Congressman receive such discovery well in advance of trial and prior to the filing of substantive motions, to enable him to fully protect his Legislative rights and to allow the Court to consider

the entire context when fashioning an appropriate remedy, whether it be suppression of evidence, dismissal of some or all of the counts in the indictment, or otherwise.

Accordingly, Congressman Collins brings this motion pursuant to Fed. R. Crim. P. 12 and 16 seeking an order directing the government to identify and produce three discrete categories of discovery directly bearing on the privilege established by the Speech or Debate Clause: (a) the complete contents of all email accounts, iCloud accounts, social media accounts, document collections, and electronic devices obtained by the government from current and former Congressional staffers; (b) all statements made to the government by any current and former Congressional staffer; and (c) all testimony and materials provided to the grand jury that reference or concern any investigation by the U.S. House of Representatives Office of Congressional Ethics ("OCE") or Committee on Ethics related to Congressman Collins. This initial step is appropriate under the Federal Rules and the Court's inherent power. Furthermore, the Constitution demands no less.

## II.   **RELEVANT BACKGROUND**

### A.   *Congressman Collins' Relationship with Innate, and the Congressional Inquiry Spurred by Complaints Derived from that Relationship*

Congressman Collins has been a Member of the United States House of Representatives since January 3, 2013, covering the entire period relevant to this case. He is currently serving his fourth term representing the 27th District of New York. For years prior to his election to Congress, he had a long-standing connection to an Australian biotechnology company then called Innate Immunotherapeutics Ltd. ("Innate"). Prior to the date of the alleged conspiracy charged in the indictment, Congressman Collins and other investors participated in private placements during Innate fundraising rounds. One such investor was the then-Member from Georgia, Congressman Tom Price, who became Secretary of Health and Human Services.

2

During former Secretary's Price's confirmation process, political opponents seized upon his Innate investment in a spurious and ultimately unsuccessful attempt to confuse the issues and hinder the confirmation. Unjustified as it was, the scrutiny on Innate's private placements led political opponents of Congressman Collins to allege unjustifiably that he, too, purchased discounted Innate stock that was not available to the public and was offered to him based on his status as a Member, and that he undertook official action to the singular benefit of Innate. Thereafter, OCE initiated a review on March 9, 2017 to investigate the allegations, which included meritless allegations related to his conduct in Congress. Congressman Collins cooperated fully with the OCE review, including by providing extensive on-the-record testimony to OCE staff during an interview on June 5, 2017.

B.     The Government's Investigation and Its Intersection with Congressman Collins' Office, Staff, and the Activities of the House of Representatives

The indictment alleges that Innate issued an announcement on June 27, 2017 regarding the failure of a drug candidate, MIS416. Thereafter, the government initiated an investigation into trading of Innate securities that occurred in the days around that announcement. At all times relevant to the investigation, Congressman Collins was a Member of the United States House of Representatives, and the official Congressional Ethics probe was ongoing.

Through materials produced in discovery, the government has shed some light, albeit limited, on how it went about investigating this case. As can be expected, the government obtained and executed search warrants, issued grand jury subpoenas, conducted interviews, took testimony, and engaged in other covert and overt investigative techniques. The testimony and materials collected by the government were obtained from, among others, family, friends, and supporters of Congressman Collins. Critically for purposes of this motion, persons subject to investigative activities also included current and former Congressional staffers. For instance, the

government applied for and obtained search warrants for: (i) all content or other information associated with email accounts belonging to ██████████████████████████ ██████████████████████████ (ii) the cell phones belonging to each; (iii) an iCloud account belonging to ██████████████████ (iv) the Facebook account for the same individual; (v) the iCloud account belonging to ████████████████ and (vi) historical location information and/or pen register information for cell phones belonging to, *inter alia*, ██████████████████████████

In the applications seeking these orders, the government was aware of the potential for seizure of materials reflecting legislative activities of the House — indeed, some warrant applications relied on communications among Congressional staff as a basis for probable cause — yet it failed to notify the issuing court of that possibility or the potential applicability of the Speech or Debate privilege. Likewise, it failed to include in the warrant applications any procedures designed to prevent collection or review of protected legislative materials which might implicate the Speech or Debate privilege. To the contrary, in some instances the warrants provided that law enforcement was authorized to conduct a complete review of *all* the ESI from seized devices or storage media.[1] The government did not provide the reviewing court with any description of prophylactic procedures it intended to follow (e.g., use of a taint team). Instead, a member of the U.S. Attorney's Office (who was not part of the prosecution team) unilaterally conducted an initial review of certain complete materials for privilege and, shockingly, a paralegal at the U.S. Attorney's Office assigned to the investigative team reviewed other

---

[1] In only a single instance, the government informed ████████████████████ — and not the Congressman himself, the holder of the privilege — that it was mindful of the possibility that materials contained on a seized phone may fall within the scope of the Speech or Debate Clause and, accordingly, it would not review those materials until conferring with ██ counsel (not the Congressman's). That device contained Speech or Debate privileged materials.

materials, all without the imprimatur of the Court as to how potentially Speech or Debate privileged materials would be safeguarded. Worse yet, there is no indication that the government approached or sought to work through the Clerk or the Office of the General Counsel of the House or sought guidance from either as to how to properly safeguard Speech or Debate privileged materials. Finally, Congressman Collins has reason to believe that other Congressional staffers were interviewed as part of the investigation without consultation with the Office of General Counsel for the House of Representatives or other specific steps being taken to safeguard the Speech or Debate privilege. Although the government has identified some staffers interviewed, surprisingly, it has refused to identify all staffers interviewed or to provide interview notes or FBI Form FD-302 reports ("FD-302s") for all staffers or former staffers interviewed.[2]

The government has continued to proceed brashly, despite counsel for Congressman Collins repeatedly urging caution. With the exception of a single cellphone, the Congressman, his counsel, and, to the best of counsel's knowledge, the Office of General Counsel of the House of Representatives, have never been afforded an opportunity to review, in advance, such information obtained or elicited by the government from current or former Congressional staff.

