ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

CHRISTOPHER COLLINS,
CAMERON COLLINS, and
STEPHEN ZARSKY,

        Defendants.

- - - - - - - - - - - - - - - - - - x

**SUPERSEDING INDICTMENT**

S1 18 Cr. 567 (VSB)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8|6|19

**COUNT ONE**
(Conspiracy to Commit Securities Fraud)

    The Grand Jury charges:

**Relevant Entities and Individuals**

    1.    At all times relevant to this Indictment, Innate
Immunotherapeutics Limited ("Innate") was a biotechnology
company with its headquarters in Sydney, Australia and offices
in Auckland, New Zealand.  Innate's stock traded on the
Australian Securities Exchange ("ASX") under the ticker "IIL,"
and on the United States over-the-counter ("OTC") market under
the ticker "INNMF."

    2.    Innate's primary business was the research and
development of a drug called MIS416, which was intended to treat
Secondary Progressive Multiple Sclerosis ("SPMS").  In or about
June 2017, Innate completed MIS416's Phase 2B drug trial (the

"Drug Trial"), which was meant to determine the drug's clinical efficacy in treating SPMS.  Because there were few or no alternative treatments for SPMS, MIS416 had the potential to be enormously profitable if the Drug Trial was successful.  MIS416, however, failed the Drug Trial.  The public announcement of these results caused the stock price of Innate to drop by 92%.

3.    At all times relevant to this Indictment, CHRISTOPHER COLLINS, the defendant, was a Congressman representing the 27th District of New York.  CHRISTOPHER COLLINS was also a member of Innate's Board of Directors and was one of Innate's largest shareholders, holding approximately 16.8% of its stock.  In his capacity as a member of Innate's Board of Directors, Collins regularly had access to material, nonpublic information, including about MIS416 and the Drug Trial.

4.    CAMERON COLLINS, the defendant, was the son of CHRISTOPHER COLLINS, the defendant.  At all times relevant to this Indictment, CAMERON COLLINS was in a relationship with (and subsequently became engaged to be married to) a co-conspirator not named as a defendant herein ("Individual-1").  At times relevant to this Indictment, and as CHRISTOPHER COLLINS well knew, CAMERON COLLINS was also a significant shareholder in Innate, owning approximately 2.3% of its shares.

5.    At all times relevant to this Indictment, STEPHEN ZARSKY, the defendant, was the father of Individual-1.  He was

2

also married to another co-conspirator not named as a defendant herein ("Individual-2") and was the brother of two individuals ("Individual-3" and "Individual-4"). In addition, ZARSKY was longstanding friends with a Florida-based financial advisor ("Individual-5").

6. At all times relevant to this Indictment, CAMERON COLLINS, the defendant, and Individual-1 were friends with another individual ("Individual-6").

7. At times relevant to this Indictment, STEPHEN ZARSKY, the defendant, Individual-1, Individual-2, Individual-3, Individual-4, Individual-5, and Individual-6 all owned Innate stock. ZARSKY, Individual-1, Individual-2, and Individual-6 each purchased Innate stock based in part on the recommendation of CAMERON COLLINS, the defendant. Individual-3, Individual-4, and Individual-5 purchased Innate stock based in part on the recommendation of ZARSKY.

## The Confidentiality Policy and Prohibition on Insider Trading

8. At all times relevant to this Indictment, Innate maintained a corporate policy entitled, "Securities Trading Policy." This policy provided, in part, that

If a Designated Person possesses "inside information" in relation to a company, the person must not:

(i) Deal in any securities of such company in any way; nor

3

(ii) Directly or indirectly communicate the information, or cause the information to be communicated, to another person if the person knows, or ought reasonable to know, that the other person would, or would be likely to, deal in any securities of such company in any way or procure a third person to deal in any securities of such company in any way.

The Securities Trading Policy further defined the term "Designated Person" to include "all directors, executives, employees, contractors, consultants and advisors of the Company and its subsidiaries." The term "inside information" was defined to include, in part, information that was "not generally available" and that "a reasonable person would expect [] to have a material effect on the price or value" of Innate's stock.

9.    At all times relevant to this Indictment, CHRISTOPHER COLLINS, the defendant, was subject to the terms of Innate's Securities Trading Policy by virtue of his position as a member of Innate's Board of Directors.

