**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      -against-

CHRISTOPHER COLLINS,
CAMERON COLLINS, and
STEPHEN ZARSKY,

               Defendants.

18 Cr. 567 (VSB)

## SENTENCING MEMORANDUM ON BEHALF OF
## CHRISTOPHER COLLINS

BAKER HOSTETLER LLP
45 Rockefeller Plaza, 14th Floor
New York, NY 10111

*Attorneys for Christopher Collins*

# TABLE OF CONTENTS

**Page**

I.   Preliminary Statement ................................................................................................ 1

II.  Chris' Background and Character ............................................................................... 4

    A.   Chris' Family and Early Life ............................................................................ 5

    B.   Education and Early Working Career ................................................................ 5

    C.   Chris' Decades of Entrepreneurship, Job Creation, and Assistance to Others ................................................................................................................ 6

    D.   Chris Continued His Service to Others as Erie County Executive .................... 10

    E.   Chris Continued A Decade of Public Service in Washington ........................... 13

    F.   Chris' Lifelong Dedication to Community Service and Giving Back ................. 16

III. Chris is Devoted to His Family, Friends, and Neighbors, With A Demonstrated Commitment to Helping Others .................................................. 19

IV.  Unresolved Objections to The PSR ............................................................................ 23

V.   The Relevant Sentencing Considerations Support A Non-Custodial Sentence ................ 25

    A.   The Offense Conduct Reflects Isolated, Uncharacteristic Conduct .................... 25

    B.   The Sentencing Guidelines Calculation ........................................................... 28

    C.   The Guidelines Place An Undue and Disproportionate Emphasis on Gain and Is Not A Fair Measure of The Offense Conduct in This Case ..................... 29

    D.   Other Section 3553(a) Factors Warrant A Sentence Substantially Below The Guidelines Range .................................................................................. 32

        1.   Chris' Personal History and Characteristics, and The Aberrational Nature of His Conduct, Support Leniency .................................... 32

        2.   A Non-Custodial Sentence Is Warranted in Light of Chris' Exceptional Public Service, Charitable Acts and Contributions to the Community .......................................................................... 34

        3.   The Letters from Innate's Former CEO, Former Chairman, and Investors are Compelling Calls for Leniency ................................ 36

i

E.   Chris Has Unquestionably Accepted Responsibility and Shown Complete Remorse ...........................................................................................39

F.   A Non-Custodial Sentence (With Conditions) Would Afford Adequate Deterrence and Protect The Public, Impose Just Punishment, and Promote Respect for The Law .........................................................................41

    1.   Incarceration Is Not Necessary for Specific Deterrence..........................42

    2.   Incarceration Is Not Necessary to Achieve General Deterrence ..............43

    3.   Society Will Derive No Benefit from Incarcerating Chris .......................44

G.   A Non-Custodial Sentence Is Warranted to Avoid Sentence Disparities .............46

H.   The Kinds of Sentences Available Strongly Support The Appropriateness of A Non-Custodial Sentence .............................................................50

VI.   Conclusion ........................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
 552 U.S. 38 (2007)............................................................................................28, 29, 50

*Kimbrough v. United States*,
 552 U.S. 85 (2007)..............................................................................................................28

*Koon v. United States*,
 518 U.S. 81 (1996)..............................................................................................................27

*Levine v. Apker*,
 455 F.3d 71 (2d Cir. 2006)..................................................................................................50

*Morrisey v. Brewer*,
 408 U.S. 471 (1972)............................................................................................................50

*Nelson v. United States*,
 555 U.S. 350 (2009)............................................................................................................29

*Rita v. United States*,
 551 U.S. 338 (2007)............................................................................................................34

*SEC v. Deeba*,
 19 Cv 05346 (N.D. Cal. 2018)............................................................................................49

*SEC v. Lawson*,
 14 Cv 02157 (N.D. Cal. 2014)............................................................................................49

*SEC v. Williky*,
 15 Cv 357 (S.D. Ind. 2015).................................................................................................49

*United States v. Adelson*,
 441 F. Supp. 2d 506 (S.D.N.Y. 2006)................................................................30, 33, 34, 43

*United States v. Bonthu*,
 18 Cr. 237 (AT) (N.D. Ga. 2018) .......................................................................................48

*United States v. Booker*,
 543 U.S. 220 (2005)............................................................................................................28

*United States v. Caraballo*,
 219 Fed. App'x 99 (2d Cir. 2007).......................................................................................46

*United States v. Carvajal*,
   2005 WL 476125 (S.D.N.Y. Feb. 22, 2005) ........................................................28

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ..............................................................................28

*United States v. Chow*,
   17 Cr. 667 (GHW) (S.D.N.Y. 2017) .............................................................26, 50

*United States v. Collotta*,
   07 Cr. 143 (VM) (S.D.N.Y. 2007) ......................................................................48

*United States v. Cope*,
   16 Cr. 210 (AAT) (M.D. Tenn. 2016) ................................................................48

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) ..............................................................................30

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) ...............................................................30

*United States v. Faibish*,
   No. 12-CR-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ...................30

*United States v. Gupta*,
   11 Cr. 907 (JSR) (S.D.N.Y. 2011) .............................................................27, 43

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012) .........................................................30, 35

*United States v. Hobson*,
   16 Cr. 351 (LTS) (S.D.N.Y. 2017) ....................................................................27

*United States v. Joyner*,
   924 F.2d 454 (2d Cir. 1991) ..............................................................................46

*United States v. Knights*,
   534 U.S. 112 (2001) ..........................................................................................50

*United States v. Leitch*,
   No. 11 Cr. 00039 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013) ...............31, 50

*United States v. Martoma*,
   894 F.3d 64 (2d Cir. 2018), 2013 WL 12196768 (S.D.N.Y. Dec. 26, 2013) .........48

*United States v. Melvin*,
   14 Cr. 22 (TCB) (RVG) (N.D. Ga. 2014) ............................................................48

iv

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014), *abrogated by Salman v. United States*, 137 S. Ct.
    420 (2016) .......................................................................................................................48

*United States v. Ng*,
    11 Cr. 161 (JSR) (S.D.N.Y. 2012) .................................................................................47

*United States v. Okada*,
    07 Cr. 144 (DC) (S.D.N.Y. 2008) .................................................................................47

*United States v. Perez*,
    17 Cr. 538 (MS) (D.N.J. 2017) .....................................................................................48

*United States v. Peterson*,
    11 Cr. 664 (RPP) (S.D.N.Y. 2012) ...............................................................................47

*United States v. Serafini*,
    233 F.3d 758 (3d Cir. 2000) ..........................................................................................34

*United States v. Stewart*,
    15 Cr. 287 (LTS) (S.D.N.Y. 2016) ................................................................................47

*United States v. Stewart*,
    15 Cr. 287 (JSR) (S.D.N.Y. 2015) ................................................................................26

*United States v. Thurston*,
    544 F.3d 22 (1st Cir. 2008) ...........................................................................................35

*United States v. Tomko*,
    562 F.3d 558 (3d Cir. 2009) ..........................................................................................35

*United States v. Toohey*,
    132 Fed. App'x 883 (2d Cir. 2005) ...............................................................................46

*United States v. Vigil*,
    476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) *aff'd*, 523 F.3d 1258 (10th Cir.
    2008) ..............................................................................................................................43

*United States v. Whitman*,
    12 Cr. 125 (JSR) (S.D.N.Y. 2013) ................................................................................31

*United States v. Yu*,
    17 Cr. 349 (MS) (D.N.J. 2017) .....................................................................................47

*United States v. Zeringue*,
    14 Cr. 67 (BAJ) (RLB) (M.D. La. 2014) ......................................................................48

**Statutes**

18 U.S.C. § 3553(a) ................................................................................................ *passim*

18 U.S.C. § 3624(c)(2)............................................................................................4, 44

28 U.S.C. § 994(j) ........................................................................................................31

U.S.S.G. § 2B1.1(b)(1)...........................................................................................29, 30

U.S.S.G. § 3E1.1(a) .....................................................................................................29

U.S.S.G. § 3E1.1(b) .....................................................................................................29

U.S.S.G. § 2B1.4(a) .....................................................................................................29

U.S.S.G. § 2B1.4(b)(1) ................................................................................................29

U.S.S.G. § 3B1.3 ..........................................................................................................29

U.S.S.G. § 3C1.1..............................................................................................24, 28, 29

U.S.S.G. § 3D1.2(c) .....................................................................................................29

**Other Authorities**

"A Report on Behalf of the American Bar Association Criminal Justice Section
   Task Force on The Reform of Federal Sentencing for Economic Crimes"
   (Nov. 10, 2014), *available at* https://www.americanbar.org/content/ ...................31

FBI, "Hedge Fund CEO Sentenced (Jan. 11, 2012) *available at*
   https://archives.fbi.gov/archives/newyork/press-releases/2012/hedge-fund-
   ceo-sentenced-in-manhattan-federal-court-to-one-year-and-one-day-in-prison-
   for-insider-trading-scheme-that-netted-nearly-2.5-million-in-profits ....................47

Memorandum, U.S. Dep't of Justice, Federal Bureau of Prisons, "Home
   Confinement under the First Step Act" (Apr. 4, 2019) *available at*
   https://www.bop.gov/policy/om/001-2019.pdf........................................................4

*United States v. Beshey, et al.*, Sentencing as to Shane Fleming (Aug. 30, 2019),
   *available at* https://www.law360.com/articles/1194287/ex-fitness-vp-gets-2-
   months-for-tipping-go-private-deal (Aug. 30, 2019)..............................................36

On January 17, 2020, defendant Christopher Carl Collins ("Chris") will appear before this Court for sentencing pursuant to his plea of guilty, well in advance of trial, to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and one count of making a false statement in violation of 18 U.S.C. § 1001. After carefully weighing the offense against Chris' long history of good works, charitable acts, public service to his community, the extreme aberrational nature of his conduct, the effects of the conduct on Chris and his family, as well as Chris' heartfelt and genuine regret and remorse, the United States Probation Office ("Probation") submitted a Presentence Investigation Report ("PSR") concluding "that a non-guidelines sentence is warranted." PSR at 36. Specifically, Probation recommends a substantial downward variance pursuant to 18 U.S.C. § 3553(a) with a custodial sentence of a year and a day, a term of supervised release, and a $200,000 fine.

Although we concur with Probation's well-reasoned determination that a substantial downward variance is warranted, we respectfully submit that a measured application of the factors set forth in section 3553(a)—including Chris' advanced age, prior good and charitable acts, non-existent risk of recidivism, and acceptance of responsibility—supports a non-custodial sentence of probation, with the conditions of a significant term of home confinement and extensive community service, and the imposition of a substantial fine.

## I.   **PRELIMINARY STATEMENT**

Chris comes before the Court humbled, penitent, and remorseful. He acknowledges that his criminal conduct was serious and betrayed the values he spent a lifetime advocating and pursuing. Chris accepted responsibility for his actions by pleading guilty well in advance of trial, resigning from Congress in disgrace prior to his plea and, as Probation observed, by thoroughly expressing regret and remorse. PSR at 35. In addition, Chris reached a settlement with the Securities and Exchange Commission ("SEC") in which he consented to the entry of a permanent

1

injunction and a permanent bar from serving as an officer or director of a public company. In allocuting to his crimes, Chris acknowledged the seriousness of his offenses, expressed his shame and remorse, and apologized to his former constituents, friends, and family for letting them down and betraying their trust. As the many letters submitted to the Court make clear, he has also apologized and expressed remorse to many outside of the view of the Court and Probation, including former corporate leaders of Innate Immunotherapeutics ("Innate").

As Chris acknowledges, he has paid a heavy price for his crimes. He is, and will forever be, tortured with the knowledge that his actions have caused his son, to whom he always aspired to be a role model, to live with the stain of a felony conviction, and perhaps serve time in prison. He also carries the heavy burden of having caused his family significant pain, shame, and torment, which can never be undone. It is difficult to imagine a more painful punishment for a devoted father. He also tarnished a reputation that took 69 years to build, and foreclosed future public service—his true passion—after resigning from Congressional Office in disgrace. Having spent much of his life serving his community in upstate New York by creating jobs through entrepreneurship, through charitable works, and through public service, he is now too ashamed to spend significant time in the community he loves.