While the government may have recklessly ignored the protections of the Speech or Debate privilege during its investigation, it intentionally included allegations about the OCE proceedings in the indictment. The indictment explicitly alleges that Congressman Collins could not trade on his own behalf in part because of ongoing House activities (i.e., the Ethics inquiry), including the Congressman's interview by the OCE. The inclusion of such allegations in the

---

[2] In one instance, the government produced in discovery materials from a former member of Congressman Collin' staff. Counsel identified to the government that the documents contained information potentially protected by the attorney-client privilege. The government thereafter agreed to destroy copies of certain documents.

indictment raises serious concerns about whether constitutionally privileged information was presented to the grand jury in order to return the indictment and whether the government intends to rely on such privileged information in its case in chief at trial. After filing the charges, the government doubled down on the allegations concerning the OCE proceedings by specifically highlighting this purported cause-and-effect in a press release and press conference the day charges were announced. Given that the government's charges are predicated on the existence of a conspiracy, it appears that such ridiculous allegations are a key component of the case the government has brought: Congressman Collins could not trade himself (because of the OCE proceeding) so he allegedly conspired with and tipped his son.

Notwithstanding the request of counsel, the government has refused to provide information that would shed light on the extent to which it encountered and used legislative materials in the investigative and grand jury stages, as detailed above. Accordingly, it has been impossible to probe the nature and scope of any contamination, which prevents Congressman Collins from effectively litigating motions premised upon the violation of the Speech or Debate Clause privilege.

## III.   ARGUMENT

### A.   *The Speech or Debate Clause Protects the Legislature Against Invasion by the Executive and Shields Legislative Activities from Discovery*

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Finding roots in the English Bill of Rights of 1689, the Clause bars executive or judicial

intrusions into the legislative process and seeks to maintain the essential autonomy of Congress.[3]
*Gravel v. United States*, 408 U.S. 606, 617, 624-25 (1972) ("The Speech or Debate Clause was
designed to assure a co-equal branch of the government wide freedom of speech, debate, and
deliberation without intimidation or threats from the Executive Branch. It thus protects Members
against prosecutions that directly impinge upon or threaten the legislative process."*); accord
United States v. Brewster*, 408 U.S. 501, 524 (1972) (describing the purpose as "to preserve the
independence and thereby the integrity of the legislative process"); *Fields v. Office of Johnson*,
459 F.3d 1, 8 (D.C. Cir. 2006) (*en banc*) ("The Speech or Debate Clause reinforces the
separation of powers and protects legislative independence."). The effect, therefore, is
"reinforce[ment of] the separation of powers so deliberately established by the Founders."
*Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502 (1975).[4]

  This is a core institutional protection mandated by the Constitution for the benefit of
Congress, and not merely one provided for individual Members of Congress. *United States v.
Myers*, 635 F.2d 932, 935-36 (2d Cir. 1980) ("[T]he Speech or Debate Clause . . . serves as a
vital check upon the Executive and Judicial Branches to respect the independence of the
Legislative Branch, not merely for the benefit of Members of Congress, but, more importantly,
for the right of the people to be fully and fearlessly represented by their elected Senators and
Congressmen."). It must be read broadly to effectuate its purpose. *Johnson*, 383 U.S. at 182-3.
Where the privilege applies, the protection is "absolute," *Eastland*, 421 U.S. at 509, for that class

---

[3] More specifically, the Clause was rooted in the struggle for parliamentary independence of the sixteenth and
seventeenth centuries in England, during which "successive monarchs utilized the criminal and civil law to suppress
and intimidate critical legislators." *United States v. Johnson*, 383 U.S. 169, 178 (1966).

[4] The Framers expected that the privilege would provide "practical security" as a shield against the other branches
and thereby "protect[] against possible prosecution by an unfriendly executive and conviction by a hostile
judiciary." *See also, Johnson*, 383 U.S. at 178-79, 181 (quoting The Federalist No. 48 (James Madison)).

of "legislative acts" undertaken as part of the legislative process. *Gravel*, 408 U.S. at 615-17. In

turn, such privileged acts are defined as those which are "an integral part of the deliberative and

communicative processes by which Members participate in committee and House proceedings

with respect to the consideration and passage or rejection of proposed legislation *or with respect*

*to other matters which the Constitution places within the jurisdiction of either House.*" *Id.* at 625

(emphasis added).

In evaluating the protections arising under the Clause, "a Member and his aide are to be

'treated as one.'" *Gravel*, 408 U.S. at 616 (quoting *United States v. Doe*, 455 F.2d 753, 761 (1st

Cir. 1972)). As such, the protections arising under the Clause must apply equally, and extend to,

staff who perform legislative activities on behalf of the representative. *Id.* Anything less would

undermine the privilege:

> [I]t is literally impossible, in view of the complexities of the modern legislative
> process, with Congress almost constantly in session and matters of legislative
> concern constantly proliferating, for Members of Congress to perform their
> legislative tasks without the help of aides and assistants; . . . the day-to-day work
> of such aides is so critical to the Members' performance that they must be treated
> as the latter's alter ego; and that if they are not so recognized, the central role of the
> Speech or Debate Clause—to prevent intimidation of legislators by the Executive
> and accountability before a possibly hostile judiciary [*Johnson*, 383 U.S. at 181]—
> will inevitably be diminished and frustrated.