## Overview of the Insider Trading Scheme

10.   In or about June 2017, CHRISTOPHER COLLINS, the defendant, violated the duties he owed to Innate by passing material, nonpublic information regarding the Drug Trial results to his son, CAMERON COLLINS, the defendant, so that CAMERON COLLINS could use that information to make timely trades in Innate stock and to tip others. CAMERON COLLINS traded on the inside information and passed it to STEPHEN ZARSKY, the defendant, as well as to Individual-1, Individual-2, and

4

Individual-6, so that they could utilize the information for the same purpose. ZARSKY, in turn, traded on the information and used it to tip Individual-3, Individual-4, and Individual-5, so that they too could engage in timely trades in Innate stock. All of these trades preceded the public release of the negative Drug Trial results, and were timed to avoid losses that they would have suffered once that news became public.

11.   In total, these trades allowed CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, and Individual-1 through Individual-6, to avoid over $768,000 in losses that they would have otherwise incurred if they had sold their stock in Innate after the Drug Trial results became public.

## The Drug Trial Results

12.   In or about October 2014, Innate initiated a Phase 2B clinical trial of its primary drug, MIS416.  The Drug Trial was "blinded," meaning that neither the administrators of the Drug Trial nor Innate's leadership would know or be able to determine the results of the Drug Trial until it was completed, after which point data collected during the course of the Drug Trial would be unblinded and analyzed.  Successful completion of the Drug Trial was a necessary prerequisite to the commercialization of MIS416.  Because Innate had no other significant products in development, its stock price was tied to the success of MIS416.

5

13. The Drug Trial was widely expected to be completed around the Summer of 2017. On or about April 20, 2017, for example, Innate issued a press release stating that "[a] final report on the outcomes of the [Drug Trial] should be available in late August or during September" of that year, but that "[i]nitial 'topline' data may become available prior to the release of this report and if so, will be released to the market at that time." Further, on or about June 9, 2017, Innate's Chief Executive Officer ("CEO") sent various individuals, including CHRISTOPHER COLLINS, the defendant, an email stating that "the delivery date for [the] review and 'verdict'" of the Drug Trial "will [] occur at COB on US Thursday June 22nd."

14. As the summer progressed, individuals within Innate remained optimistic that the Drug Trial results would be positive. As late as June 21, 2017, for example, Innate announced in a press release that it had received clearance from the U.S. Food and Drug Administration to open an Investigational New Drug ("IND") application (the "FDA Announcement"). The IND process is an early step in securing approval for a drug in the United States, and is intended to help ensure that subsequent trials will be designed in a manner to pass FDA scrutiny. Innate's press release described this approval as "a further important milestone in the ongoing clinical development of the Company's lead drug candidate MIS416."

6

15. The initial Drug Trial results were made available by trial administrators to Innate's CEO on June 22, 2017. These results established that MIS416 lacked therapeutic value in the treatment of SPMS. The results were not publicly released at that time.

16. On the night of June 22, 2017, which was the morning of June 23, 2017 in Australia, Innate issued a press release stating, in substance and in part, that Innate had requested that the ASX halt trading in Innate's stock on the ASX "as [Innate] has received results from its Phase 2B trial of MIS416 in patients with secondary progressive multiple sclerosis." The press release further stated that Innate expected the halt to end on June 27, 2017, at which point Innate would announce "the results of the trial."

17. The ASX issued a trading halt in Innate stock that same day. That halt, however, affected only the Australian market for Innate stock, not the U.S. OTC market. The trading halt also did not signal the direction of the MIS416 trial results. To the contrary, the ASX routinely halts trading at a company's request in situations in which the company has become aware of material information, either positive or negative, but is not yet ready to announce that information to the public.

18. On the night of Monday, June 26, 2017, after the U.S. markets had closed, Innate issued a press release publicly

stating, in substance and in part, that MIS416 had failed its Drug Trial (the "Public Announcement"). As explained in the press release, MIS416 "did not show clinically meaningful or statistically significant differences in measures of neuromuscular function or patient reported outcomes."

19. Innate's stock price crashed in response to the Public Announcement. On the previous trading day, Monday, June 26, 2017, Innate's stock had closed at approximately $0.455 per share on U.S. OTC market. On or about Tuesday, June 27, 2017, after the Public Announcement, Innate's stock closed at approximately $0.0351 per share, a drop of over 92% in value.