Under the terms of Chris' plea agreement, his agreed-upon Sentencing Guidelines range is 46 to 57 months—driven primarily by an enhancement for total losses avoided, although Chris did not trade, profit, or avoid losses himself. However, 18 U.S.C. § 3553(a) mandates that the Court impose a sentence "sufficient, *but not greater than necessary*" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence (emphasis added). Probation, after carefully analyzing the offense conduct, Chris' individual history and characteristics, and the objectives of sentencing, recommends a sentence well below

the Guidelines and concludes that a non-Guidelines sentence would fully achieve the statutory

sentencing objectives. For the reasons set forth below, we respectfully submit that a sentence of

probation with conditions of a significant term of home confinement and extensive community

service, and the imposition of a substantial fine is sufficient, but not greater than necessary.

Among those 3553(a) factors relevant to this sentencing:

- As Probation accurately concluded, Chris' criminal conduct was aberrational behavior committed in moments of weakness that is "difficult to adjoin . . . with the otherwise commendable life [Chris] has led" including "dedicat[ing] himself to several charitable, self-less acts, helping and assisting others, both in the public and private sectors." PSR at 36. This was an uncharacteristic deviation from an otherwise law-abiding life.

- Chris' out of character conduct should be considered against the backdrop of a life that both Probation and many others observe has been defined by substantial community and public service, numerous charitable and selfless acts, a dedication to family, and an entrepreneurial career of rescuing companies and saving jobs for hundreds of families in New York. He has positively impacted countless lives.

- As both scholars and courts have recognized, the Guidelines range for insider trading offenses, which is driven largely by the amounts in the loss table, significantly overstates the seriousness of the offense. That is particularly true here, where the conduct differs markedly in scope, duration, and intensity from that of many other more serious insider trading prosecutions. Unlike many of those prosecutions, which involve regulated market participants conducting multi-year schemes with multiple stocks and multiple illegal tips, the insider trading conduct in this case involved one security and occurred over a few days. Chris' ruinous decision to tip his son was isolated, spontaneous, and emotionally driven. The absence of any pecuniary gain to the tipper also makes this case different than many others. Similarly, Chris' false statement during a surprise, early morning interview occurred in a short period of time. Although the Sentencing Guidelines calculation overstates the seriousness of the insider trading offense, Chris fully acknowledges that his offenses were nonetheless serious.

- It is significant that the former CEO, Chairman of the Board, and some investors in Innate have written letters to the Court in support of Chris in advance of sentencing and urged leniency.[1]

---

[1] Pursuant to the Court's Individual Rules, letters in support have been filed via ECF as Exhibit A, broken into attachments due to size. Counsel has added red page numbers in the bottom right corner of Exhibit A to allow for pin cite identification and Exhibit A will be cited as "Ex. A at [page] (Letter from [sender])."

- As Probation observed, Chris has exhibited thorough acceptance of responsibility and genuine remorse and regret. Numerous letters to the Court, from people who know Chris best, reflect that outside the presence of Probation and the Court, Chris has personally conveyed significant regret and remorse.

- The collateral consequences Chris has suffered as a result of his offenses—including knowledge of the harm he has caused to his son and family, resigning from his career in public service, the stigma of forever being branded a felon, and being publicly disgraced—are severe and permanent. They ensure that Chris will never re-offend. These consequences are a significant warning to society at large, buttressed by numerous other prosecutions of insider trading. Incarceration in the circumstances of this case is not necessary to achieve specific or general deterrence.

- Society, as a whole, will gain no benefit from incarcerating a 69-year-old husband, father, and grandfather. Recently, Congress enacted the First Step Act, Pub. L. 115-391, which specifically encourages home confinement for elderly offenders that pose no danger or risk of recidivism.[2] Thus, a significant term of home confinement with extensive community service and a fine is a suitable alternative to incarceration. Critically, it would allow Chris to continue giving back and contributing to the betterment of society while serving his sentence.

- A non-custodial sentence would avoid unwarranted sentence disparities, when considering the totality of the circumstances and similar cases.

We respectfully request that the Court consider not just Chris' conduct over a few hours or days, but his lifetime of good works and upstanding character. In this light, we believe, the mandates of section 3553(a) strongly counsel in favor of probation, with home confinement, community service, and a fine.

## II.   CHRIS' BACKGROUND AND CHARACTER

Chris is a 69-year-old devoted and loving husband, father, grandfather, and brother. He has been married to his wife, Mary, for 31 years and has three adult children and four

---

[2] Specifically, Section 602 of the Act modified 18 U.S.C. § 3624(c)(2) to direct the Bureau of Prisons to maximize the amount of time spent on home confinement when possible. Further, Section 603(a) of the Act reauthorized and expanded a pilot program that allows the Bureau of Prisons to place elderly (60 years and older) and terminally ill inmates in home confinement including through waiver of section 3624(c)(2)'s limitation that home confinement be no longer than the shorter of ten percent of the term of imprisonment or six months. *See* Memorandum, U.S. Dep't of Justice, Federal Bureau of Prisons, "Home Confinement under the First Step Act" (Apr. 4, 2019) *available at* https://www.bop.gov/policy/om/001-2019.pdf.

grandchildren. Throughout lengthy careers in business and public service his life has always centered on three core values: devotion to family, service to others, and hard work. He has no prior criminal history and did not personally profit from his crime.

### A.    Chris' Family and Early Life

Born in Schenectady, New York in 1950, Chris was the second-oldest of seven children. The family moved when Chris' father was periodically transferred by General Electric Corporation, and consequently Chris spent time in Schenectady, Stamford, Connecticut, Glens Falls, New York, and Hendersonville, North Carolina, where he completed high school. As part of a family of nine, Chris understood the importance of productivity and hard work from an early age. This included obtaining employment as a commissioned shoe salesman at age sixteen—a job that he kept throughout college to pay for tuition and expenses.

He married Mary in 1988, and together they are parents to Caitlin, 28, and Cameron, 27. Chris is also father to Carly, 43, from his first marriage, and she has one son and three daughters—Chris' grandchildren—ages 14, 11, 8, and 3.

### B.    Education and Early Working Career

After graduating high school, Chris attended North Carolina State University. He remained busy throughout college with his studies, job as a shoe salesman, leadership roles, and volunteerism, all while completing a degree in Mechanical Engineering. He graduated in 1972 and took a job at Westinghouse Electric settling in Birmingham, Alabama. While working for Westinghouse, Chris also earned his MBA from the University of Alabama Birmingham in 1975.

In 1976, Westinghouse transferred Chris to Buffalo, where he stayed for the next four decades. This move also put Chris in proximity to his parents and younger siblings, who had moved to Rochester while Chris was in college. He remained with Westinghouse through 1982.

### C.    Chris' Decades of Entrepreneurship, Job Creation, and Assistance to Others

In 1983, Chris started down the path that would come to define the next three and a half decades of his life: entrepreneurship, job creation, and helping the community around him. While success in business quickly followed, Chris prioritized the well-being of his employees and community.

Chris' first venture was the acquisition of Westinghouse's industrial gearing division that faced closure. He partnered with three colleagues and arranged a leveraged buyout. After the transaction, the new company was named Nuttall Gear Corporation. As described by one individual, who was on the ground:

> When it became known that Westinghouse was considering exiting the gearing market, Chris organized a private acquisition of the business and moved it to the former Bell Plant in Wheatfield, NY. Words cannot express the difficulty of that undertaking. . . . In my opinion, his success in this venture was nothing short of a miracle. The saving of the jobs and the retention of the work in our local economy were a very significant benefit to our community. *If that were his only accomplishment, it would be enough for most lives.*

Ex. A at 49 (Letter from Jared Workman) (emphasis added). Another individual recounted that in saving the business, "[Chris] put up everything that he owned to buy and save [its] existence and many employees jobs." Ex. A at 96 (Letter from William Grove). Moreover, it "is worth noting that Westinghouse totally abandoned Buffalo in the early 1990's, but the successor to Chris' gearing company is still chugging along." Ex. A at 49 (Letter from Jared Workman); Ex. A at 62 ("To this day Nuttall Gear continues to manufacture at our original location in Niagara Falls, N.Y.") (Letter from W.C. Kolkebeck); at 97 ("I always respected him for sticking his neck out and risking everything to reinvent a business that would preserve good paying jobs in the community.") (Letter from Terry Galanis, Jr.).

In operating Nuttall, Chris exhibited "a strong desire to serve our customers, honesty and integrity in all he did, and a real commitment to making Nuttall Gear a better company for each and every employee." Ex. A at 62 (Letter from W.C. Kolkebeck). He always made a "special effort to build a community among the employees" and was a "fierce advocate for the company and [its] employees." Ex. A at 60 (Letter from Sawrie Becker). "His dedication to all of our employees was so strong that we turned down several attractive offers by potential purchasers of the company because it was unclear what their future plans for Nuttall were." Ex. A at 62 (Letter from W.C. Kolkebeck). "We did not want to see Nuttall consolidated or relocated by a new owner resulting in the loss of those jobs in Western N.Y." *Id.* Chris' concern for his employees was further exemplified by his decision in 1991 to implement an employee stock ownership plan (ESOP) whereby employees owned more than a third of the company at no cost to them. PSR ¶ 119. When Constellation Capital purchased Nuttall in 1997, employees split more than $3 million in proportion to their ESOP ownership. *Id.*

After the sale, Chris remained with Nuttall until he resigned in 1998 to run, unsuccessfully, for Congress. Shortly thereafter, he began a decades-long career of acquiring and turning around troubled companies including ZeptoMetrix, Bloch Industries, Volland Electric, Niagara Ceramics, Easom Automation, and Audubon Machinery. PSR ¶¶ 112-18. The common theme at each continued to be Chris' ability to grow the business to create additional jobs, his generosity toward and concern for employees, and his desire for the betterment of community. As his business partner from Bloch details:

> We employed between 30 and 80 employees and would not have been able to succeed without Chris' continued support and dedication. . . . Chris was passionate about creating jobs, especially blue collar manufacturing jobs where underemployed people could learn a trade and earn a steady income to provide for themselves and their family. Chris was a sincere and caring

advocate of helping less fortunate individuals better their position in life and improve their family circumstances.

\*　　\*　　\*

Chris supported local efforts to take formerly incarcerated people, who were released from prison into half-way house living, to become employees at our company. I was able to watch Chris interact with these former convicts, listen and learn about their life stories often filled with hardships, and show compassion for them while supporting their efforts at rebuilding their lives. Chris went so far as to provide financial support, including personal loans, to help these individuals get back on their feet and move forward rather than returning to their previous lives that could easily land them in jail.

\*　　\*　　\*

Many employees owe their lives to Chris for believing in them enough to take a chance that others[] would have never offered; for this, they are forever grateful to Chris.

Ex. A at 39 (Letter from Brian Geary).

At Volland, the company shares profits with its employees and has grown in ways that created and saved countless jobs. Another of Chris' business partners explains:

After meeting Chris and talking about my company, I approached him about becoming a partner in our family business. At the time, we were struggling to be profitable. Through his insight, we were able to turn things around quickly. This obviously benefitted our employees and their families. We went on to purchase three other troubled companies, effectively saving and/or creating many jobs.

Ex. A at 82 (Letter from E. Ronald Graham). Similarly:

His decades of experience managing small businesses proved to be very helpful in shaping the path and operational plans of our automation business in Detroit. I valued Chris's opinions and suggestions during our 12 years of co-ownership. He contributed very positively in its growth. . . . Chris was a key element to the successful growth of the company which provided gainful employment, wages health insurance, and other benefits for many local families.

Ex. A at 94–95 (Letter from Reginald Kelley). "The point is that Chris is a driven serial entrepreneur himself and has created hundreds of jobs for people while investing in medical,

industrial and manufacturing businesses." Ex. A at 41 (Letter from Joseph McMahon). Many of those who know Chris from these ventures over the years find remarkable his unique perspective and drive, particularly when it comes to caring for employees.

As explained by one partner from Audubon Machinery:

> What most people may not know is that his mentoring included the softer side of business, especially when it came to treating employees. He seemed to have a great appreciation of the value that ALL people have in an organization, and that they always need to be respected. Here are examples of some occasions when Chris went above and beyond to support people in the organization; 1) He encouraged us to offer loans to employees that had urgent needs. 2) [He] recommended helping an employee financially who was getting thru a bankruptcy. 3) He helped us support an employee who was going to lose property due to back taxes. 4) [He] backed us when we bailed out an employee who was incarcerated due to cascading traffic offenses. His family did not have the means to post bond. . . . He taught us lessons in business ethics that are important. <u>He is a good man</u>.