*Gravel*, 408 U.S. at 616-17. While the privilege does extend to staff, it necessarily flows from the

Member and remains the Member's privilege to invoke or, alternately, waive. *Id.* at 621-22 (noting

that the "privilege applicable to the aide is viewed, as it must be, as the privilege of the Senator").

    B.    *The Speech or Debate Clause Provides for Both Immunity from Suit and a Non-*
        *Disclosure Privilege*

The Clause contains both an immunity component and a non-disclosure privilege. *See*

*Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 416 (D.C. Cir. 1995). The

immunity protection shields Members of Congress from civil or criminal liability for their

legislative acts. *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973). It includes a bar prohibiting prosecutors, or civil plaintiffs, from advancing their claims against a Member or aide by "[r]evealing information as to a legislative act" even in instances were a Member is properly subject to suit. *See United States v. Helstoski*, 442 U.S. 477, 487-90 (1979); *Johnson*, 383 U.S. at 173-77; *Fields*, 459 F.3d at 14.

In addition, the non-disclosure privilege (also referred to as "testimonial") functions "as a testimonial and documentary privilege, to be asserted by members and qualified aides if they are called upon to produce evidence." *Fields*, 459 F.3d at 32 (Brown, J., concurring). This privilege exists to the same extent as the immunity against suit. *Brown & Williamson*, 62 F.3d at 417-21 ("We do not perceive a difference in the vigor with which the privilege protects against compelling a congressman's testimony as opposed to the protection it provides against suit."). *See also Howard v. Office of Chief Admin. Officer of U.S. House of Reps.*, 720 F.3d 939, 946 (D.C. Cir. 2013) ("As a general matter, the Speech or Debate Clause affords three distinct protections: (a) an immunity [from certain suits] . . . (b) an evidentiary privilege . . . and (c) a testimonial and non-disclosure privilege. . . .") (internal citations omitted).

The non-disclosure privilege follows from the Supreme Court's earliest consideration of the Speech or Debate protection wherein it held that the Clause should be read broadly, to include not only "words spoken in debate," but anything "generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). Indeed, "[d]ocumentary evidence can certainly be as revealing as oral communications" mandating that the privilege covers oral testimony and documentary material equally. *Brown & Williamson*, 62 F.3d at 420-21.

In a seminal case addressing the non-disclosure aspect of the speech or debate privilege, the D.C. Circuit in *United States v. Rayburn House Office Building* examined its contours. 497 F.3d 654 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1295 (2008). There, the Court held unequivocally that an FBI search and seizure of documents and entire computer hard drives from a Congressman's office violated the non-disclosure provision of the Speech or Debate Clause. *Id.* at 656 ("We hold that the compelled disclosure of privileged materials to the Executive . . . violated the Speech or Debate Clause . . . ."). The D.C. Circuit thoroughly examined the history and purpose of the Clause, reviewed extensive precedent, and concluded that "[t]he bar on compelled disclosure is absolute." *Id.* at 660. *But cf. United States v. Renzi*, 651 F.3d 1012, 1039 (9th Cir. 2011) (declining to adopt *Rayburn*), *cert. denied*, 565 U.S. 1157 (2012); *In re Fattah*, 802 F.3d 516, 528-29 (3d Cir. 2015) (declining to find a non-disclosure privilege under the Clause).

Although the Second Circuit has not addressed this issue, the *Rayburn* formulation has been endorsed in this District. In *Securities and Exchange Comm'n v. Committee on Ways and Means of the U.S. House of Representatives,* the Securities and Exchange Commission ("SEC") sought an order requiring a House committee and a former subcommittee director to comply with investigative subpoenas. 161 F. Supp. 3d 199, 209 (S.D.N.Y. 2015). Among other things, the Congressional parties argued that the SEC's application should be denied because the information sought was protected under the Speech or Debate Clause. *Id.* at 210. Judge Gardephe extensively examined the non-disclosure aspect of the privilege, and the relevant precedent. *Id.* at 238-240 (recognizing that "[n]either the Supreme Court nor the Second Circuit has addressed" the issue of whether "the Clause's protections include a privilege not to disclose documents"). Although recognizing a Circuit split, the court astutely concluded "[i]n this Court's view, the

10

D.C. Circuit has the better of the argument" and "*Renzi* and *In re Fattah* are not persuasive to

this Court." *Id.* at 242-43; *see also Favors v. Cuomo*, 285 F.R.D. 187, 208 (E.D.N.Y. 2012)

("[C]ourts have interpreted the Speech or Debate Clause to provide members of Congress with

absolute immunity from suit as well as from compelled discovery or testimony."); *Tohono*

*O'odham Nation v. Ducey*, No. cv-15-1135, 2016 WL 3402391, at *3 (D. Ariz. June 21, 2016)

("The Clause establishes a privilege that protects members of Congress from being compelled to

testify or produce evidence regarding their legislative activities.") (citing *Gravel* and *Rayburn*).

Further, the court explicitly rejected a "sliding scale":

> [T]he peremptory words 'shall not' suggest that the Clause does not brook
> compromise, and that the Clause does not offer less protection where the Executive
> Branch is investigating, or purports to be investigating, a legislator's allegedly
> illegal activity. . . . the Framers wisely assumed that each branch would seek to
> encroach on the authority and powers granted to the others, and intentionally
> adopted a separation of powers model—of which the Speech or Debate Clause is a
> critical component—to counteract such efforts.