## Dissemination of the Drug Trial Results

20. On or about June 22, 2017 at approximately 6:55 PM, Innate's CEO sent an email describing the Drug Trial results to the company's Board of Directors, including CHRISTOPHER COLLINS, the defendant. The email explained to Innate's Board of Directors for the first time that the Drug Trial had been a failure. The email began, in part, "I have bad news to report," and continued to explain that "the top line analysis of the 'intent to treat' patient population (ie every subject who was successfully enrolled in the study) would pretty clearly indicate[s] 'clinical failure.'" The email continued, "Top-line 12-month data . . . show no clinically meaningful or statistically significant differences in [outcomes] between

8

MIS416 and placebo," and concluded by stating, "No doubt we will
want to consider this extremely bad news . . . ."

21.   At the time CHRISTOPHER COLLINS, the defendant,
received this email, he was attending the Congressional Picnic
at the White House.  At 7:10 PM, CHRISTOPHER COLLINS replied to
the email, stating, in part, "Wow.  Makes no sense.  How are
these results even possible???"

22.   After responding to the Innate CEO's email at
approximately 7:10 PM, the following telephone calls occurred at
the following approximate times between CHRISTOPHER COLLINS and
CAMERON COLLINS, the defendants:

| TIME (Approx.) | FROM | TO | DURATION (Approx.) |
|---|---|---|---|
| 7:11:00 PM | Christopher Collins | Cameron Collins | 0:00 |
| 7:11:23 PM | Christopher Collins | Cameron Collins | 0:05 |
| 7:14:16 PM | Cameron Collins | Christopher Collins | 0:05 |
| 7:14:51 PM | Cameron Collins | Christopher Collins | 0:05 |
| 7:15:27 PM | Cameron Collins | Christopher Collins | 0:05 |
| 7:15:50 PM | Christopher Collins | Cameron Collins | 0:07 |
| 7:16:19 PM | Christopher Collins | Cameron Collins | 6:08 |

23.   The first six calls were "missed," meaning that the
recipient of the call did not answer.  During the 6:08 minute
call at 7:16:19 PM, however, CHRISTOPHER COLLINS, the defendant,
spoke to CAMERON COLLINS, the defendant, and told him, in sum
and substance, that MIS416 had failed the Drug Trial.

CHRISTOPHER COLLINS conveyed this material, nonpublic
information to CAMERON COLLINS knowing that it was in breach of
his duties to Innate and anticipating that CAMERON COLLINS would
use it to trade and tip others.

24. CHRISTOPHER COLLINS, the defendant, did not trade
himself, and his Innate stock ultimately declined by millions of
dollars in value when the Drug Trial results were made public on
June 26, 2017. As CHRISTOPHER COLLINS well knew, however, he
was virtually precluded from trading his own shares. CHRISTOPHER
COLLINS' Innate shares were held in Australia and thus subject
to the Australian trading halt. Unlike his son's shares,
CHRISTOPHER COLLINS' shares were not held at a U.S. broker where
they could be traded in the domestic OTC market. Accordingly,
he did not trade his own stock and instead tipped CAMERON
COLLINS, the defendant.

## Trading by CAMERON COLLINS

25. The U.S. OTC market was closed when CAMERON COLLINS,
the defendant, learned the negative Drug Trial results from
CHRISTOPHER COLLINS, the defendant, on or about the night of
June 22, 2017. The following morning, at approximately 7:42 AM,
CAMERON COLLINS placed an online order with his brokerage firm
to sell approximately 16,508 shares of Innate on the U.S. OTC
market. This order was executed at approximately 9:30 AM, when
the U.S. OTC market opened.

26.   Later that day, CAMERON COLLINS, the defendant, placed approximately 17 additional orders to sell Innate stock.  On or about June 26, 2017, the following Monday, CAMERON COLLINS placed approximately 36 additional orders to sell Innate stock. Many of the orders that CAMERON COLLINS placed on June 23, 2017, and June 26, 2017, moreover, occurred after additional discussion with CHRISTOPHER COLLINS, the defendant.  For example, on Friday, June 23, 2017, at approximately 3:12 PM, CAMERON COLLINS placed a 5:05 minute call to CHRISTOPHER COLLINS.  While the two were still on the phone, CAMERON COLLINS placed an online order with his broker to sell approximately 50,000 shares of Innate.