Ex. A at 55 (Letter from Robert Schlehr). As echoed by another partner:

> Chris also cares about our people. Prior to our partnership with Chris my partner Bob and I had a few negative experiences with advancing money to employees for personal reasons so we just stopped doing it. Once Chris became our partner he shared with us how he handled such requests when he ran Nuttall Gear. We decided to follow his lead and made assistance available to employees who had fallen into difficult circumstances. We have never regretted rethinking that position and credit Chris for having done it.

Ex. A at 41 (Letter from Joseph McMahon).

There is no question that throughout his career, Chris has supported employees, mentored partners, and improved the lives of those around him. He approaches business with a "caring and sincere nature" and a true appreciation for his employees. Ex. A at 39 (Letter from Brian Geary). Chris "respects others and is willing to invest his time, emotional support, and financial support to help others achieve a better position for themselves and their families." *Id.* For over thirty-five years, this has been the direct, day-to-day impact that Chris has had on others.

### D.      Chris Continued His Service to Others as Erie County Executive

By 2007, the State of New York had taken control of the finances of Chris' county, Erie,

through the imposition of a fiscal control board. Infrastructure was falling apart. Chris felt that he

had a solution and, after consulting with his wife, embarked on what would be a decade-plus of

public service by running for County Executive. His reasoning:

> [w]hen Chris was considering getting involved in politics, I questioned him
> as to his motive. I implored him to reconsider, as he was already living a
> very nice life as a result of his many business successes. *Chris told me that
> his motive was simply to make the world a better place for our children and
> secure a better future for our next generation.* I firmly believe that this was
> his sole motivation and respected his decision.

Ex. A at 51 (Letter from Craig Schreiber) (emphasis added). Likewise, "Chris was not somebody

who needed to engage in government service" but "he saw it as an opportunity for community

service." Ex. A at 54 (Letter from John Schmidt, Jr., Esq.).

In running, Chris pledged to implement the business efficiency discipline known as Lean

Six Sigma to turn around the county finances and rebuild infrastructure. To show his confidence,

Chris vowed to work for one dollar a month until the state fiscal control board stepped aside and

returned management of county finances to the County Executive. He ultimately won the

election and began serving as County Executive in 2008.

After the election, Chris formed the Brighter Future Fund as the charitable foundation

that would receive his salary and distribute it to local charities. The local charities chosen to

receive funds largely focused upon women, children and elder issues:

> Chris believed strongly in fiscal responsibility for Erie County and chose to
> donate his entire salary as County Executive to local non-profits as long as
> the budget was not balanced. . . . He asked me to chair the Brighter Future
> Fund which was endowed by his and his Deputy County Executive's salary.
> Our steering committee was comprised of a diverse group of citizens with
> an intimate knowledge of the unmet social service needs of Erie County.
> Over a period of 18 months, at which time the county budget was balanced,
> the fund donated nearly $300,000 to charity. A significant impact was made

10

> in Erie County through his generosity, vision and leadership. This is who
> Chris Collins really is.

Ex. A at 56 (Letter from Theresa Jehle); *see also* PSR ¶ 110; Ex. A at 99 ("He committed to give

up his salary until the floundering county budget and fiscal crisis could be turned around, and

indeed it did under his leadership.") (Letter from Kent Chevli); at 82 ("He donated his salary to

various worthy charities in Erie County.") (Letter from E. Ronald Graham).

Under Chris' leadership, which included making difficult and sometimes unpopular

budgetary decisions, the County's financial position greatly improved and the fiscal control

board relinquished control within eighteen months. PSR ¶ 110. The position of the County

continued to improve for the remainder of Chris' tenure:

> For the first time in the United States, Lean Six Sigma was implemented in
> a large municipal government with great results: a $250 million surplus, the
> state fiscal control board disbanded, county debt and pension obligations
> paid down, infrastructure and parks repaired and beaches reopened.
> Following through on his pledge to be a chief executive officer and not a
> chief politician, he hired and empowered his commissioners on a pure merit
> basis and held them accountable with great results for the people of Erie
> County.

Ex. A at 80 (Letter from Ed Cox); at 112 ("When Chris left office, Erie County was operating 'in

the black' for the first time in many years.") (Letter from Ronald Urmson); at 53 ("Erie County

is all the better because of Chris Collins.") (Letter from John Schmidt, Jr., Esq.); at 89 ("As Erie

County Executive he improved our community and made life better for all of us living here.")

(Letter from Lori Luzi).

As a leader, Chris "was more interested in the greater good of the community instead of

his self-interest." Ex. A at 46 (Letter from Rocco Termini). "His selfless dedication to the City of

Buffalo helped rebuild a dying city." *Id.* He was "always transparent and made himself available

11

to the people at any time." Ex. A at 97 (Letter from Terry Galanis, Jr.). Chris was "someone who

believed in strong leadership with compassion." Ex. A at 56 (Letter from Theresa Jehle).

A major focus for Chris was improving county services, especially for public assistance

recipients, veterans, local and county law enforcement officers, and other county employees.

PSR ¶ 110. He also led the county through various disasters: a potential Hepatitis outbreak, the

crash of Continental Flight 3407, and a major flooding event. *Id.* Throughout, Chris operated

with thoughtfulness and compassion:

> Chris was integrally involved in some of the most difficult historical
> circumstances that ever faced our community – a Hepatitis [] outbreak, the
> crash of Continental Flight 3407, and a funding crisis that virtually shut
> down every aspect of County services to one of the poorest communities in
> the country, just to name a few. In all of these circumstances, I personally
> stood by Chris' side as he carefully thought through material information,
> the impact it would have on our community and ultimately made decisions
> that always put the best interest of the entire community first.

Ex. A at 43 (Letter from Cheryl Green, Esq.).

> In February 2009, our community – and my and Chris' hometown – was
> devastated by the crash of Flight 3407. As County Executive, Chris was in
> charge of the emergency response. . . . Chris dealt with this as a father and
> a husband, not as a politician, because those were always his first instincts.

Ex. A at 19 (Letter from Chris Grant). In recounting Chris' interaction with family members of

the crash victims, Mr. Grant remarks "Chris Collins emerged after spending hours with those

families devastated by the tragedy, eyes red and swollen from listening to the stories of their

loved ones and the loss they were only beginning to endure." *Id.* at 20. "No one, as Chris said to

me, could ever appreciate the pain those families were going through." *Id.* "Our only job, he

reminded me, was to be there in any way we could for them." *Id.* "[H]elping others, building

successful businesses and helping countless families" and being there "when others have needed

someone to help them . . . [t]hat's the true Chris Collins." *Id.*

### E.      *Chris Continued A Decade of Public Service in Washington*

In 2012, Chris ran for, and was elected to, Congress to represent the 27th District of New York. PSR ¶ 109. He worked hard for his constituents including on legislation impacting farmers, health care, telecommunications, and energy. One important piece of legislation was the 21st Century Cures Act, of which Chris drafted a key portion. The landmark legislation was designed to streamline the drug and device approval process and bring treatments to market faster:

> One of his concerns that personally affected me was his interest in bringing lifesaving drugs to the market faster. ███████████████████████
> ██████████████████████████████████
> ████████████████████████████████

Ex. A at 59 (Letter from Robert Stevenson). Chris was also a key co-sponsor of legislation to cover Vietnam Veterans who had been exposed to Agent Orange but did not qualify for disability or health care benefits because they served in the Navy and stayed aboard ship. Dedication to veterans was a hallmark of Chris's time in Congress:

> Despite the demands of being a Member of Congress he took time each and every month to honor our local veterans. There are many stories one could tell about the impact of his Veteran of the Month Program, but I personally found his efforts to honor Vietnam Veterans heartwarming. Many of these brave men never received a welcome home or thanks for their service. Chris would go out of his way to recognize them and finally give them the respect and appreciation they deserve.

Ex. A at 21 (Letter from Christopher Catt). Similarly:

> Mr. Collins has always recognized the heroic actions of those around him. He organized and attended countless events to honor Veterans. He obtained Purple Hearts, and other medals, for soldiers who never received them, and posthumously presented medals to the families of those who were killed in action. After hearing of a World War Two Veteran's dream, he escorted the Veteran to throw out the opening pitch of a baseball game. On a separate occasion, he honored a World War Two Veteran with a flag flown over the United States Capitol at a ceremony he hosted after hearing the Veteran's recollection of the war. At this ceremony, this Veteran received the French Legion of Honor at the rank of Knight.

Ex. A at 28 (Letter from Alexandra Gould).

Chris also drafted and sponsored the Firefighter Cancer Registry Act that directs the CDC to study and create a database of firefighters in the United States that suffer from cancer related to the fires they have fought. Firefighters have a 33% greater chance of contracting cancer than the general population. The bill was signed into law in 2018:

> The knowledge he accumulated from his relationships with first responders in the district spurred the sponsorship and eventual passing of legislation to establish a fire fighter cancer registry in the United States.

Ex. A at 23 (Letter from George McNerney).

Chris always prioritized constituent service with an emphasis on veterans, the elderly, and children, as well as employment and jobs. Ex. A at 67 (Letter from Angelo Natale). Indeed, this focus on constituents was a cornerstone of his time in Congress. As shared in a poignant personal story from one constituent:

> About a year ago, my 44 year old brother, was gravely ill and living overseas…[w]hile he knew he needed to be back home for proper medical care, he would not come home without his wife despite being deathly ill. . . [but] she had no US Visa to travel on a medical flight with him . . . I reached out to several government officials [and] Mr. Collins was the only one that offered assistance. I am eternally grateful that he did his best for me and my family through a horribly difficult time. . . . [h]e reached out his hand when neither I nor my family knew where to turn.

Ex. A at 73–74 (Letter from Karen Van Houtte). One former staffer notes that "he really took pride in our constituent relations . . . it was always a priority of Chris that we would do anything we could for anyone who walked through our doors." Ex. A at 17 (Letter from Erynn Hook); *see also* Ex. A at 21 ("He understood that he worked for his district and put the needs of his constituents first and was their unapologetic voice.") (Letter from Christopher Catt). As another constituent added, "[h]e was always kind, responsive and good-natured . . . I came to regard him

as forgiving, uniquely service-oriented, constituent-focused, and eager to help." Ex. A at 45

(Letter from Michael Caputo). And others:

> Chris has always been available for the people 110%. He sincerely cared
> about each and every one of the taxpayers he represented and beyond. He was
> always a dedicated elected official.

Ex. A at 119 (Letter from Lynne Johnson & David Godfrey).

Chris' former colleagues in Washington also recognized his dedication to the job. Indeed,

more than a dozen current and former Members of Congress, including former Speaker John

Boehner, wrote in support of Chris which serves as a testament to his character and his impact on

those he worked closely with. As one Congressman described, "[d]uring all of my dealings with

Chris I always found him to be honest, straightforward and a strong advocate for New York even

when it did not directly affect his district or greatly benefit him politically." Ex. A at 76 (Letter

from Hon. Peter King). Another observed, "[o]n many occasions I saw how much Chris cared

and how hard he worked for those that elected him. . . . he always showed a deep level of

concern and resolve to make it right." Ex. A at 108 (Letter from Hon. Renee Ellmers). Those

around him "felt he truly cared about his job and doing the best by his constituents, whether they

voted for him or not. I always felt that Chris served with a servant's heart . . . ." Ex. A at 91

(Letter from Hon. Todd Rokita).

Ultimately, Chris brought to Congress the same humility, humanity, and commitment to

others that has characterized his entire professional life. One former member of Chris' staff

describes his time in service: "Chris has taught me so many valuable lessons over the years . . .

[m]ore than a leader and a boss, I have come to think of him as a friend." Ex. A at 17 (Letter

from Erynn Hook). Further:

> [I]t is too often in D.C. that people have inflated egos, but that was never
> Chris. For Chris, it was always about making sure that people who didn't

15

> always get noticed, were noticed. Before she retired, I remember Chris
> making sure that the elevator operator that he always chatted with was given
> a personal Christmas card, from him along with some Sponge Candy – a
> Buffalo, NY delicacy. That's something that's carried with me, making sure
> that no one goes un-noticed and small gestures really do make a difference.

*Id.* Another former staffer adds that, "I quickly learned from him if you wake up every day, turn

on your brain and give your best you will accomplish your goals." Ex. A at 23 (Letter from

George McNerney). Ms. Hook emphasizes that "I wouldn't be who I am today if it weren't for

the lessons he's taught me, the advice he's given, the hardships we've been through, and all the

great memories we've all shared as a team." Ex. A at 18 (Letter from Erynn Hook).