*Committee on Ways and Means*, 161 F. Supp. 2d at 243. The non-disclosure aspect of the

Clause's protection is necessary to ensure proper functioning of that "essential precaution in

favor of liberty." The Federalist No. 47 (James Madison).

C.    *The Prosecution's Investigation Was Furthered, In Part, on the Basis of Protected*
      *Materials*

The government has disclosed at least two dozen warrant applications covering the search

and production of voluminous material. Included among these are warrants that the government

sought, and obtained, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████



Congressman Collins submits that it is patently improper for the government to support its application for search warrants by intrusion on protected legislative communications.

A similar flaw underlies another warrant obtained



Additional materials produced by the government indicate that iCloud materials for accounts

 Moreover, the government sought historical location information and/or pen register information for cell phones belonging to, ███████████████████████████████████

███████████

The government, further, has acknowledged that it secured interviews with, or grand jury testimony of, various members of Congressman Collins' staff. Discovery productions have included FD-302s memorializing interviews of ████████████████. Separately, the prosecution has revealed that ████████████ has been interviewed, as was ████████████ ████████████████████████, however the government has refused to provide any interview notes or FD-302s of these interviews. ████████████████████ ███████████.[5] Finally, Congressman Collins has reason to believe that other Congressional staffers were interviewed by the government, but to date the government has refused to even identify those individuals.

Notwithstanding the government's recognition that it would be seizing and searching through emails by, between, and among Congressman Collins and Congressional staffers, neither the agents' affidavits nor the search warrant applications mention a single precaution that the government intended to implement to prevent improper review of privileged communications. Indeed, nothing in the materials suggests that the prosecution team, in seeking warrants, even

---

[5] The government has represented that it provided in discovery all communications from current or former staffers that were "produced in response to compulsory process or identified as responsive to [a] search warrant." Wangsgard Decl., Ex. D at 4. Separately, the government represented that it did not obtain other materials from staffers on a voluntary basis or by consensual search.

alerted the issuing court to the potential Speech or Debate implications of those warrants or indicated to the reviewing court its plan for respecting and preserving the constitutional privilege. Nothing in the applications identified the manner in which the prosecution would segregate materials or otherwise avoid trampling the "absolute" Constitutional protection afforded by the Clause. *Eastland*, 421 U.S. at 509. Furthermore, the prosecution inexplicably elected to bypass the Office of the General Counsel of the House of Representatives, a body designed to "represent[] Members, committees, officers and employees . . . in connection with requests for information arising from or relating to performance of their official duties and responsibilities." *See* "Welcome," Office of General Counsel of the United States House of Representatives *available at* https://ogc.house.gov (last visited Jan. 24, 2019); Rules of the House of Representatives of the United States, Rule II.8(a) ("There is established an Office of General Counsel for the purpose of providing legal assistance and representation to the House."). There is likewise no indication that the prosecution sought to work through the Clerk of the House. The magnitude of these failures is inconceivable.

To the contrary, such communications involving staffers were reviewed by the FBI and are specifically identified — in detail — as the basis for the warrants and, by execution thereof, for the collection of additional privileged material. These investigative transgressions run counter to the Department of Justice's longstanding recognition that the initial determination of the Speech or Debate Clause applicability is to be made by the House or Senate itself. For instance, the Department of Justice *Criminal Resource Manual* recognizes:

> [T]he parameters of what constitutes a 'legislative act' are quite broad . . . When evidence embraced by this privilege is introduced—either in trial or in grand jury proceedings—the effect can be as troubling to the prosecution as introducing the fruits of an illegal search.

14

> In addition, both the House and the Senate consider that the Speech or Debate
> Clause gives them an institutional right to refuse requests for information that
> originate in the Executive or the Judicial Branches that concern the legislative
> process. . . . The customary practice when seeking information from the Legislative
> Branch which is it not voluntarily forthcoming from a Senator or Member is to
> route the request through the Clerk of the House or the Secretary of the Senate.

U.S. Dep't of Justice, Justice Manual, Criminal Resource Manual, § 2046 *available at*

*https://www.justice.gov/jm/criminal-resource-manual-2046-other-issues* (last visited Jan. 24,

2019) (citations omitted). For reasons unknown, the prosecution appears to have blatantly

disregarded the "customary approach" dictated by the Justice Manual for respecting the

protections of the Speech or Debate privilege.

 The government's disregard for the constitutional protections of the Speech or Debate

Clause was further compounded by the manner of its execution of these search warrants. After

receiving copies of the search warrants in the course of discovery, Congressman Collins

requested that the government provide:

> an explanation of any precautions with regard to potentially privileged documents
> taken by the government in reviewing electronic communications, devices and
> other materials obtained from, or produced by, any current or former member of
> Rep. Collins' Congressional staff, including but not limited to the use of a 'taint
> team.'