27.   In total, CAMERON COLLINS, the defendant, sold approximately 1,391,500 shares of Innate stock between the morning of June 23, 2017, and the close of the market on June 26, 2017, when Innate publicly released the Drug Trial results. These sales allowed CAMERON COLLINS to avoid approximately $570,900 in losses.

## Trading by Direct Tippees of CAMERON COLLINS

28.   After learning the results from CHRISTOPHER COLLINS, the defendant, on or about the night of June 22, 2017, CAMERON COLLINS, the defendant, provided the Drug Trial results to at least the following three sets of individuals so that they could trade in advance of the Public Announcement:  (1) his fiancée,

Individual-1; (2) STEPHEN ZARSKY, the defendant, and ZARSKY's wife, Individual-2; and (3) his friend, Individual-6. These individuals are discussed below.

## Sales by Individual-1

29. On or about June 19, 2017 and June 20, 2017, Individual-1 purchased approximately 40,464 shares of Innate stock. These purchases preceded the seemingly positive FDA Announcement by just days and were the first purchases of Innate stock in Individual-1's brokerage account. Nonetheless, on or about 9:37 AM on June 23, 2017, shortly after the U.S. OTC market opened, Individual-1 caused an order to be placed with Individual-1's brokerage firm to sell all of Individual-1's approximately 40,464 Innate shares. These sales allowed Individual-1 to avoid losses of approximately $19,440.

## Sales by STEPHEN ZARSKY and Individual-2

30. On or about the night of June 22, 2017, after CAMERON COLLINS, the defendant, received the negative Drug Trial results from CHRISTOPHER COLLINS, the defendant, CAMERON COLLINS and Individual-1 drove to the home of STEPHEN ZARSKY, the defendant, and Individual-2 (the "Zarsky Residence"). CAMERON COLLINS and Individual-1 arrived at the Zarsky Residence at approximately 9:17 PM, when Individual-1 sent a text message to Individual-2 stating, in part, "We're here." Once at the Zarsky Residence, CAMERON COLLINS told ZARSKY and Individual-2 the following, in

12

substance and in part:  that MIS416 had failed the Drug Trial;
that he intended to sell his own Innate shares; and that he
would allow ZARSKY and Individual-2 to sell their Innate shares
first so as to avoid depressing Innate's stock price with his
own sales beforehand.

31.  At approximately 9:34 PM on the night of June 22,
2017, while CAMERON COLLINS, the defendant, and Individual-1
were still at the Zarsky Residence, Individual-2 called her
brokerage firm and asked, in substance and in part, to sell all
of her Innate shares.  A representative from the brokerage firm
then walked Individual-2 through the process of placing an order
to sell her Innate stock online.  Individual-2 subsequently
entered an order online to sell her shares.  As a result of this
order, approximately 30,250 of Individual-2's total holdings of
50,000 shares of Innate stock were sold on the ASX before
trading of Innate was halted on the ASX later that night.
Individual-2 sold the remainder of her shares on the U.S. OTC
market the following morning, avoiding a total of approximately
$22,600 in losses.

32.  At approximately 7:52 AM on the morning of June 23,
2017, STEPHEN ZARSKY, the defendant, placed an online order with
his brokerage firm to sell all 303,005 of his Innate shares at a
limit price of $0.41 per share, well below the prior day's
closing price of approximately $0.52 per share.  This order was

executed when the U.S. OTC market opened at approximately 9:30 AM, and the order was filled at $0.51 per share, allowing ZARSKY to avoid approximately $143,900 in losses.

## Sales by Individual-6

33. On or about 9:01 AM on June 26, 2017, CAMERON COLLINS, the defendant, placed a call to Individual-6, which Individual-6 did not answer. Individual-6 then sent CAMERON COLLINS a text message at 9:02 AM stating, "Sorry, on a conference call right now. Doing a little phone tag – what's going on?" CAMERON COLLINS responded, "Give me a call when you get a free minute." At approximately 9:14 AM, Individual-6 called CAMERON COLLINS, and the two had a 51 second conversation. During this conversation, CAMERON COLLINS told Individual-6, in substance and in part, that MIS416 had failed the Drug Trial, and that Individual-6 should consider selling Individual-6's Innate shares (which Individual-6 had purchased at an earlier date based in part on CAMERON COLLINS's recommendation).