Chris will never again be able to pursue this true passion of his: public service.

### F.     Chris' Lifelong Dedication to Community Service and Giving Back

Long before taking up elected office, Chris strived to give back to his community. He has

a life-long connection to the Boy Scouts of America, an organization where he began as a Cub

Scout, advanced through Boy Scouts, and earned the Eagle Scout rank in 1964. PSR ¶ 121. He

served in numerous leadership roles, chaired the National Scout Jamboree committee, and has

been honored at a national level. *Id.* But, it is at the personal level where Chris' commitment to

Scouting has been embodied most.

For example, he served as an assistant scoutmaster for his son's Troop, went to summer

camps and Jamborees, participated in monthly outings, and accompanied Scouts to the Philmont

High Adventure Base. As Mary explains, "Chris designed the patches for the National Scout

Jamborees and financially covered the cost" and in other instances "provided camping equipment

for the scouts who couldn't afford the equipment." Ex. A at 2 (Letter from Mary Collins).

Another time, he purchased a kiln for a local scout camp's ceramics program when it was

needed. *Id.* Beyond just financial support, however, "[w]hen Chris sees a need, he steps in":

16

> When the scouts went to Ft. George to participate in the War of 1812
> reenactment, over a dozen young scouts didn't have a wooden gun and were
> told they could use a broomstick as a make-believe gun. That wasn't
> acceptable to Chris, so he went to work in our basement workshop and made
> twelve beautiful wooden model rifles for the young scouts. This is just one
> example of Chris jumping into action to try to help others.

*Id.* Others echo that Chris "has always been generous with his time and resources on behalf of the

Boy Scouts, and the community in general." Ex. A at 54 (Letter from John Schmidt, Jr., Esq.).

Likewise:

> I am an Eagle Scout, as is Chris. He is one of very few Eagle Scouts
> recognized as a Distinguished Eagle Scout at the national level. Chris is a
> huge supporter of BSA, not only with his generous donations, but as
> someone who believes in the Scout principles of trustworthy, loyal[],
> helpful, . . . Chris was active in his son's scout troop as an assistant
> scoutmaster. Chris helped many scouts, including his son, earn the Eagle
> Scout award. Chris could always be counted on to support Scouting with
> his time, talent and money.

Ex. A at 114 (Letter from Mark Mattar). Chris' success helping shape young men is manifest:

> To this day, the young men I've encountered in my travels who became
> Eagle Scouts under both Chris Collins and my direction have made it a point
> to comment on what a great influence Chris had been on them and the great
> role model he has been to them.

Ex. A at 100 (Letter from Ronald Nowak). Further:

> We are not perfect beings, but at his core I believe Chris strives to emulate
> the mission of scouting in his every day life. I witnessed first hand the
> patience and persistence he exhibited in teaching these values to young
> people engaged in scouting. And perhaps it is through his dedication to
> teaching the values of scouting to our youth that Chris made his most
> important contribution to our community.

Ex. A at 69 (Letter from Victor Martucci).

Apart from Scouting, Chris has been involved with the State University of Buffalo Center

for Entrepreneurial Leadership (CEL) for the past twenty years. PSR ¶ 122. CEL is a nine-month

program for small business owners who want to grow their businesses and find solutions for

problems they may be encountering. *Id.* One former mentee describes:

> I contacted [Chris] and asked him if he would be willing to Mentor me
> through a one year program at the University of Buffalo. The program was
> at the Center for Entrepreneurial Leadership and would change both of our
> lives. . . . Chris' help was invaluable to me. . . . His advice was practical and
> gave me the confidence to expand into the role I need to fill as the leader of
> this small new company

Ex. A at 40 (Letter from Joseph McMahon). And another, "[h]e provided vast amounts of his

personal time assisting entrepreneurs he had met both through [the Young Presidents

Organization] and The Center for Entrepreneurial Leadership at the University of Buffalo. This

commitment to our community helped keep and grow employment in Western NY." Ex. A at 83

(Letter from Paul Harder); *see also* Ex. A at 104 ("Chris, experienced in consolidating businesses

was very helpful mentoring me through some difficult challenges and opening paths to growth.

The employees of the company including me were very fortunate to have him cross our paths.")

(Letter from August Iacovitti). One writer estimates that, throughout his involvement in the

program, "Chris was engaged in one way or another by at least 100 entrepreneurs." Ex. A at 40

(Letter from Joseph McMahon).

Chris has also served on the Federal Reserve Bank of New York, Small Business and

Agricultural Advisory Council, the Kenmore Mercy Hospital Board of Trustees, and the United

Way House of Delegates. PSR ¶¶ 123-25. In these endeavors, too, he was always "very

generous, supportive and kind. . . . I know Chris Collins to be a humble and dedicated

community servant, a giver to those in need . . ." Ex. A at 101 (Letter from Brian Rusk); *see also*

Ex. A at 100 ("I've tried to convey in this letter what a positive role model Chris Collins has been

and continues to be for many young men. Thank you for taking into consideration the positive

impact Chris has had on the many lives he has touched.") (Letter from Ronald Nowak); at 58

("While I understand the seriousness of his actions I hope the court will show some leniency

given his service to our community and to the country.") (Letter from Maureen Griffin

Tomczak). In short, Chris' "selfless acts and desire to serve the people have been impactful at

every level." Ex. A at 67 (Letter from Angelo Natale).

Chris' strength of character, civic-mindedness, compassion, and dedication have

unquestionably been a defining aspect of his remarkable life.

## III.   CHRIS IS DEVOTED TO HIS FAMILY, FRIENDS, AND NEIGHBORS, WITH A DEMONSTRATED COMMITMENT TO HELPING OTHERS

According to those who know him best—family, friends, neighbors, colleagues, and

business partners—Chris is a kind, loving, hardworking, decent man who is devoted to his

family and community. He has sought to live an upright life and make the world around him a

better place. As his wife of 31 years notes, she has never met somebody more positive,

encouraging, supportive, or caring than Chris. Ex. A at 1 (Letter from Mary Collins).

Chris has striven to make his family feel safe and secure, *id.*, while devoting bottomless

time, energy, and dedication to his wife and children. *Id.* at 2; at 11 (Letter from Ted Collins). He

cares deeply for his siblings, all but one of whom were younger. Ex. A at 12 (Letter from

Claudia Topping). He has always provided "friendship and stability." Ex. A at 13 (Letter from

Deene Kennon). Simply put, "[t]he brother I know is dynamic, hard-working, generous and

helpful." Ex. A at 14 (Letter from Lynn Schiller).

Throughout his life, Chris truly put his family first—cherishing his children's trips,

sports, school projects, and extracurricular activities. He has always been present and caring. His

success in this regard is readily apparent. As Caitlin, his younger daughter, notes:

> [Chris] has always been an amazing father, friend and role model to me. He
> showed up to every dance recital, parent teacher conference and graduation

19

> ceremony. . . . he never let his outside activities interfere with family time. Whenever I would call, he would drop everything he was doing to speak to me and help me.

Ex. A at 5 (Letter from Caitlin Collins). Moreover, she can bear witness to extraordinary acts of kindness, love, generosity, and charity that turn "each day with him [into] a gift." *Id.* at 7. After Caitlin ███████████████████████████, her father "was there for me in ways I never could have expected from him. He has always been an amazing father, but the support I have received from him since the diagnosis has been unwavering." *Id.* His older daughter, Carly, likewise recounts:

> When I was in need, he gave without reserve. He was always interested in my successes and responsibilities, encouraging me to be a leader and to be the best human I could be. He never gave in to the distance of time and space and creatively turned the limited time we had together into exciting family traditions and experiences . . .
>
> *     *     *
>
> My 4 children love their Papa Chris very much and love to visit, write letters and look forward to each gift and card that comes their way, without fail, giving them a stable sense of family and tribe.
>
> My father has always been a responsible, reliable, generous, dedicated dad to me.

Ex. A at 8 (Letter from Carly Coleman). Chris has "always encouraged his children to lead lives of substance, accomplishment and with a concern for the lives of others." Ex. A at 106 (Letter from Brian Lipke); *see also* Ex. A at 93 ("Above all, he is a good husband and father who I know to be an honorable man with integrity.") (Letter from Michelle DeBergalis); Ex. A at 64 ("This unfortunate incident does not tell the full story of who Chris is. He is a considerate and nurturing husband, father and friend.") (Letter from Margaret Saeli). It is no wonder that one former colleague observed that even in "casual conversation[]" "his concern for his wife and children was evident . . . . [i]t was always my belief that Chris Collins's dedication to his family was

paramount in his life." Ex. A at 76 (Letter from Hon. Peter King). His devotion to family makes the consequences of his criminal conduct with regard to his son, Cameron, all the more difficult to bear.

Outside of his family, Chris has shown the same caring spirit, generosity, and compassion to friends, neighbors, and strangers alike. Mary describes that after a nasty divorce:

> My one friend was on the verge of losing her home to foreclosure. Chris stepped in and purchased her mortgage from the bank to let her stay in the home so she could sell it on her schedule and keep her family safe.
>
> [ ]
>
> Another friend didn't have an acceptable credit rating after her divorce and couldn't purchase a home. Chris stepped up and provided her with a low interest mortgage so she could buy a home.
>
> [ ]
>
> Another work friend who Chris didn't even know had twin babies and couldn't afford to buy them cribs. Chris bought them cribs and other bedroom furniture with no one knowing his generosity.

Ex. A at 3 (Letter from Mary Collins).[3] These acts, and this pattern, exemplify who Chris fundamentally is as a person – "[this] is the Chris I know and love." *Id.* As one family friend recounted, "Chris provided financial stability and housing for a woman who[] was mentally, physically, and financially abused by her husband, whom later abandoned her and her children." Ex. A at 51 (Letter from Craig Schreiber).

---

[3] Avoiding publicity for his generosity and philanthropy is a theme for Chris. *See, e.g.,* Ex. A at 71 ("For Chris, he wasn't concerned about scoring points in the public arena. He specifically asked me to not share our conversations about his philanthropy, charitable works and good deeds. For him, he put service over self because it was the right thing to do.") (Letter from Stefan Mychajliw); at 87 ("While [Chris and Mary] have been very private about their philanthropy efforts in Western NY, I know firsthand about their kindness and generosity. . . . [I]t's been my experience they always donate monetarily as well as their time." (Letter from Kathi Sullivan). "To name just a few of the many charities they support: Maria Love Foundation, Suneel's Light Foundation, Junior League of Buffalo, Greater Buffalo Youth Orchestra Foundation, Boy Scouts of America (BSA), Oishei Children's Hospital, [and the] Salvation Army."). *Id.*

Another former colleague and friend adds that in working together:

> you get a glimpse of who people really are. You see their character at their
> core. Chris was my friend at times when he didn't have to be my friend . . .
> [h]e is a person of loyalty, and courage. . . . [and] I continue to believe he is
> a good man who loves his family and country.

Ex. A at 70 (Letter from Hon. John Boehner). Another friend adds that, "[w]hen Chris learned

that my husband was suffering from a progressive neurological condition that eventually took his

life, he extended himself to our family in a way that was instrumental in how our family survived

during some extremely challenging times." Ex. A at 60 (Letter from Sawrie Becker).

A particularly poignant story comes from a retired prosecutor who has "personally

experienced the degree of his integrity, kindness and compassion." Ex. A at 42 (Letter from

Elizabeth Donatello Vito, Esq.). Ms. Vito explains how after she was subjected to sexual

harassment—"[a] moment that was painful, emotional and at times humiliating"—

> [v]ery few people wanted to be seen associating with me, including many
> in Chris' own political party, in his own district. But Chris, despite the
> potential political fallout, never wavered in his friendship and support. Not
> only did he listen with compassion he and Mary never treated me or my
> husband any differently than they had before. It is easy for others to
> minimize the small acts of friendship . . . but in that moment in time those
> simple common acts provided a much needed lifeline. *In those moments I
> wasn't alone, I wasn't a public spectacle, instead I was surrounded by the
> warmth of friendship.*

*Id.* (emphasis added). Ms. Vito also adds that, "[p]erhaps the best measure of his character,

beyond taking responsibility for his actions, is the fact that his family and friends have stayed by

his side steadfast in their love and support despite how easy, and socially expedient, it would be

to walk away." *Id.*

These words ring true. More than a hundred family members, friends, constituents,

partners, and supporters have written letters to the Court on behalf of Chris. Each represents a

life that Chris has touched in ways great and small.[4] Together, they show a man driven by humility, charity, selflessness, passion, and devotion. There can be no question that Chris is dedicated to family, community, and the well-being of others.