Wangsgard Decl., Ex. C. The government responded that with respect to ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ a member of the U.S. Attorney's Office who was not part

of the prosecution team conducted an initial review of the *complete materials* for privilege. *Id.*,

Ex. D at 5. For ▓▓▓▓▓▓▓▓▓▓ personal cellphones, a *paralegal* — not a lawyer —

who *is* assigned to the case conducted the initial review. *Id.* For other materials, including the

iCloud account of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓,

the *complete materials* were again reviewed by a prosecutor, just not one who is part of the

prosecution team. *Id.*

15

These half-hearted measures are wholly inadequate and stand in marked contrast to the precautions employed by the FBI during the search of Congressman Jefferson's office that formed the basis for the *Rayburn* decision. In that case, the prosecution followed "special procedures" intended to guide and confine the search process. 497 F.3d at 656. These included:

- A warrant affidavit containing detailed itemization of evidence sought;

- A description of the government's efforts to exhaust less intrusive approaches to obtain the documents;

- Utilization of a search team of FBI agents who had no role in the investigation;

- Forbidding those non-case agents from revealing non-responsive or politically sensitive information they came across during the search;

- Providing responsive documents to a "filter team" consisting of two DOJ attorneys not on the prosecution team and a non-case FBI agent to determine responsiveness and whether the privilege applied;

- Transfer of responsive, non-privileged documents to the prosecution team, with copies to be provided to counsel for Congressman Jefferson;

- Use of a log for papers potentially covered by the Clause, to be provided to counsel, and not provided to the prosecution team until ordered by the court; and

- Use of a special FBI forensics team to download all electronic files and transfer them to an FBI facility for search using court-approved search terms, with responsive data turned over to the filter team to follow similar procedures.

*See id.* at 656-57. Even so, the court in *Rayburn* found a constitutional violation, observing that "[t]he special procedures outlined in the warrant affidavit would not have avoided the violation of the Speech or Debate Clause . . . ." *Id.* at 662.

Here, no procedures were identified to the court and the supposed filter team apparently consisted of an unnamed, non-prosecution team attorney serving in the same office.[6] Even more

---

[6] The problems with filter teams were thoughtfully described in *In re Grand Jury Subpoenas*, 454 F.3d 511, 525 (6th Cir. 2006) ("[T]aint teams present inevitable, and reasonably foreseeable, risks to privilege, for they have been implicated in the past in leaks of confidential information to prosecutors."). Filter teams are also prone to error. *Id.* at

troubling, a paralegal *assigned to the case* has been tasked with other aspects of the review.[7] If the far more rigorous "special procedures" identified in *Rayburn* were constitutionally deficient, it necessarily follows that the substantially lesser precautions cannot pass muster. *Id*. Moreover, review of privileged documents by *any* executive agent, including a filter team member, represents the type of intrusion on the legislative branch that the non-disclosure prong of the Speech or Debate privilege prohibits. Simply put, even the limited record available to date demonstrates that the Constitutional protections of the Speech or Debate Clause were needlessly infringed.

D.     *The Prosecution Relied On Speech or Debate Clause Protected Activities to Bring the Charges Alleged in the Indictment*

The indictment secured by the prosecution in this case incorporates as a key allegation activities occurring in and internal to the House of Representatives, to wit:

> CHRISTOPHER COLLINS, the defendant, did not trade himself, and his Innate stock ultimately declined by millions of dollars in value when the Drug Trial results were made public on June 26, 2017. As CHRISTOPHER COLLINS well knew, however, he was virtually precluded from trading his own shares for practical and technical reasons. First, CHRISTOPHER COLLINS was already under investigation by the Office of Congressional Ethics ("OCE") in connection with his holdings in, and promotion of, Innate. Indeed, he had just been interviewed by OCE personnel on or about June 5, 2017, just 17 days earlier. . . . Accordingly, he did not trade his own stock and instead tipped CAMERON COLLINS, the defendant.

Indictment, ECF No. 2, ¶ 24. The prosecution has sought to emphasize this point, including issuing a press release echoing this language. *See* Press Release, Department of Justice, U.S. Attorney's Office Southern District of New York, Aug. 8, 2018 *available at*

---

523 (stating that "[i]t is reasonable to presume that the government's taint team might have a more restrictive view of privilege . . . .").

[7] The only appropriate precaution taken by the government in this investigation was to segregate a single cell phone seized from a staffer and allow Congressman Collins to make the privilege determination in the first instance. *See Rayburn*, 497 F.3d at 662 (criticizing procedures that call for review by the Executive "before the Congressman would be afforded an opportunity to identify potentially privileged materials.").

*https://www.justice.gov/usao-sdny/pr/congressman-christopher-collins-and-others-charged-manhattan-federal-court-insider* (last visited Jan. 24, 2018) ("For example, CHRISTOPHER COLLINS was already under investigation by the Office of Congressional Ethics ("OCE") in connection with his holdings in, and promotion of, Innate. Indeed, he had been interviewed by OCE personnel on or about June 5, 2017, just 17 days earlier. Accordingly, he did not trade his own stock and instead tipped CAMERON COLLINS."). Not satisfied with the indictment, and the press release, the government also held a press conference to much fanfare during which U.S. Attorney Geoffrey Berman asserted: "[t]he Congressman knew he couldn't sell his own shares for personal and technical reasons, including, that he was already under investigation regarding Innate by the Congressional Ethics Office [sic]." *See* Department of Justice, U.S. Attorney's Office Southern District of New York, "Congressman Christopher Collins Charged with Insider Trading & Lying to Federal Law Enforcement" *available at https://www.justice.gov/usao-sdny/video/congressman-christopher-collins-charged-insider-trading-lying-federal-law* (last visited Jan. 24, 2019). It is clear that the government has deemed this allegation sufficiently important to warrant repeated and publicized heralding.