34. Individual-6 subsequently sold all of his Innate shares prior to the Public Announcement, thereby avoiding approximately $680 in losses.

14

## Trading by Direct Tippees of STEPHEN ZARSKY

35.   On or about the morning of June 23, 2017, STEPHEN ZARSKY, the defendant, provided the negative Drug Trial results that he had learned from CAMERON COLLINS, the defendant, and Individual-1 to at least the following individuals, among others, or otherwise caused them to trade or attempt to trade in advance of the Public Announcement: (1) his brother, Individual-3; (2) his sister, Individual-4; and (3) his longstanding friend, Individual-5. These individuals are discussed below.

### Trading by Individual-3

36.   At approximately 9:36 AM on June 23, 2017, minutes after he had finished selling his own shares, STEPHEN ZARSKY, the defendant, called Individual-3.  Individual-3 did not answer but returned ZARSKY's call at approximately 9:40 AM.  During this call, ZARSKY told Individual-3, in substance and in part, to sell Individual-3's Innate shares.

37.   Correctly concluding that STEPHEN ZARSKY, the defendant, had inside information that he had received from the Collins family, Individual-3 did not ask questions.  At approximately 9:43 AM on June 23, 2017--roughly one minute after Individual-3's call with ZARSKY--Individual-3 sold all of his Innate shares, avoiding losses of approximately $4,200.

\

## Attempted Trading by Individual-4

38.  At approximately 7:37 AM and 7:44 AM on the morning of June 23, 2017, STEPHEN ZARSKY, the defendant, sent text messages to Individual-4 stating, in part "Call me asap!" and "Call me immediately."  ZARSKY and Individual-4 subsequently spoke by telephone at approximately 9:47 AM.  During this and later calls, ZARSKY told Individual-4, in substance and in part, that Individual-4 needed to sell her Innate shares and not to ask why.  Individual-4 attempted to sell her Innate shares after receiving ZARSKY's call, but Individual-4's broker was unable to execute Individual-4's order.

39.  STEPHEN ZARSKY, the defendant, and Individual-1 subsequently expressed confusion as to why Individual-4 had not traded.  For example, the following text-message exchange occurred on or about June 27, 2017:

> ZARSKY:        [Individual-4 and Individual-4's
>                spouse] didn't get out but they are not
>                complaining
>
> Individual-1:  Strange that they didn't
>
> Individual-1:  Such is life
>
> ZARSKY:        Told them when I told [Individual-3]
>
> Individual-1:  Yep
>
> ZARSKY;        [Individual-3] got out
>
> Individual-1:  That's that . . . .
>
> ZARSKY:        Yes

16

ZARSKY, moreover, had a similar text-message exchange with
Individual-3 on or about the same date:

> ZARSKY:     [Individual-4 and Individual-4's
>             spouse] never got out even though I
>             told them both right after I spoke with
>             you . . . .
>
> Individual-3:   They have a broker they couldn't
>             do it right away it was Friday and they
>             couldn't get the guy to do it
>
> ZARSKY:     [Individual-4] doesn't want to talk
>             about it or hear any numbers again
>
> Individual-3:   I was able to enter the trade
>             myself right away

### Trading by Individual-5

40.  At approximately 10:01 AM on June 23, 2017--
approximately 30 minutes after his own sell order had been
executed--STEPHEN ZARSKY, the defendant, called and spoke with
Individual-5.  During this call, ZARSKY told Individual-5, in
substance and in part, that CAMERON COLLINS, the defendant, had
told ZARSKY that MIS416 had failed the Drug Trial.  Minutes
later, Individual-5 sold all of his shares of Innate, avoiding
losses of approximately $6,700.

41.  STEPHEN ZARSKY also told Individual-5, in substance
and in part, that CAMERON COLLINS intended to purchase a house
so that CAMERON COLLINS would have an ostensible excuse for the
timing of his own trades in Innate if he were ever asked about
them.

17

## Statutory Allegations

42. In or about June 2017, in the Southern District of New York and elsewhere, CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

43. It was a part and object of the conspiracy that CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon persons,
in violation of Title 15, United States Code, Sections 78j(b)
and 78ff.