His character and established record of extraordinary deeds deserves significant consideration.

## IV.  UNRESOLVED OBJECTIONS TO THE PSR

In the PSR, Probation has accepted the parties' consensus with respect to the Guidelines calculation and has recognized that a substantial variance is warranted in this case. However, three minor objections remain outstanding concerning factual arguments by the Government that should not be relevant, in any event, to the Court's sentencing decision.

First, paragraph 34 makes an unsupported implication that Chris hypothetically would have traded but for the technical inability to do so. There is no evidence to support this supposition by the Government and, more importantly, a defendant's sentence must not be based upon what might have happened under a hypothetical set of circumstances that did not occur.

Second, paragraphs 38 and 41 imply that there is evidence to establish that Chris and his son agreed, some time prior to their surprise FBI interviews, to use the trading halt in Innate stock as a cover story. However, nothing produced by the Government in discovery, including, but not limited to, FBI Form 302s and Grand Jury testimony establishes that Chris and his son discussed in advance that they would use the fact of the trading suspension as a false excuse when later questioned by the FBI in separate, unannounced visits to their homes. Moreover, the Superseding Indictment does not specifically charge this conduct and it was not part of either

---

[4] Of course, not every letter can be recounted in detail. This is not meant to minimize the role Chris has played in the lives of the writers or the strength of their sentiment.

Chris' or Cameron's allocutions. Although the Government seeks to infer that Chris and Cameron previously discussed such a cover story from the fact that they both mentioned the trading halt during their FBI interviews, correlation is not causation. As a matter of common-sense, the fact that Innate had publicly announced a suspension in trading in advance of announcing the drug trial results was an obvious, untruthful excuse for trading prior to the public release of the results. There simply is no basis, beyond mere conjecture, to find that Chris and Cameron had a prior agreement to use a particular cover story. In any event, as a practical matter this contested fact has no impact on the Guidelines calculation, because Chris has agreed to a two-point enhancement under U.S.S.G. § 3C1.1 for obstruction.

Finally, paragraph 39 is wholly irrelevant. As records produced in discovery show, immediately after his FBI interview Chris unsuccessfully attempted on multiple occasions to reach Cameron. It was during this effort to contact Cameron, that he contacted Lauren Zarsky's brother looking for Cameron and obtained Dorothy Zarsky's number. An email from Lauren's brother to Lauren confirms that, "Cam's dad just gave me a call and is trying to get in touch with Cam."[5] The attempted call to Dorothy at 10:39 am, went to voicemail and no conversation occurred. The call to Dorothy was an unremarkable and unsuccessful attempt to locate his son, and has no relevance to sentencing.

While Chris maintains his objections to these minor factual points contained in the PSR, we respectfully submit that, as both a legal and practical matter, they should be of no relevance to the Court's sentencing decision. They have no additional impact on the Guidelines calculation, and do not require an evidentiary hearing.

---

[5] As we are not requesting an evidentiary hearing, we have not attached this email message. However, should the Court wish to review it, we can provide a copy.

## V.  THE RELEVANT SENTENCING CONSIDERATIONS SUPPORT A NON-CUSTODIAL SENTENCE

A sentence must be "sufficient, but not greater than necessary" to achieve the statutory sentencing purposes detailed in 18 U.S.C. § 3553(a)(2) for the sentence imposed to: (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The factors to be considered under section 3553(a) in fashioning an appropriate sentence include the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the Sentencing Guidelines Range; pertinent policy statements of the Sentencing Commission; the need to avoid unwarranted sentence disparities; and the need to provide restitution to victims. *See* 18 U.S.C. § 3553(a)(1)-(7).[6]

Chris accepted responsibility for his actions and pled well in advance of a scheduled trial. Probation and many who know him best have recounted in detail Chris' heartfelt expressions of remorse and regret for his conduct. He has already paid a heavy price. We respectfully submit that a measured consideration of the 3553(a) factors supports a sentence of probation plus a significant term of home confinement, extensive community service, and imposition of a substantial fine. This sentence will accomplish justice and satisfy the sentencing objectives.

### A.  The Offense Conduct Reflects Isolated, Uncharacteristic Conduct

Although Chris' life has been defined by hard work, charitable deeds, family devotion, generosity, civic engagement, job creation, public service, and giving back to community, he

---

[6] Chris neither traded himself nor profited from the trading of others. The Government is not seeking restitution and all of the defendants have settled with the SEC. PSR ¶¶ 46-47. Accordingly, this final factor is not relevant.

made critically bad decisions over the course of a few hours that have brought him before this Court. Probation said it best when it observed that, "[i]t is difficult to adjoin the individual who committed the illicit actions in this offense, with the otherwise commendable life Collins has led." PSR at 36. Chris accepts responsibility for his conduct and does not attempt to make excuses for it. However, a measured consideration of his history and characteristics, when considered along with the nature and circumstances of this offense, support a non-custodial sentence.

As recounted by former Innate CEO Simon Wilkinson, Chris was a steadfast and significant supporter of Innate for more than a decade. He had, on more than one occasion, come to the company's rescue financially because he had high hopes for the good that Innate could do. As a consequence, he was emotionally invested in Innate's outlook for success. Moreover, in early 2017, all indications for Innate's drug trial pointed to impending success, and a potential cure for a debilitating disease. The ultimate failure of Innate's drug trial was shocking and devastating, for Chris in particular. PSR ¶ 55; *see also* Ex. A at 37 ("[T]he trial failure surprised and devastated everyone associated with the company. We were all shocked.") (Letter from Michael Quinn). It was under these emotional circumstances that Chris made the terrible decision to share the bad news with his son, Cameron. The insider trading crime itself occurred in a phone call lasting less than seven minutes.

Unlike many insider trading cases prosecuted in this district, the offense here was not a long running, pre-meditated scheme among industry professionals. Similarly, the conduct did not involve multiple securities or multiple tips.[7] Chris did not receive a kickback or any other

---

[7] *Cf. United States v. Chow*, 17 Cr. 667 (GHW) (S.D.N.Y. 2017) (involving the co-founder of a private equity firm who provided tips on numerous occasions over a seventeen-month period and approximately $5 million in illicit profits); *United States v. Stewart,* 15-cr-00287-JSR (S.D.N.Y. 2015) (involving an investment banker and serial insider trading on multiple tips over four years resulting in more than $1.1 million in illicit profits); *United States v.*

personal financial benefit, and he did not trade himself.[8] Even the Government conceded that "[i]t [was] a one-event, one-stock, three-defendant scheme that took place over five days." (Gov't Opp. to Defs.' Discovery Mots. 8, March 8, 2019, ECF No. 69). Probation, too, recognized the aberrational and isolated nature of Chris' offense conduct:

> We understand that his motivation in becoming involved in the offense was out of concern for his son. This is no excuse to commit a crime, but it appears that Collins had a moment of weakness and executed bad judgment in the offense.

PSR at 36.

Nonetheless, it remains a very serious lapse of judgment committed by someone who would give anything to undo his mistakes. Chris acknowledged this in his allocution and in his statement of remorse:

> I was distraught that MIS 416 was not successful and would no longer be available to the compassionate trial patients in New Zealand and Australia. The failure of the trial was confidential corporate information that would not be released to the public for several days. As a Board member, I had a duty not to disclose it before public release by the company. News of the trial failure was shocking and devastating to me. Overcome by emotion I called Cameron and my wife Mary. Although I cannot remember exactly what I said to either of them, I made it clear that I had received bad news about Innate's drug trial result, and Cameron and I agreed that if he could trade any of his stock, he would.

PSR ¶¶ 54-55. *See also* Ex. A at 3 (describing the phone call as "rash, emotional") (Letter from Mary Collins); at 48 ("His wasn't a pre-meditated, carefully contrived plan to cheat. Rather, it

---

*Gupta*, 11 Cr. 907 (JSR) (S.D.N.Y. 2011) (involving former McKinsey & Co. managing director and Goldman Sachs board member and one of the largest hedge fund trading cases in history, yielding $64 million); *United States v. Hobson*, 16 Cr. 351 (LTS) (S.D.N.Y. 2017) (involving investment advisor and six-year-long scheme).

[8] Put another way, this conduct was not in the "heartland" of insider trading cases as envisioned by the Sentencing Commission. *See, e.g., Koon v. United States*, 518 U.S. 81, 96 (1996) (a sentencing court must determine whether a particular case presents features that "take the case out of the Guideline's heartland.")

was a spontaneous and emotional reaction to a devastating turn of events.") (Letter from Geoffrey Rosenberger).

The false statements charge similarly involved conduct that occurred over an extremely short period of time—namely during the course of a 6:30 a.m. surprise interview by the FBI— when a father lied in a misguided effort to protect his family and himself. Notably, at the time of the interview, the FBI had already developed probable cause to believe insider trading had been committed and had secured at least sixteen search warrants. The false statements made by Chris and others, while material, were likely not credited. Indeed, the investigation was completed and the indictment returned within a few months after the interviews. However, in his allocution, Chris readily admitted that he falsely denied sharing the trial results with his son and acknowledged the seriousness of the offense. Critically, he also stipulated to a two-level enhancement under U.S.S.G. §3C1.1 as applicable in light of this conduct which further demonstrates the fullness of his acceptance of responsibility.

### B.    *The Sentencing Guidelines Calculation*

There is no disagreement among Chris, Probation, and the Government over the applicable Guidelines calculation. However, as the Court is aware, the Guidelines are "advisory" and sentencing courts should "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (quoting *United States v. Booker*, 543 U.S. 220, 245 (2005)). Accordingly, the Sentencing Guidelines represent an "initial benchmark," but are "only one of the factors to consider" when imposing a sentence. *Gall v. United States*, 552 U.S. 38, 49, 59 (2007). *Accord Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (the Guidelines "serve as one factor among several courts must consider in determining an appropriate sentence"); *United States v. Carvajal*, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22,

2005) (stating that a "sentence that satisfies only the Guidelines would be 'greater than necessary, to comply with the purposes' set forth in the statute.").

Indeed, because they are only a starting point, there is no presumption that the Guidelines range is reasonable. *Gall*, 552 U.S. at 50. This character of the Guidelines—being both advisory and not presumptively reasonable—has been emphasized by the Supreme Court. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable. . . . The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").

As the parties agree, the counts of convictions are grouped pursuant to U.S.S.G. § 3D1.2(c) and § 3C1.1 note 8, with section 2B1.4 applicable to the group. The base offense level is 8 pursuant to U.S.S.G. § 2B1.4(a). A 14-level increase applies under U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(H). Two additional 2-level increases are applicable under U.S.S.G. §§ 3B1.3 and 3C1.1. Finally, a three-level reduction is warranted pursuant to §§ 3E1.1(a) and 3E1.1(b) for acceptance of responsibility and timely entry of a guilty plea. Consequently, the parties anticipate that the adjusted offense level is 23. Because he has no criminal history, Chris' criminal history score is zero, giving him a criminal history category of I. The corresponding Guidelines imprisonment range is 46-57 months. In the PSR, Probation has accepted the parties' consensus with respect to the Guidelines calculation, PSR ¶¶ 60-71, with a recommendation for a substantial variance.

### C.    The Guidelines Place An Undue and Disproportionate Emphasis on Gain and Is Not A Fair Measure of The Offense Conduct In This Case

Notwithstanding the Guidelines calculation, we respectfully submit that a substantial variance is warranted here because the Guidelines methodology in this and many other insider trading cases, places a disproportionate reliance upon the loss table set forth in section

2B1.1(b)(1). In the instant case, Chris' advisory Guidelines range is driven largely by a 14-point

increase based on the loss table in § 2B1.1(b)(1). For good reason, numerous courts and scholars

have strongly criticized this methodology for assessing the seriousness of an insider trading case

as irrational or unjust.

Courts have increasingly recognized the loss table as a poor proxy for culpability. "Under

the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies

may trigger sentences amounting to life imprisonment." *United States v. Ebbers*, 458 F.3d 110,

129 (2d Cir. 2006). As another judge in this District noted in an insider trading case that, unlike

this one, spanned many years and involved multiple tips:

> By making a Guidelines sentence turn, for all practical purposes, on this
> single factor, the Sentencing Commission effectively ignored the statutory
> requirement that federal sentencing take many factors into account, *see* 18
> U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such
> sentences would be irrational on their face.