      1.     *OCE Testimony and Proceedings Fall Squarely Under Protections of the Speech or Debate Clause*

As a corollary to the absolute immunity for certain legislative acts provided in the Speech or Debate Clause, the Constitution provides Congress with the authority to discipline its members. U.S. Const. art. I, § 5, cl. 2 (empowering "[e]ach House [to] . . . punish its Members for disorderly Behaviour. . . .") (the "Discipline Clause"). Put another way, the Constitution mandates a formula by which the Legislature is responsible for policing its own house and Executive intrusion thereupon is prohibited. This right to discipline is, by the very text of the document, one of the matters '"which the Constitution places within the jurisdiction of either

18

House.'" *United States v. Eilberg*, 465 F. Supp. 1080, 1083 (E.D. Pa. 1979) (quoting *Gravel*, 408 U.S. at 626). The disciplinary function is fundamental, internal, and institutional to the House and it is evident that "testimony before the Ethics Committee is protected by the Speech or Debate Clause." *Eilberg*, 465 F. Supp. At 1083; *see also United States v. Durenberger*, Crim. No. 3-93-65, 1993 WL 738477, at *2 (D. Minn. Dec. 3, 1993) (finding appearance and testimony before Senate Ethics Committee "to be within the sphere of protected legislative activity and, therefore, privileged."); *Ray v. Proxmire*, 581 F.2d 998, 1000 (D.C. Cir. 1978) (Senator immune from liability for allegedly libelous statement made in letter submitted to Senate Select Committee on Standards and Conduct).

Justice Kavanaugh, then on the Court of Appeals for the D.C. Circuit, explained that the intersection between the Discipline Clause and the Speech or Debate Clause squarely places Members' statements to congressional ethics committees within the ambit of the protection afforded by the Clause. *In re Grand Jury Subpoena*, 571 F.3d 1200, 1205 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("Regardless whether the Member's underlying 'disorderly Behaviour' is considered official or personal, the House or Senate's disciplinary proceedings are official 'Proceedings' of the House or Senate. And a Member's speech in such an official congressional proceeding constitutes 'Speech . . . in either House.'"). Then-Judge Kavanaugh also took issue with the result reached by a prior panel of the D.C. Circuit in *United States v. Rose*, 28 F.3d 181 (D.C. Cir. 1994). In that case, the court held that a House Ethics Committee report was not protected by the Speech or Debate Clause because Congressman Rose was a witness to facts relevant to an investigation of wholly private conduct rather than of any official acts. *Id.* at 188. As Judge Kavanaugh's concurrence explained, the *Rose* decision misconstrues the constitutional

text of the Clause, was decided wrongly, and should be overruled. *In re Grand Jury Subpoena*, 571 F.3d at 1205.

In any event, the *Rose* decision is inapplicable here because the OCE review and Congressman Collins' testimony concerned, *inter alia*, erroneous allegations that he received favorable treatment based on his status as a Member and that he took official actions to assist a private enterprise. These aspects of the investigation include inquiry into whether he violated House Rules and standards of conduct, a question fundamentally falling under the Discipline Clause. Moreover, in *Rangel v. Boehner*, D.C. District Court Judge Bates cited with approval Justice Kavanaugh's *Grand Jury Subpoena* concurrence in holding that "Discipline Clause activities are plainly within [the legislative] sphere." 20 F. Supp. 3d 148, 177 (D.D.C. 2013). *aff'd*, 785 F.3d 19 (D.C. Cir. 2015) (declining to review "a congressional disciplinary proceeding – a 'legislative' matter that the 'Constitution places with the jurisdiction of [the] House.") (citations omitted). Judge Bates fully recognized the import of Judge Kavanaugh's concurrence and repudiation of *Rose* and his opinion was thereafter affirmed by the Circuit panel.

Because the OCE testimony was privileged, the indictment, the press release, *and* the press conference, each evince an additional Constitutional violation: deliberate infusion of protected Speech or Debate by the Executive into a prosecution involving a Member of the House of Representatives.

2.    *Prior "Publication" of the Testimony Has no Part in the Calculus*

Likewise, the fact that the OCE investigation was public is of no consequence. Any suggestion to the contrary would misconstrue the purpose and effect of the Speech or Debate privilege. Publication cannot effect any sort of waiver as, indeed, the "core activity protected by the Clause . . . is a public act." *Rayburn*, 497 F.3d at 670. Much speech or debate by Members is a matter of public record, through the media (e.g., C-SPAN) or otherwise, as it must be. *See* U.S.

20

Const. art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from time to time publish the same. . . ."). Absolute protection of such highly public acts is the precise purpose of the Clause. *See, e.g., Doe*, 412 U.S. at 312 ("Doubtless, also, a published report may, without losing Speech or Debate Clause protection, be distributed to and used for legislative purposes . . . ."); *United States v. Helstoski*, 576 F.2d 511, 522 (3d Cir. 1978) (stating that to "allow proof of legislative acts" "by producing non-privileged evidence containing some reference to that act. . . . would reduce drastically the effectiveness of the Speech or Debate provision, and would discourage the dissemination to the public of information about legislative activities"); *United States v. Swindall*, 971 F.2d 1531, 1549-50. n.26 (11th Cir. 1992) (the fact that a legislative act is memorialized in a public record does not sidestep the Speech or Debate issue, and a Member's legislative acts are protected whether or not they are published).