## Overt Acts

44.  In furtherance of the conspiracy and to effect its
illegal object, CHRISTOPHER COLLINS, CAMERON COLLINS, and
STEPHEN ZARSKY, the defendants, and others known and unknown,
committed the following overt acts, among others, in the
Southern District of New York and elsewhere:

a.  On or about June 22, 2017, CHRISTOPHER COLLINS
told CAMERON COLLINS, in substance and in part, that MIS416 had
failed its Drug Trial so that CAMERON COLLINS could sell his
Innate shares before the Public Announcement and tip others.

b.  On or about June 22, 2017, CAMERON COLLINS told
Individual-1, in substance and in part, that MIS416 had failed
the Drug Trial so that Individual-1 could sell Individual-1's
shares before the Public Announcement.

c.  On or about June 23, 2017 and June 26, 2017,
CAMERON COLLINS sold approximately 1,391,500 shares of Innate
stock based in part on material, nonpublic information he had
received from CHRISTOPHER COLLINS.

d.  On or about June 23, 2017, STEPHEN ZARSKY sold
approximately 303,500 shares of Innate stock based in part on

19

material, nonpublic information he had received from CAMERON
COLLINS.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH EIGHT
(Securities Fraud)

45.   The allegations contained in paragraphs 1 through 40 and
44  of  this  Indictment  are  hereby  repeated,  realleged,  and
incorporated by reference, as if fully set forth herein.

46.   On or about the dates set forth below, in the Southern
District of New York and elsewhere, CHRISTOPHER COLLINS, CAMERON
COLLINS, and STEPHEN ZARSKY, the defendants, willfully and
knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce, and of the mails, and
the facilities of national securities exchanges, used and
employed manipulative and deceptive devices and contrivances in
connection with the purchase and sale of securities, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by: (a) employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material fact and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices, and courses of business which operated and would
operate as a fraud and deceit upon persons, to wit, CHRISTOPHER

20

COLLINS provided material, nonpublic information to CAMERON

COLLINS in violation of his duties of trust and confidence, and

CAMERON COLLINS and ZARSKY used material, nonpublic information

aware of this breach of duty to execute and cause others to

execute the securities transactions listed below on or about the

dates listed below:

| Count | Defendants | Order Dates | Transaction |
|-------|-----------|-------------|-------------|
| 2 | CHRISTOPHER COLLINS; CAMERON COLLINS | June 23-26, 2017 | Sale of 1,391,500 shares of Innate held by Cameron Collins |
| 3 | CHRISTOPHER COLLINS; CAMERON COLLINS; STEPHEN ZARSKY | June 23, 2017 | Sale of 303,500 shares of Innate held by Stephen Zarsky |
| 4 | CHRISTOPHER COLLINS; CAMERON COLLINS | June 23, 2017 | Sale of 40,464 shares of Innate held by Individual-1 |
| 5 | CHRISTOPHER COLLINS; CAMERON COLLINS; STEPHEN ZARSKY | June 22-23, 2017 | Sale of 19,750 shares of Innate held by Individual-2 |
| 6 | STEPHEN ZARSKY | June 23, 2017 | Sale of 4,500 shares of Innate held by Individual-3 |
| 7 | STEPHEN ZARSKY | June 23, 2017 | Sale of 14,800 shares of Innate held by Individual-5 |
| 8 | CAMERON COLLINS | June 25-26, 2017 | Sale of 1,600 shares of Innate held by Individual-6 |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT NINE
(Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

47. The allegations contained in paragraphs 1 through 40 and 44 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

48. In or about June 2017, in the Southern District of New York and elsewhere, CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

49. It was a part and an object of the conspiracy that CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TEN
(Wire Fraud)

The Grand Jury further charges:

50. The allegations contained in paragraphs 1 through 40 and 44 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

51. In or about June 2017, in the Southern District of New York and elsewhere, CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CHRISTOPHER COLLINS, CAMERON COLLINS, ZARSKY and others schemed to defraud Innate of confidential information regarding the Drug Trial results for the purpose of executing securities transactions in Innate stock.

(Title 18, United States Code, Sections 1343 and 2.)

ᴖ

23

## COUNT ELEVEN
(False Statements - Christopher Collins)

The Grand Jury further charges:

52.  The allegations contained in paragraphs 1 through 40 and 44 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein.