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). *See also, United States v.*

*Faibish*, No. 12-CR-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) ("The loss

table is but one example of the seemingly mindless acceleration of penalties for economic crimes

incorporated into the current Sentencing Guidelines regime."); *United States v. Adelson*, 441 F.

Supp. 2d 506, 509 (S.D.N.Y. 2006) (describing the "inordinate emphasis that the Sentencing

Guidelines place in fraud cases on the amount of actual or intended financial loss"); *United*

*States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (describing loss amount as a

"relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

In addition to skepticism from courts in this Circuit, the economic crimes Guidelines

have received broad criticism from across the legal profession. Indeed, the ABA commissioned a

task force to review and propose amendments to the economic crimes Guidelines. Published in

November 2014, the ABA Task Force Report proposed an overhaul that shifted the emphasis

away from loss. *See* "A Report on Behalf of the American Bar Association Criminal Justice

Section Task Force on The Reform of Federal Sentencing for Economic Crimes" (Nov. 10,

2014), *available at* https://www.americanbar.org/content/

dam/aba/publications/criminaljustice/economic_crimes.pdf. Moreover, the ABA Task Force

Report recommended that where a defendant has zero criminal history points and the crime was

not "otherwise serious" under 28 U.S.C. § 994(j), the offense level should be no greater than 10

and "a sentence other than imprisonment is generally appropriate." *Id.* at 2.

> It is clear the Guidelines miss the mark for economic crimes:

>> [t]he Sentencing Commission was supposed to ensure "the general
>> appropriateness" of probationary sentences for first-time offenders unless
>> they commit "crime[s] of violence or ... otherwise serious offense[s]."
>> Instead, it unilaterally declared in 1987 that every theft, tax evasion,
>> antitrust, insider trading, fraud, and embezzlement case is "otherwise
>> serious," and thus no more eligible for a sentence of probation, even when
>> committed by a firsttime offender, than would a crime of violence.

*United States v. Leitch*, No. 11 Cr. 00039 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28,

2013) (internal citations omitted). The collective view among many respected jurists, scholars,

and practitioners is that a sentencing court's considerations should not begin and end with gain,

but, rather, should turn on a number of other factors, a broad view of the offense, and the specific

characteristics of the defendant. The advisory Guidelines range of 46-57 months in this case "is

skewed irrationally" through an undue emphasis on gain. *United States v. Whitman*, 12 Cr. 125

(JSR) (S.D.N.Y. Jan 24, 2013) Sentencing Tr. at 7:19-20; 9:17-18, attached as Ex. B.

> The U.S. Attorney's Office itself has implicitly recognized that the Guidelines can be

overstated in insider trading cases. In the recent case of Sean Stewart, for instance, the defendant

was due to be re-sentenced following a guilty verdict in a retrial of a conviction that had been set

aside on appeal. His advisory sentencing guidelines range was 63 to 78 months. Unlike Chris, Mr. Stewart was a financial insider on Wall Street and his scheme was long-running—he "repeatedly and persistently" breached his duties on at least five separate occasions over four years. *See* 1:15-cr-00287-JSR, ECF No. 363 at 27 (Government's Sentencing Submission). Moreover, he committed perjury in his first trial and violated his bail conditions. Nonetheless, the Government took the position that a sentence of only 36 months—slightly more than half of the Guidelines minimum—was reasonable for Mr. Stewart. *Id.* at 28. Ultimately, the Court sentenced Mr. Stewart to 24 months' imprisonment for conduct that was substantially more culpable and serious than the conduct in the instant case.

We agree with the judgment of Probation that the Guidelines range of 46 to 57 months is not an appropriate indicator of the sentence Chris should receive.

> **D.   *Other Section 3553(a) Factors Warrant a Sentence Substantially Below The Guidelines Range***

After carefully evaluating the section 3553 factors, Probation concluded that, "given Collins's lack of a criminal history record, the non-violent nature of his offense, his acceptance of responsibility in the offense, and his service to his community, we believe that a non-guideline sentence is warranted. . . ." PSR at 36; PSR ¶ 151 ("A variance may be warranted in this case based on the defendant's personal characteristics, such as his lack of criminal history record, and his history of volunteerism and service to the community, pursuant to 18 USC 3553(a)."). Probation is correct in its conclusion that the section 3553(a) factors support leniency and a substantial variance from the Guidelines.

> **1.   *Chris' Personal History and Characteristics, and The Aberrational Nature of His Conduct, Support Leniency***

Section 3553(a)(1)'s directive that a sentencing court consider "the history and characteristics of the defendant" as a necessary sentencing factor is a balancing exercise:

> surely, if ever a man is to receive credit for the good he has done, and his
> immediate misconduct assessed in the context of his overall life hitherto, it
> should be at the moment of his sentencing, when his very future hangs in
> the balance. This elementary principle of weighing the good with the bad. .
> . .was plainly what Congress had in mind. . . .

*Adelson*, 441 F. Supp. 2d at 513-14. As the recommendation by Probation and the numerous

letters submitted by friends, colleagues, and family members who know him best make clear,

Chris' criminal conduct was an extreme deviation from his 69 years of being a model, law

abiding citizen. Chris's family, friends, and colleagues give testament to that fact that he is a

fundamentally honorable person. He is "kind and decent." Ex. A at 105 (Letter from August

Iacovitti). He conducts himself with the "highest" and "utmost" integrity. Ex. A at 116 (Letter

from James Olchawski); at 59 (Letter from Robert Stevenson); at 100 (Letter from Ronald

Nowak). He is a man of "caring nature and upstanding character." Ex. A at 36 (Letter from Brian

Geary). In his dealings with others, Chris is "compassionate, loyal and sympathetic." Ex. A at

117 (Letter from David Flaum). Simply: "He is a good man." Ex. A at 55 (Letter from Robert

Schlehr).

But, even good people make bad decisions. That is what happened here. There is no

question that Chris betrayed his own values:

> I know that Chris believes in the values of Scouting and that makes his
> current situation all the more difficult because I truly think that his action in
> this case was totally out of character for him.

Ex. A at 41 (Letter from Joseph McMahon). Those who know Chris "truly believe this incident

was an aberration that should not define him as a person." Ex. A at 54 (Letter from John

Schmidt, Jr., Esq.). This theme is echoed throughout the attached letters of support. *See, e.g.,* Ex.

A at 56 ("Chris Collins' criminal conduct was an aberration and not who Chris truly is.") (Letter

from Theresa Jehle); at 91 (describing the charges as "completely out of character" and "an

33

aberration of his character.") (Letter from Hon. Todd Rokita); at 10 ("I can't explain his

behavior, but I can say with all sincerity that this was completely out of character.") (Letter from

Ted Collins); at 82 ("I do know that what he has pled guilty to is completely out of character

from my personal dealings with Chris.") (Letter from E. Ronald Graham). In short, "sometimes

individuals make decisions that are outside the scope of character of who they are as a person –

an outlier event – and I firmly believe this to be the case with Chris." Ex. A at 44 (Letter from

Cheryl Green, Esq.). Chris' error in judgment does not reflect his true character.

> 2.    *A Non-Custodial Sentence Is Warranted in Light of Chris' Exceptional Public Service, Charitable Acts and Contributions to the Community*

In accordance with the fundamental policy concerns underlying section 3553(a), courts

should consider a defendant's long and extensive history of good deeds and public service. *See*

*Rita v. United States*, 551 U.S. 338, 364-65 (2007) (concurrence) ("[C]ivic, charitable, or public

service are . . . matters that § 3553(a) authorizes the sentencing judge to consider."). *Accord*

*Adelson*, 441 F. Supp. 2d at 513-14 (recognizing the defendant's extensive history of compassion

and generosity).

Indeed, "exceptional" good works warrant a meaningful variance for an individual like

Chris. *United States v. Serafini*, 233 F.3d 758, 773-74 (3d Cir. 2000). In *Serafini*, a case

involving an elected official, the Third Circuit upheld a Guidelines departure where many letters

supporting the defendant "contain[ed] substantive descriptions of Serafini's generosity with his

time as well as his money." *Id.* at 773. Indeed, "[s]everal constituents and friends described

situations in which Serafini extended himself to them in unique and meaningful ways during

times of serious need." *Id.* Finding that Mr. Serafini was "an exceptionally giving person,"—

such as is the case here—the Third Circuit upheld the district court's downward departure for

community and charitable activities. *Id.* at 774-75.

In another case, the Third Circuit affirmed a variance due largely to the defendant's exceptional charitable acts and good works, resulting in a sentence similar to the sentence requested in this submission—probation, home confinement, community service, and a significant fine. *See United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009). *See also United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming reduced sentence (three months against a Guidelines range of 60 months) in part based on the defendant's "charitable work, community service, generosity with time, and spiritual support and assistance to others"); *Gupta*, 904 F. Supp. 2d at 353 (imposing sentence of 24 months, against a Guidelines range of 78-97 months (a variance of 70%) in part because the record established "beyond cavil that Mr. Gupta has selflessly devoted a huge amount of time and effort to a wide variety of socially beneficial activities . . . .").

Over the past thirty-five years, if not longer, Chris has impacted countless lives for the better. The letters of support recount a lifetime filled with charity, acts of kindness, generosity, and love. They show a man driven by dedication to family, service to community, charity to others, and a desire to better the world around him. As summarized above, many letters detail Chris's efforts to preserve and create jobs for hundreds of families in his community, the help he provided to employees, friends, and constituents in need, and his work with the Boy Scouts to positively impact the lives of young people. Others wrote powerfully of how Chris made a difference in the lives of employees and other individuals in need. The help that Chris has provided to employees, scouts, his constituents, friends, and relatives, squarely represents the type of "exceptional" works that warrant a substantial variance.

3. <u>*The Letters from Innate's Former CEO, Former Chairman, and Investors are Compelling Calls for Leniency*</u>

The Court has before it letters from Innate's former CEO and Chairman as well as four letters from other Innate investors sent in support of Chris. Such appeals for leniency from people so closely associated with a putative victim are unique in an insider trading case and, as one court has recently observed, "a pretty significant statement." *United States v. Beshey, et al.*, Sentencing as to Shane Fleming (Aug. 30, 2019).[9] In that case, involving a Life Time Fitness executive who leaked information about the gym's planned announcement that it was going private, the court imposed a 60-day sentence on the tipping executive. That sentence, as Judge Matthew Kennelly described, was "significantly lower" than what he had anticipated handing down before Life Time's former general counsel asked for leniency. *Id.* The support of the company's general counsel, the Court observed, said a great deal about the defendant's character.

Here, too, the letters from those associated with Innate demonstrate understanding, sympathy and a sincere desire for leniency. As Simon Wilkinson, former Innate CEO writes:

> Mr Collins was a stalwart supporter of Innate for over 10 years and the Company would have failed on at least two separate occasions without his significant cash investments and his unwavering confidence in the Company and its clinical programs. . . . At the Board table, Mr Collins could be totally relied upon to put the interests of the Company and its shareholders at the forefront of any discussions or decisions that occurred. . . . I believe he cared very deeply for the plight of these patients and he steadfastly believed that the Company's drug development efforts would ultimately lead to treatment breakthroughs for these patients.
>
>         *          *          *
>
> I was shocked to learn of the allegations made against Mr Collins last year. Given Mr Collins personal wealth, I can only think that he had something akin to a 'brain explosion' upon learning of the completely unexpected

---

[9] While the transcript of this proceeding is not public on ECF, the statements quoted were published in an article *available at* https://www.law360.com/articles/1194287/ex-fitness-vp-gets-2-months-for-tipping-go-private-deal (Aug. 30, 2019).

clinical trial result. . . . In light of this and all my previous positive and straight up and down dealings with Mr Collins, I am at a complete loss to explain or understand why he did what he did.

Subsequent to him pleading guilty, Mr Collins has written to me saying his actions were stupid, rash, and inexcusable. He said he was racked with emotion and not thinking straight. I think those admissions tend to confirm my own initial reaction to his actions as noted above.

*     *     *

I would like to think that what I have been able to say in the letter might help the Court when considering it's sentencing of Mr Collins.

Ex. A at 35–36 (Letter from Simon Wilkinson). Similar sentiments are expressed by Michael

Quinn, former Chairman of the Board of Innate:

[T]he trial failure surprised and devastated everyone associated with the company. We were all shocked. That shock was compounded by the realisation that the patients on compassionate use would have the drug withdrawn and would return to the cruel path of physical deterioration.