E.   *The Constitutional Violations Give Rise to Grave Concerns*

In light of the foregoing, it appears that the government relied on Speech or Debate-protected activities in pursuing and charging this case. By definition, information included in an indictment must be only "essential facts." *See* Fed. R. Crim. P. 7(c)(1) ("The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . ."). The government's primary charge is conspiracy to commit securities fraud (Count One). *See* ECF No. 2. It would appear that the conscious decision to inject protected materials into the prosecution is for the purpose of straining to allege motive and the purpose of the conspiracy, namely, the flawed premise that because Congressman Collins could not trade himself (because of the OCE proceeding), he allegedly tipped his son. By doing so, the prosecution has improperly made privileged materials a pillar of its theory of the case. *See Helstoski*, 442 U.S. at 487-89 (rejecting outright the government's contention that references to past legislative acts was "essential to show the motive" for accepting money in a

21

bribe scheme); *Brown & Williamson*, 62 F.3d at 415, n.5 ("[M]embers of Congress are privileged against the evidentiary use against them of any legislative act, even if the act is not claimed to be illegal, but is offered only to show motive, such as behavior in furtherance of a bribe.") (citing *Helstoski*, 442 U.S. at 487-89; *Brewster*, 408 U.S. at 527; *Johnson*, 383 U.S. at 169).

Consequently, there is significant reason for pause and cause for concern about taint with respect to the investigation and grand jury proceedings. Although violations known to the Congressman Collins have been detailed, the obvious corollary question remains: just how far does it go? It is in this context that Congressman Collins seeks the requested relief.

## IV.   RELIEF REQUESTED

In short, the relief that Congressman Collins requests is an order mandating that the government produce discrete categories of information, as detailed below. Each directly implicates the Executive intrusion into legislative acts described herein, i.e., collection of materials from Congressional staff with no regard to protecting and preserving the privilege, and injection of the Congressional Ethics inquiry into the prosecution of this case. Discovery of this information, at this time, is a necessary prerequisite for the Congressman to be put into a position in which he can effectively file substantive motions to suppress and to seek and obtain further relief sufficiently in advance of trial as required by this Court.

A.   *An Order Mandating Production is Warranted by the Government's Refusal to Produce Information Necessary to Enable Congressman Collins to File Effective Motions Regarding Speech or Debate Violations*

As discussed above, counsel for Congressman Collins has been in frequent contact with the prosecution team, including with respect to the very Speech or Debate concerns detailed herein. To that end, on December 2, 2018, counsel requested the following, tailored categories of material under Fed. R. Crim. P. 12 and 16 to enable counsel to determine the extent of any

violations of the Speech or Debate Clause, and whether the investigative teams or the grand jury

were further tainted by reviewing additional protected material:

1. the entire contents of any materials or devices obtained from, or produced by, any current or former member of Rep. Collins' Congressional staff;

2. all of the emails and documents obtained as a result of the execution of search warrants for the email accounts of ███████████████ ;

3. all statements made by any current or former member of Rep. Collins' Congressional staff including, but not limited to, notes, FBI 302s, and grand jury transcripts of testimony;

4. any materials provided or shown to the grand jury related to any investigation by the U.S. House of Representatives Office of Congressional Ethics or Committee on Ethics relating to Rep. Collins;

5. transcripts of any grand jury testimony referencing or relating to any investigation by the U.S. House of Representatives Office of Congressional Ethics or Committee on Ethics relating to Rep. Collins; and

6. any communications wherein any member or former member of Rep. Collins' staff references any investigation by the U.S. House of Representatives Office of Congressional Ethics or Committee on Ethics relating to Rep. Collins.

Wangsgard Decl., Ex. C.

To date, the government has not produced any additional materials in response to defense

counsel's request. *See id*. Ex. D.[8] The government has clarified for defense counsel that it has

produced all "responsive" materials obtained by search warrant and all materials obtained by

compulsory process. *Id.* at 4. On this point, however, the government has asserted that it does not

view itself as having the right to disclose "non-responsive" materials. *Id.* at 2. This argument is

without merit for the reasons stated in the defendants' concurrently filed motion addressing

---

[8] As noted above, the government did respond to Congressman Collins' request that it identify the putative safeguards taken with regard to potentially privileged documents. Wangsgard Decl., Ex. D. at 5-6.

*Brady* and Rule 16 disclosures. For the separate reasons detailed therein, production of these full

materials is warranted.

      The government has further advised defense counsel that it is not aware of the existence

of any materials that were obtained from current or former Congressional staffers either

voluntarily or through a consensual search. However, in response to counsel's other requests, the

government has taken the position that the defendant is "simply not entitled to [certain]

materials" at this time or the government "sees no reason to provide those at this point, or for

others, at all." *Id.* Because the parties have reached an impasse, Congressman Collins now

requests that the Court order identification and production of the following materials:

1. The complete contents of all email accounts, iCloud accounts, social media accounts and electronic devices seized from ███████████████████████████████████ ███████████████████████████████████████████; [9]

2. All statements made by any current or former member of Rep. Collins' Congressional staff including, but not limited to, notes, FBI 302s, and grand jury transcripts of testimony; and

3. Transcripts of any grand jury testimony, and any materials provided or shown to the grand jury, that references or relates to any investigation by the U.S. House of Representatives Office of Congressional Ethics or Committee on Ethics relating to Congressman Collins.