53.  On or about April 25, 2018, CHRISTOPHER COLLINS, the defendant, was interviewed by a Special Agent from the Federal Bureau of Investigation.  During this interview, CHRISTOPHER COLLINS stated, in substance and in part, that he did not tell CAMERON COLLINS, the defendant, the Drug Trial results before the Public Announcement.

54.  The statement referenced in paragraph 53 was false, as CHRISTOPHER COLLINS, the defendant, well knew.

### Statutory Allegation

55.  On or about April 25, 2018, in the Southern District of New York and elsewhere, CHRISTOPHER COLLINS, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, CHRISTOPHER COLLINS made the above materially false statement during a meeting with a Special Agent from the Federal Bureau of Investigation.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT TWELVE
### (False Statements – Cameron Collins)

The Grand Jury further charges:

56.   The allegations contained in paragraphs 1 through 40 and 44 of this Indictment are hereby repeated, realleged, and incorporated by reference, as if fully set forth herein..

57.   On or about April 25, 2018, CAMERON COLLINS, the defendant, was interviewed by a Special Agent from the Federal Bureau of Investigation.  During this interview, CAMERON COLLINS stated, in substance and in part:

a.   That he had no discussions with CHRISTOPHER COLLINS, the defendant, about the Drug Trial results until after CAMERON COLLINS sold his shares; and

b.   That he was not sure if STEPHEN ZARSKY, the defendant, or Individual-2 had bought Innate shares, but thought they might have.

58.   The statements referenced above in paragraph 57 were false, as CAMERON COLLINS, the defendant, well knew.

### Statutory Allegation

59.   On or about April 25, 2018, in the Southern District of New York and elsewhere, CAMERON COLLINS, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of

25

the United States, to wit, CAMERON COLLINS made the above
materially false statements during a meeting with a Special
Agent from the Federal Bureau of Investigation.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT THIRTEEN
(False Statements – Stephen Zarsky)

The Grand Jury further charges:

60.    The allegations contained in paragraphs 1 through 40 and
44 of this Indictment are hereby repeated, realleged, and
incorporated by reference, as if fully set forth herein.

61.    On or about April 25, 2018, STEPHEN ZARSKY, the
defendant, was interviewed by a Special Agent from the Federal
Bureau of Investigation.  During this interview, ZARSKY stated,
in substance and in part:

a.    That ZARSKY sold his Innate stock solely because
of his concern that Innate was too risky of an investment;

b.    That ZARSKY's investment in Innate had been
recommended to him by a friend from Connecticut;

c.    That ZARSKY did not know whether CAMERON COLLINS,
the defendant, or Individual-1 sold any shares of Innate; and

d.    That ZARSKY did not know the Drug Trial results
before he sold his Innate shares, and did not discuss the Drug
Trial results with CAMERON COLLINS or Individual-1 when they
visited him on or about June 22, 2017.

26

62.  The statements referenced above in paragraph 61 were false, as STEPHEN ZARSKY, the defendant, well knew.

## Statutory Allegation

63.  On or about April 25, 2018, in the Southern District of New York and elsewhere, STEPHEN ZARSKY, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, ZARSKY made the materially false statements above during a meeting with a Special Agent from the Federal Bureau of Investigation.

(Title 18, United States Code, Sections 1001 and 2.)

## FORFEITURE ALLEGATION

64.  As a result of committing one or more of the offenses alleged in Counts One through Ten of this Indictment, CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

27

## Substitute Assets Provision

65.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third party;

   c.    has been placed beyond the jurisdiction of the court;

   d.    has been substantially diminished in value; or

   e.    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c) to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.)


_Angella Bruce_
FOREPERSON

_Geoffrey S. Berman_
GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**CHRISTOPHER COLLINS,**
**CAMERON COLLINS, and**
**STEPHEN ZARSKY,**

**Defendants.**

### SUPERSEDING INDICTMENT

S1 18 Cr.328 (VSB)

(Title 15, United States Code,
Sections 78j(b) & 78ff; Title 17,
Code of Federal Regulations, Section
240.10b-5; and Title 18, United States
Code, Sections 371, 1001, 1343, 1349, &
2.)

GEOFFREY S. BERMAN
_____
United States Attorney.

A TRUE BILL

_Angella Bucco_
_____
Foreperson.

Aug 6, 2019
Filed First Superseding Indictment.
U.S.M.J, Debra Freeman