*     *     *

[A]s we dealt with the news I expect many of the board and executives in New Zealand and Australia did share their dismay with family members. . . . It is no surprise to me that Chris was equally, if not more shattered as the rest of us when he heard the trial outcome. In what could only have been an emotional reaction to news, he made the reactive decision to share his dismay with someone close.

*     *     *

I know he is hurting. His reputational loss is immense. His Congressional resignation embarrassing. I am sure he finds it hard to face his many friends and colleagues whom he encouraged to support the company on its journey. I know he is shaken because he is at a loss to explain his blunder and can't apologise enough for letting down his family, friends and colleagues. I expect he is finding his situation mentally challenging.

Your Honor, as you ponder sentencing, may I request that you give consideration to Chris's terrible reversal of personal circumstances and weigh his natural emotional but erroneous response to bad news against his huge support of the company and the years of contribution to his upstate New York community.

Ex. A at 37–38 (Letter from Michael Quinn). One investor adds:

> Should Chris have known better than to make that telephone call?
> Absolutely. But, speaking as someone who has shared the Virionyx/lnnate
> journey with Chris over the course of all these years, I can understand the
> panic that must have set in when he heard the news that the trial had failed.
> His reputation and a lifetime of personal relationships were now suddenly
> at risk. That certainly doesn't excuse his action in calling his son to share
> the news. But I hope it does help to explain his state of mind. His wasn't a
> pre-meditated, carefully contrived plan to cheat. Rather, it was a
> spontaneous and emotional reaction to a devastating turn of events.
>
> *        *        *
>
> I'm not trying to minimize in any way the severity of the actions for which
> Chris had plead guilty. But I do hope that the context I've provided in this
> letter contributes some useful relevant perspective as you work your way
> through the sentencing process.

Ex. A at 48 (Letter from Geoffrey Rosenberger). *See also* Ex A at 51–52 ("I am an original investor in Virionyx . . . I appeal to the Court to show leniency to a man, who has been an outstanding citizen all his life except for one unlawful mistake that will affect him and his family for the rest of their lives.") (Letter from Craig Schreiber); at 110 ("If you look at Chris' life in totality it certainly isn't defined by what I think must have been a momentary lapse in judgment.") (Letter from Innate investor Philip Corwin); at 59 ("In short, despite the fact that I lost my investment I don't blame Chris and still consider him a friend.") (Letter from Innate investor Robert Stevenson).

These submissions, from those involved directly with Innate and who also suffered losses as a result of the failed drug trial, are telling. They recognize that Chris' was in a state of shock and disbelief when he learned the bad news, as were they, and that his bad decision to tell his son about the results was undoubtedly the product of emotion. Moreover, they ask the court to weigh this isolated breach of trust by Chris against the decade of support he provided to Innate in the

38

hope of developing a drug that would improve the lives of many who were suffering. It is particularly revealing of Chris' character and decency that individuals who not only held their shares and lost money, but also suffered the failure of the entire company, emphatically support Chris and ask for leniency. These are, indeed, "pretty significant statement[s]." *Beshey*, supra.

### E.     *Chris Has Unquestionably Accepted Responsibility and Shown Complete Remorse*

Without question, Chris is a man of conviction and singular character who admittedly committed a serious offense in contradiction to his core values. Who he remains as a person, however, is evident from the manner in which he has responded to his failings.

Chris deeply regrets engaging in the charged conduct and has fully accepted responsibility. He has acknowledged that what he did was unlawful and entered a guilty plea at an early stage, well before trial. Along with his guilty plea, he resigned from Congress ending a decade of dedicated public service under a cloud of shame and humiliation. *See* Ex. A at 7 ("His ability to help his constituents through his job as a Congressman gave his life purpose and joy.") (Letter from Caitlin Collins). Chris makes no excuses. *See* PSR ¶ 59 ("Based on the defendant's offense statement and timely plea, it appears that the defendant has accepted responsibility for his actions in the offense."); PSR ¶ 69 ("The defendant has clearly demonstrated acceptance of responsibility for the offense"). As one friend and neighbor observes, "[t]hough his misconduct has surprised me his show of remorse and his willingness to accept responsibility for his actions has not." Ex. A at 58 (Letter from Maureen Griffin Tomczak).

As another friend explains, Chris' shame and remorse are so great that it defies a ready description—words simply cannot capture its breadth and completeness. Ex. A at 42 ("He is ashamed and remorseful beyond what I have the ability to express.") (Letter from Elizabeth Donatello Vito, Esq.). These days, Chris is a humbled individual. Caitlin Collins explains that

"[t]he man I know as my father is now a gentler, humbler, and more introspective man." Ex. A at

7 (Letter from Caitlin Collins). Those around Chris know that he is "very remorseful" and

"disappointed in himself in that his actions are counter to the culture he was trying to create in

the community." Ex. A at 103 (Letter from R. Cole Bergan). There is no question that Chris

"understands that his conviction will forever change his future and how he is perceived in our

community. He knows this and has expressed his deep remorse." Ex. A at 22 (Letter from

Christopher Catt). *See also* Ex. A at 15 (Letter from Marcia Geary); at 59 (Letter from Robert

Stevenson); at 67 (Letter from Angelo Natale); at 75 (Letter from John Yurtchuk); at 86 (Letter

from Hon. Luke Messer); at 102 (Letter from Hon. Brian Babin); at 107 (Letter from Brian

Lipke).

      It is not the impact on himself, however, that most fuels Chris' remorsefulness. He bears

the burden of knowing that he has harmed those whom he loves most. "I know firsthand that he

feels he has jeopardized his family with his actions. . . . Mr. Collins has expressed to me his

remorse, embarrassment, and sense of letting those he cared about down because of his actions."

Ex. A at 24 (Letter from George McNerney). Chris' sister adds that "I know his heart is broken

for what he has done and the pain he has caused his family and his community." Ex. A at 12

(Letter from Claudia Topping).

      As Chris' wife, Mary, explains Chris has been "torturing himself over this horrible failure

on his part," which has been devastating to the entire Collins family. Ex. A at 3 (Letter from

Mary Collins). She describes:

> I can attest to Chris' remorse over the rash, emotional phone call he made
> to our son, . . . He has spent his life protecting Cameron and he recognizes
> that the phone call has had a [devastating] impact on our family and on
> Cameron. Chris now has to live with the fact that Cameron has a felony
> conviction that will haunt him for the rest of his life. Nothing could be worse

for a caring, loving Dad who always tried to steer Cameron to success and be a positive role model.

\* \* \*

Our family has suffered terribly . . . As a mother and wife, I find myself reduced often to uncontrollable tears. Chris has been so devastated and ashamed of his actions that he finds it hard to go back home to Buffalo, where my whole world is.

\* \* \*

I am asking you, Judge Broderick, to be merciful in your decision, taking into account all the pain and anguish our family and Chris has already endured . . . .

*Id.* Independent of the outcome in this case, the harm, anguish, and pain that Chris has caused will be a permanent punishment: "the embarrassment and shame he brought upon himself and his family will live with him for the rest of his life." Ex. A at 111 (Letter from Hon. Michael Ranzenhofer); *see also* Ex. A at 52 ("one unlawful mistake [ ] will affect him and his family for the rest of their lives") (Letter from Craig Schreiber). Chris will forever be haunted by what he has done. *See* Ex. A at 3 (Letter from Mary Collins); at 7 ("He . . . remains haunted by the impact on our family.") (Letter from Caitlin Collins); at 55 ("One bad decision . . . will haunt him for the rest of his life.") (Letter from Robert Schlehr).

### F. A Non-Custodial Sentence (With Conditions) Would Afford Adequate Deterrence and Protect The Public, Impose Just Punishment, and Promote Respect for The Law

Chris has already paid, and will continue to pay, a very serious price for his crimes. As a result of his felony prosecution, plea, and harsh collateral consequences, nobody can look at the impact on Chris' life and conclude he escaped with minimal consequences. Chris is already a lesson to others. Moreover, society would receive no benefit from incarcerating Chris. He poses no danger to the community and has given back to the public his whole life. Under the

circumstances of this case, a non-custodial sentence with home confinement, extensive

community service, and a considerable fine appropriately addresses the purposes of sentencing.

       1.      <u>*Incarceration Is Not Necessary for Specific Deterrence*</u>

With respect to specific deterrence, given the aberrational nature of Chris' conduct, his

extreme remorse, his advanced age, and the harsh collateral consequences of the offense, there is

no colorable risk that Chris will commit an offense in the future. Chris has and continues to pay a

very serious price—both personal and professional—for his crimes. Having experienced the

devastating effect that his criminal conduct has had on his family, and others, Chris will never

fall on the wrong side of the law again. In addition to enduring the penalty of a felony conviction

and the loss of various civil rights for the rest of his life, Chris entered into a civil settlement with

the SEC. As part of this agreement, he has been permanently barred from serving as an officer or

director of a public company and enjoined from future violations. He will not be in a position to

commit similar conduct.

Chris' professional life is now also at an end as a result of his offenses. In advance of

pleading guilty, he resigned from Congress. This was "one of the hardest things he has ever

done." Ex. A at 7 (Letter from Caitlin Collins). Notwithstanding a lifetime of good works, Chris'

legacy will forever be tarnished: "[h]e . . . will always be known as the disgraced former

Congressman." Ex. A at 3 (Letter from Mary Collins). His brother describes how the

consequences for Chris have been immediate and severe:

> Chris is a loving father and has always been there for his wife and children.
> He now has to live with the fact that because of his actions his only Son has
> been convicted of a felony.
>
> Chris has been known as a successful businessman and is now viewed by
> many as corrupt.
>
> He was known as the Honorable Congressman Collins and is now viewed
> as the disgraced former Congressman.

> Chris was considered a pillar of his community and is now known as a convicted felon.

Ex. A at 11 (Letter from Ted Collins). For "someone who so valued public life," he "has already dealt himself the most severe punishment that could be imposed." Ex. A at 79 (Letter from Philip Stokes).

The public humiliation will follow Chris and mar him for the rest of his life. *Cf. United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (considering, when granting a variance, the "incalculable damage" from "tremendous media coverage" including that the defendant was "portrayed as the face of public corruption") *aff'd*, 523 F.3d 1258 (10th Cir. 2008). The likelihood of recidivism in this case is infinitesimal and a sentence of incarceration is unnecessary for specific deterrence. *See, e.g., United States v. Gupta*, 11 Cr. 907 (JSR) (S.D.N.Y.) Sentencing Tr. at 54:3-6 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result."), attached as Ex. C; *Adelson*, 441 F. Supp. 2d at 514 ("[with the defendant's] reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."). Specific deterrence has already been achieved. As Probation recognizes: "[w]e believe that Collins will not be committing any illegal actions in the future." PSR at 36.

### 2.    *Incarceration Is Not Necessary to Achieve General Deterrence*

Under the circumstances described above, incarceration in this case is not necessary to deter criminal conduct generally or promote respect for the law. The already-manifest consequences, as well as the imposition of a sentence of probation with home confinement, would serve as a profound example to anyone in a position to leak material non-public information to a relative. The mere fact of a career-ending felony conviction generally deters bad

conduct among first-time offenders, who largely comprise the class of insider-trading defendants. This is particularly true in the case of a convicted Congressman whose offense did not concern the misuse of his office. The prosecution and plea in this case demonstrate that nobody is above the law and that the consequences of insider trading are severe.

> 3.    *Society Will Derive No Benefit from Incarcerating Chris*

Chris has never been arrested before this case, and does not pose any danger to the community. There is no need to protect the public from further crimes by him. Incarceration would not only *not* further the purposes of sentencing, but it would be a societal detriment.

Chris is 69 years old and his age, combined with his notoriety, would likely result in higher costs of, and greater challenges to, achieving safe incarceration. In May 2015, the Department of Justice's Office of Inspector General issued a report titled "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" (*available at* https://oig.justice.gov/reports/2015/e1505.pdf) (revised February 2016). That report found that the Bureau of Prisons had limitations on its ability to house elderly inmates and incurred a greater cost to do so. The Report further concluded that aging inmates (age 50 and up) engage in fewer incidents of misconduct while incarcerated and have a significantly lower recidivism rate than for all federal inmates. *Id*. at i. Likewise, the First Step Act specifically emphasizes that the "Bureau of Prisons shall, to the extent practicable, place prisoners with lower risk levels and lower needs on home confinement for the maximum amount of time permitted under this paragraph." 18 U.S.C. § 3624(c)(2). And the pilot program evidences a Congressional intent of encouraging home confinement for elderly offenders that pose no danger or risk of recidivism. A sentence that incorporates home confinement rather than incarceration would be in keeping with the Congressional intent behind the First Step Act.