      As the Court seemed to observe at the December 18, 2018 status conference, this appears

to be a logical first step to the Congressman seeking additional relief and tailoring future request

appropriately. Tr. 24:12-17, Dec. 18, 2018 ("So you can actually see the statements and the

---

[9] The government has noted that to the extent Congressman Collins seeks "non-responsive material contained within ███████████████ you are of course welcome" to seek "consent to the Government's disclosure to you of the otherwise non-responsive contents of their respective accounts." Wangsgard Decl., Ex. D at 3. ███████████ provided just such consent to counsel, which has been conveyed to the government. On the afternoon of February 8, 2019, the government agreed to produce contents of an iCloud and an email account██████████ █████ if Congressman Collins agrees to only use it for the purpose of review for any Speech or Debate privileged materials. Once those materials are produced, Congressman Collins acknowledges that the relief he requests should be modified accordingly.

parties can give their relative position about if there are any statements whether or not they fit within the rubric of speech or debate and the like. That, I think, makes sense, so we can deal with the discovery issue first."). Congressman Collins respectfully submits that for all the reasons set forth above, the evidence already indicates that the government's investigation and prosecution have violated Congressman Collins' privileges under the Speech or Debate Clause. However, this additional discovery is necessary for the Congressman to assess the complete scope and severity of the government's violations and the extent to which those violations have tainted the evidence or indictment in this case.

The Federal Rules provide that a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Further, motions that *must* be made before trial include those defenses, objections, and requests premised on a defect in instituting the prosecution, including an error in the grand-jury proceeding, *id.* at (b)(3)(A)(v), suppression of evidence, *id.* at (b)(3)(C), and discovery under Rule 16. *Id.* at (b)(3)(E).

In turn, Rule 16 provides, *inter alia*, that "[u]pon a defendant's request, the government must permit the defendant to inspect . . . item[s] material to preparing the defense." *Id.* at (a)(1)(E). The district court has broad discretion "to make any discovery order that is not barred by higher authority." *United States v. Campagnuolo*, 592 F.2d 852, 857 n.2 (5th Cir. 1979); *see also United States v. Valona*, 834 F.2d 1334, 1340 (7th Cir. 1987) (District courts have wide discretion to determine the manner and course of discovery for a criminal case).

Without the disclosure of the materials requested by Congressman Collins, the defendant and the Court will be left partially in the dark on the adjudication of motions involving a Constitutional privilege. Any motion to suppress or dismiss under Rule 12 that Congressman

Collins might file would necessarily be fragmentary and incomplete because the government would be effectively and unnecessarily hiding the ball on the full extent of facts relevant to such motions. Thus, there undeniably would be a heightened risk that the Court would be deciding a critical motion involving a Constitutional privilege on an inadequate and incomplete record which might affect the Court's ability to grant effective relief. There is no good reason whatsoever to handicap the defendant and Court in this fashion. Moreover, it would be inefficient for the parties and the Court to engage in a protracted, multi-round series of motions addressing the same issue in piecemeal fashion. *See, e.g., United States v. Bradshaw*, No. cr. 108-107, 2008 WL 4724691, at *1 (S.D. Ga. Oct. 24, 2008) (contemplating that the purpose of early disclosure of materials "subject to suppression" is to allow for efficient administration of the case and avoid delay). Congressman Collins cannot realistically seek remediation without having sufficient information (uniquely in the possession of the government) necessary to determine precisely what information may have been collected, or used, in violation of the Constitution. *Cf. United States v. Stewart*, 590 F.3d 93, 129 (2d Cir. 2009) (discussing that in the Foreign Intelligence Surveillance Act context, the statute contemplates disclosure of materials "necessary to make an accurate determination of the legality of the surveillance"). *See also United States v. Green*, 144 F.R.D. 631, 641 (W.D.N.Y. 1992) ("Defense counsel have indicated that they intend to file a motion to suppress the intercepted conversations and therefore this information would appear to be necessary to determine the suppression motion.").

Disclosure is also appropriate as the nature and scope of any violations will impact the relief the Court deems adequate to give force to the purposes underlying the Clause. *See, e.g., Helstoski*, 635 F.2d at 204 (accepting that it could be necessary to forego a prosecution entirely to redress an incursion on the integrity of the Legislature); *United States v. Rostenkowski*, 59

26

F.3d 1291, 1298-99 (D.C. Cir. 1995) (agreeing that presentation of Speech or Debate material to a grand jury could require dismissal of indictment); *Rayburn*, 497 F.3d at 663-66 (finding the Congressman entitled to return of privileged legislative materials).

Finally, the specific contours of the violations will impact those motions that Congressman Collins must make before trial and will be material to the preparation of the defense. *See, e.g., United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) ("Evidence that the government does not intend to use in its case in chief is material if it could be used to counter the government's case or to bolster a defense . . . ."). Disclosure of the requested materials, at this time, is essential to protect the constitutional mandates of the Speech or Debate Clause and "provide for the just determination of [this] criminal proceeding, [] secure simplicity in procedure and fairness in administration, and [] eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2.

## V.   **CONCLUSION**

Congressman Collins respectfully requests that the Court order the government to produce additional material, as detailed herein, for all of the foregoing reasons. This initial remedy is necessary in order to effectuate the purpose and spirit of the Speech or Debate Clause. Anything less would undermine a Constitutional mandate, diminish a core protection afforded the Legislature as an institution, violation the separation of powers, and burden efficient adjudication of this case. The motion should be granted.

Respectfully submitted,

New York, New York
February 8, 2019

BAKER HOSTETLER LLP
By: */s/ Jonathan B. New*
Jonathan B. New
45 Rockefeller Plaza, 14th Floor

New York, NY 10111
T: 212.589.4200
F: 212.589.4201
jnew@bakerlaw.com

Jonathan R. Barr (*pro hac vice*)
Kendall E. Wangsgard
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
T: 202.861.1500
F: 202.861.1783
jbarr@bakerlaw.com
kwangsgard@bakerlaw.com

*Counsel for Christopher Collins*