Further, if Chris receives a non-custodial sentence, he will be able to contribute to society through extensive mandatory community service. Even in the absence of a court-order, Chris would endeavor to spend his time volunteering and giving back to the community as he has done throughout his life.

As one former colleague observed: "I am convinced that, if given the opportunity, Chris has more to offer to his family and nation." Ex. A at 86 (Letter from Hon. Luke Messer). As many of the other attached letters describe, Chris' good deeds have been exceptional and extensive throughout his lifetime. His generosity of spirit, kindness of soul, and strength of character make clear the impact that Chris' deeds have had on countless people. Fashioning a sentence structured around community service guarantees that he will continue giving back the community, as he has done for all of his life. *See, e.g.,* Ex. A at 65 ("If incarcerated he will read books, exercise and wait for his sentence to pass. Our society will not be any better served.") (Letter from Paul Shine); at 92 ("I think Chris has a lot left to give his community and society in general.") (Letter from Hon. Todd Rokita). To this end, Chris has already sought to identify community service organizations and potential opportunities. These would, of course, be subject to approval by Probation, but could include among other enterprises: (a) a national small business resource organization wherein Chris could provide the type of mentorship and assistance that many of the attached letters emphasize has been so important over the years; (b) a nation-wide program serving low-income residents, veterans, and others, including the infirm and homebound, addressing hunger and nutrition needs prevalent in every community; (c) a national organization focused on constructing homes for needy members of local communities, and one that could greatly benefit from Chris' engineering, handyman, and woodworking skills; and (d) an organization dedicated to serving children and teens as they learn and grow into

productive and caring citizens (young entrepreneur programs, financial literacy, and the overall mission could benefit from Chris' experience, knowledge, and wisdom, including as a father, grandfather, businessman, and mentor). He would be prepared to begin immediately after approval.

In short, Chris should be somebody who is *part* of the community, not removed from it.

### G.      *A Non-Custodial Sentence Is Warranted to Avoid Sentence Disparities*

A non-custodial sentence which incorporates significant home confinement is appropriate when looking at other similarly situated individuals who have pled guilty to insider trading offenses. Indeed, a broad survey of insider trading cases shows that a probationary sentence (or time served) is common where individuals have pled to at least one substantive insider trading offense or an insider trading conspiracy. This is true based on a review of cases in this District, as well as nationally.[10]

Judges in the Southern District of New York (and elsewhere) have recognized that, for defendants who have pled guilty to insider trading, probation or home confinement provides appropriate, substantial, and just punishment. Former Arthur Anderson Managing Partner, H. Clayton Peterson who tipped his son material non-public information (on which the son traded and tipped another) received a non-custodial sentence for his insider tipping activities. Mr. Peterson, a board member of Mariner Energy, tipped his son, an industry insider, to an impeding merger following his participation on a telephonic board meeting discussing this material non-public information. The illicit profits from the entire scheme totaled in excess of $5 million. He

---

[10] In considering this factor, it is necessary and appropriate to look at the body of case law developed nationwide. *See United States v. Toohey*, 132 Fed. App'x 883, 886 (2d Cir. 2005) ("Congress's 'objective was to eliminate unwarranted disparities nationwide.'") (quoting *United States v. Joyner*, 924 F.2d 454, 460-61 (2d Cir. 1991)); *United States v. Caraballo*, 219 Fed. App'x 99, 101 n.1 (2d Cir. 2007).

received two years' probation including three months of home confinement and a $400,000 fine. *United States v. Peterson*, No. 11 Cr. 664 (RPP) (S.D.N.Y. 2012).[11]

Similarly, Judge Swain recently sentenced Robert Stewart, a 61-year-old father and grandfather to four years' probation including a year of home confinement following his plea to participating in a trading scheme that produced $1.6 million in profits. Over the course of four years, Mr. Stewart's son provided material non-public information which Mr. Stewart used to both trade and tip another. Mr. Stewart received probation despite lying in the course of the government's investigation. Judge Swain acknowledged that there are significant consequences a court could impose beyond a custodial term. Given the restrictions of home confinement, the legal troubles faced by Mr. Stewart's son, the need to care for his wife, Stewart's age and otherwise lawful and positive life, Judge Swain's imposed a sentence of probation with home confinement. *United States v. Stewart*, 15 Cr. 287 (LTS) (S.D.N.Y. 2016).

Likewise, Judge Chin sentenced Ken Okada to three years' probation for his participation as both a tipper and tippee in a pervasive insider trading ring. Mr. Okada received $300,000 in profits and made false statements to the FBI prior to his guilty plea. *United States v. Okada*, 07 Cr. 144 (DC) (S.D.N.Y. May 6, 2008). District of New Jersey Judge Shipp sentenced Richard Yu to one-year of home confinement following a guilty plea to trading on, and tipping, inside information that Yu had received on two separate occasions. Mr. Yu realized $93,000 in profits while his tippee realized $107,000. *United States v. Yu,* 17 Cr. 349 (MS) (D.N.J. 2017). *See also United States v. Ng*, 11 Cr. 161 (JSR) (S.D.N.Y. 2012) (tipper who violated his fiduciary duties

---

[11] Even Drew Brownstein, a downstream tippee and an industry insider, reaped millions in illegal profits yet only received year and a day in prison following his guilty plea. FBI, "Hedge Fund CEO Sentenced" (Jan. 11, 2012) *available at* https://archives.fbi.gov/archives/newyork/press-releases/2012/hedge-fund-ceo-sentenced-in-manhattan-federal-court-to-one-year-and-one-day-in-prison-for-insider-trading-scheme-that-netted-nearly-2.5-million-in-profits.

sentenced to probation); *United States v. Collotta*, 07 Cr. 143 (VM) (S.D.N.Y. 2007) (Morgan Stanley attorney at the apex of the scheme sentenced to four years' probation, six months' home confinement, and 60-days imprisonment); *United States v. Bonthu*, 18 Cr. 237 (AT) (N.D. Ga. 2018) (defendant received eight months' home confinement following his sale of stocks sold due to knowledge of insider information); *United States v. Perez*, 17 Cr. 538 (MS) (D.N.J. 2017) (defendant who traded following two separate tips from an insider sentenced to one year home confinement); *United States v. Cope*, 16 Cr. 210 (AAT) (M.D. Tenn. 2016) (defendant who was an attorney and board member violated his fiduciary duty by trading on inside information received two years' probation including nine months' home confinement); *United States v. Melvin*, 14 Cr. 22 (TCB) (RVG) (N.D. Ga. 2014) (defendants, the tipper and the tippee, both received a one-day prison sentence along with probation following participation in an insider trading scheme netting $550,000 in profits); *United States v. Zeringue*, 14 Cr. 67 (BAJ) (RLB) (M.D. La. 2014) (defendant-tipper sentenced to three years' probation).

As the cases above demonstrate, non-custodial sentences are common "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Indeed, it has been the necessary conclusion of such courts that the Guidelines are overly punitive when it comes to insider trading cases like this one.

It is notable that criminal prosecutors frequently decline to charge tippers when they do not receive any financial gain from a tippee's trade. Recent prominent cases illustrate this point. *See, e.g., United States v. Newman*, 773 F.3d 438, 443 (2d Cir. 2014), *abrogated by Salman v. United States*, 137 S. Ct. 420 (2016) (in scheme with nearly $70 million in profits from illegal trading, insider/tipper (Rob Ray) was not charged at all and another insider/tipper (Chris Choi) faced only civil charges); *United States v. Martoma*, 894 F.3d 64 (2d Cir. 2018), 2013 WL

12196768 (S.D.N.Y. Dec. 26, 2013) (neither doctor/tipper was charged, and both received non-prosecution agreements, in what the Government described as the most lucrative insider trading scheme ever charged).

Moreover, solely for purposes of pointing out the significant punitive effect of Chris' felony conviction in this case as compared with other insider trading cases involving similar or larger trading amounts that are handled civilly only. The SEC often singularly handles insider trading cases with comparable gains/losses through its civil authority to impose punishments such as disgorgement, fines, and officer and director bars. *See, e.g., SEC v. Lawson*, 14 Cv 02157 (N.D. Cal. 2014) (settling, civilly, an insider trading case involving a co-chairman who tipped his brother and a family friend in advance of a merger resulting in nearly $2 million in profit); *SEC v. Williky*, 15 Cv 357 (S.D. Ind. 2015) (charging civilly a securities fraud recidivist who engaged in a pump-and-dump scheme for over $860,000 in profit). The SEC has also engaged as the only investigative authority where an insider tipped but did not personally trade. *See SEC v. Deeba*, 19 Cv 05346 (N.D. Cal. 2018) (settling with a $581,170 penalty from a corporate executive who tipped his two brothers in advance of an announcement of poor financial results).

We highlight the aforementioned instances where tippers or insider traders were not charged criminally, not to take issue with the prosecutorial discretion exercised in this case, but rather merely to emphasize that Chris' felony conviction standing alone, is already significantly more punitive than certain comparable cases that were left for the SEC to handle civilly. Notwithstanding this important point, Chris fully accepts that his prosecution and plea were well founded.

### H.     *The Kinds of Sentences Available Strongly Support The Appropriateness of A Non-Custodial Sentence*

Section 3553(a)(3) requires the Court to consider what sentences are available in fashioning an appropriate remedy. A sentence of probation is no minor sanction and, indeed, such a sentence "substantially restrict[s]" a defendant's freedom. *Gall*, 552 U.S. at 48 (upholding a sentence of probation as reasonable notwithstanding a Guidelines range of 30-37 months). *Accord United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'") (quoting *Morrisey v. Brewer*, 408 U.S. 471, 480 (1972)). As Judge Gleeson articulated:

> [I]t bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. Probation is less severe than a prison term, but both are punishment. And as the Supreme Court has recognized, probation is *significant* punishment.
>
> *          *          *
>
> In addition to standard and special conditions, there is an array of alternative sanctions—home confinement, community service, and fines, for example—that allow judges to impose enhanced (and sometimes even constructive) punishment without sending the defendant to prison.

*Leitch*, 2013 WL 753445 at *12 (citations omitted). Probation, with conditions including home confinement, is a substantial punishment which in this case achieves the statutory sentencing purposes of section 3553.[12]

---

[12] As noted above, home confinement for an elderly, non-violent offender with a low risk of recidivism is also in line with the recently stated preference of Congress in enacting the First Step Act and authorizing the pilot program. Should the Court, however, determine that some amount of incarceration is nevertheless necessary, we respectfully submit that service of any term in a Residential Reentry Center (RRC) (*i.e.*, halfway house) would be most adequate. RRCs are fully recognized as a form of incarceration. *See, e.g., Levine v. Apker*, 455 F.3d 71 (2d Cir. 2006). Alternately, a split sentence would satisfy the need for incarceration in light of the section 3553(a) factors. *See, e.g., Chow*, 17 Cr. 667 (Co-founder and partner at Canyon Bridge Capital sentenced to three months' imprisonment and nine months' home confinement (against a Guidelines range of 78-97 months) after being found guilty at trial, and not having accepted responsibility).

## VI. __CONCLUSION__

Chris pled guilty early and admitted his role in criminal conduct. He has shown extreme remorse and already paid dearly for his crimes. He has resigned from Congress in disgrace. In light of Chris' exemplary character, acceptance of responsibility, long history of community and public service, extensive record of charitable acts and the need to avoid unwarranted sentence disparities, we respectfully request that the Court impose a sentence of probation, with conditions requiring a significant term of home confinement, extensive community service, and the imposition of a substantial fine. Such a sentence achieves the statutory sentencing purposes of section 3553 and represents a proper balancing of the history and characteristics of the defendant with the nature and seriousness of the criminal offenses. None of the purposes of sentencing would be furthered by anything greater.

Respectfully submitted,

New York, NY
January 7, 2020

BAKER HOSTETLER LLP
By: /s/ *Jonathan B. New*
Jonathan B. New
45 Rockefeller Plaza, 14th Floor
New York, NY 10111
T: 212.589.4200
F: 212.589.4201
jnew@bakerlaw.com

Jonathan R. Barr
Kendall E. Wangsgard
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
T: 202.861.1500
F: 202.861.1783
jbarr@bakerlaw.com
kwangsgard@bakerlaw.com

51