**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 13, 2020

BY ECF

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:      *United States v. Christopher Collins,*
                  S1 18 Cr. 567 (VSB)

Dear Judge Broderick:

      The Government respectfully submits this letter in advance of the sentencing of former Congressman Christopher Collins, which is scheduled for January 17, 2020. On October 1, 2019, Congressman Collins pleaded guilty to one count of conspiring to commit securities fraud, in connection with his tipping his son, Cameron Collins, with material non-public information that would dramatically affect the stock price of Innate Immunotherapeutics Limited ("Innate") so that Cameron could trade on that information and tip others, and to one count of making materially false statements to the Federal Bureau of Investigation ("FBI") about this crime nearly a year after he had committed it. As reflected in the plea agreement between the parties and in the Presentence Investigation Report ("PSR") prepared by the United States Probation Office ("Probation"), the applicable sentencing range for Congressman Collins under the United States Sentencing Guidelines ("Guidelines") is 46 to 57 months' imprisonment. The Government believes that a sentence at the top end of the Guidelines range is necessary in order to satisfy the objectives of Title 18, United States Code, Section 3553(a), and in particular to promote respect for the law, to provide just punishment for the offense, and to achieve general deterrence.

## FACTUAL BACKGROUND

      Beginning in 2013 and through the period of his criminal conduct in this case, Christopher Collins was a United States Congressman representing the 27th District of New York. (PSR ¶ 18.) During that same period, he sat on the Board of Directors of Innate, a biotechnology company headquartered in Australia. (PSR ¶¶ 16, 25.) In that capacity Collins regularly had access to material non-public information about the company and its activities. (PSR ¶ 18.) In addition to being a Board member, Collins was one of Innate's largest shareholders, owning approximately 16.8% of its stock. (PSR ¶ 18.) Collins's son Cameron was also a significant shareholder in Innate, owning approximately 2.3% of its shares. (PSR ¶ 19.) Relatives and friends of the Collins family, including Cameron's fiancée Lauren Zarsky, her parents Stephen and Dorothy Zarsky,

Stephen's siblings, a childhood friend of Stephen's, and a friend and neighbor of Cameron and Lauren, all held Innate stock based on the recommendation of Cameron or Stephen. (PSR ¶ 22.)

The primary business of Innate was the research and development of a drug called MIS416 that was intended to treat Secondary Progressive Multiple Sclerosis. (PSR ¶ 17.) In October 2014, Innate initiated a Phase 2B clinical trial of MIS416, the successful completion of which was a prerequisite to the commercialization of the drug. (PSR ¶ 17.) In June 2017, Innate completed the trial, which was meant to determine the clinical efficacy of the drug. (PSR ¶ 17.) Had the trial been successful, the drug would likely have been enormously profitable for Innate. (PSR ¶ 17.) However, the trial was a failure, and when the results became public Innate suffered a 92% drop in its stock price. (PSR ¶ 17.)

As a member of Innate's Board of Directors, Congressman Collins had a duty not to disclose material non-public information about the company that came into his possession. (PSR ¶ 25.) During the summer of 2017, however, he violated that duty in order to confer a financial benefit on his family that ordinary investors, who lacked access to inside information, could not obtain. On June 22, 2017, by virtue of his membership in the United States House of Representatives, Collins was attending the annual Congressional Picnic at the White House. (PSR ¶ 26.) While there, he received an email from the CEO of Innate letting him and other select insiders at the company know that MIS416 had failed its clinical trial. (PSR ¶ 26.) The plain import of the news was that the drug would be worthless and that when the trial results became public Innate's stock price would plummet. Collins replied to the CEO's email expressing dismay at the news and then, from the White House lawn, tried several times in quick succession to contact his son Cameron by cellphone. (PSR ¶ 27.) Collins waited approximately one minute after responding to the CEO's email before repeatedly attempting to reach Cameron. (PSR ¶ 27.) After several urgent minutes of phone tag, Collins and Cameron connected. During their call, Collins tipped Cameron about the failed drug trial, and they agreed that Cameron would sell his shares in Innate if it were possible to do so. (PSR ¶ 27.) Collins could not trade his own shares in Innate because they were still held by a transfer agent in Australia. (PSR ¶ 27.)

The same day that Collins tipped Cameron, Cameron and Lauren Zarsky drove to her parents' house and tipped Stephen and Dorothy Zarsky with inside information about the failed drug trial. (PSR ¶ 28.) Cameron, Lauren, Stephen, and Dorothy agreed that they would sell their shares in Innate, and that Cameron would space out his selling activity in order to avoid depressing the price of the stock before Lauren, Stephen, and Dorothy could sell their shares. (PSR ¶ 28.) Dorothy commenced selling her shares that same night in the presence of Cameron, Lauren, and Stephen. (PSR ¶ 28.)

Later on the night of June 22, 2017, Innate issued a press release indicating that the Australian Stock Exchange, where the company's stock was listed, would halt trading pending the announcement of the drug trial results. (PSR ¶ 29.) The company said nothing about whether the results, which remained confidential, were positive or negative, and the fact of the trading halt was not indicative of the results. The halt only affected the trading of Innate shares on the Australian Stock Exchange; it had no impact on the United States over-the-counter ("OTC") markets, where Innate shares were also trading. (PSR ¶ 29.) On June 23, Cameron began selling his Innate shares on the OTC markets. (PSR ¶ 30.) He did not sell all of his shares at once, but rather, as he had

discussed with Lauren, Stephen, and Dorothy, spaced out his transactions. He initially sold shares from his own apartment, but later in the morning on June 23 he sold shares from the home of Stephen and Dorothy Zarsky. (PSR ¶ 30.) Stephen and Dorothy Zarsky, meanwhile, sold all of their remaining shares of Innate on the morning of June 23. (PSR ¶ 30.) Lauren Zarsky's shares were also sold that morning; she was at work while Cameron accessed her brokerage account from Stephen and Dorothy's home and placed an order to sell her shares. (PSR ¶ 30; Cameron Collins PSR ¶ 61.) In the midst of his and his family members' massive selloff on the morning of June 23, Cameron was in frequent phone contact with Congressman Collins, the source of the material non-public information about Innate. (PSR ¶ 31.)

Cameron finished selling his shares of Innate on June 26. That night – after Cameron had sold over a million shares of Innate – the company released the failed drug trial results to the public. (PSR ¶ 33.) Upon the release of the news, Innate's stock price fell by 92%, subjecting investors who were not able to take advantage of inside information to heavy losses. (PSR ¶ 33.) By contrast, as a result of Congressman Collins's unhesitating breach of his duty to Innate, Cameron avoided approximately $571,000 in losses, and Stephen Zarsky avoided approximately $143,900 in losses. (PSR ¶ 35.) Dorothy Zarsky and Lauren Zarsky avoided losses of approximately $22,600 and $19,440, respectively. (PSR ¶ 35.) Congressman Collins was unable to avoid losses by selling his own shares because they were not held at a United States broker and could not be traded on the OTC markets. (PSR ¶ 34.)[1]

In the ten months that followed, Congressman Collins, having knowingly and willfully committed the crime of insider trading, continued to serve in the United States House of Representatives. On April 25, 2018, FBI agents came to Congressman Collins's home to ask him questions relating to trading activity in Innate around the time that the failed drug trial results were made public. (PSR ¶ 38.) Collins elected to speak with the agents, and to lie to them in order to divert law enforcement from the trail of evidence showing that he and Cameron had committed insider trading.

Collins initially stated in his interview that he had not told anyone about the results of the failed MIS416 trial after receiving them. (PSR ¶ 38.) That was a lie. Then, he amended his account to say that he had told his wife about the trial results, but not Cameron. (PSR ¶ 38.) That was also a lie. Then, he invented an additional wrinkle: that Cameron had told him that he (Cameron) intended to sell shares in Innate due to concerns about the trading halt. (PSR ¶ 38.) Collins compounded this lie, in an attempt to make it more convincing, by claiming that Cameron had told him that sophisticated stock blogs generally say that trading halts indicate negative news.

---

[1] Collins objects to the causal link drawn in paragraph 34 of the PSR between his technical inability to trade his shares and his failure to do so. *See* Collins Br. 23. The Government respectfully submits that the evidence supports this inference and that Collins's objection to paragraph 34 should be overruled. Collins's immediate reaction to learning of the negative drug trial results was to tip his son so that he could take advantage of the inside information for his financial benefit. It stands to reason that, had it been possible, Congressman Collins would have sought that same financial benefit for himself. There is no reason to believe otherwise. In any event, Collins's technical inability to sell his shares during the trading halt should preclude assigning any mitigating value to his failure to avoid any losses personally from his crimes.

(PSR ¶ 38.) Collins's evolving statement to the FBI was an effort to cover up the crime that he and other members of his extended family had committed ten months earlier.

Almost immediately after lying to the FBI, Collins called Dorothy Zarsky and left a lengthy voicemail for her. (PSR ¶ 39.) Whether he was attempting to warn her that she too may also be approached by law enforcement agents (which she was), or whether, as Congressman Collins asserts in his objections to the PSR, *see* Collins Br. 24, he was calling her in an effort to reach Cameron, there can be no doubt that the strategy of pretending that the Collins family's trading activity resulted from being spooked by the trading halt was a coordinated one. (PSR ¶ ¶ 38, 41.)[2] When Cameron was interviewed by the FBI, he provided substantially the same false explanation for his suspicious trading that Collins had offered on his behalf: namely, that he had been prompted to sell his Innate stock after reading about the trading halt on the internet. (PSR ¶ 41.) And in a separate interview, Lauren Zarsky told the FBI the same lie – that she had sold her shares in Innate because the mere fact of the trading halt had made her nervous.

Having committed *two* federal crimes – insider trading and lying to the FBI to cover it up – Collins continued to represent the 27th District of New York as a Congressman. On August 8, 2018, he surrendered to law enforcement authorities after an indictment was returned charging him, Cameron, and Stephen Zarsky with committing insider trading and making materially false statements to federal law enforcement officials. Collins pleaded guilty to one count of conspiracy to commit securities fraud and to one count of making materially false statements on October 1, 2019. From the period of his arrest on August 8, 2018 until his guilty plea more than a year later, Collins continued to serve in the United States House of Representatives and in fact ran for and was reelected to Congress. He resigned his seat only immediately prior to his guilty plea.[3]

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than

---

[2] Collins objects to the finding in the PSR (reflected in paragraphs 38 and 41) that he and Cameron agreed to use the trading halt as a pre-textual explanation for Cameron's sale of his Innate shares. *See* Collins Br. 23. This objection should be overruled. Collins, Cameron, and Lauren Zarsky all separately provided the FBI with substantially the same false explanation of the suspicious trading activity around the same time, nearly ten months after engaging in that activity. There is no plausible basis to find that this was a coincidence.

[3] Collins emphasizes, in stressing his acceptance of responsibility, that he pleaded guilty "well in advance of trial." Collins Br. 1. But while Collins pleaded guilty approximately five months before trial, he did so approximately 14 months after being charged and only after extensive motion practice. Collins's entry of a guilty plea certainly merits credit for acceptance of responsibility under the Sentencing Guidelines, but its timeliness with respect to the course of the litigation was not unusual nor, in the Government's view, was it reflective of any special degree of acceptance.

necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in Section 3553(a) to Congressman Collins's conduct, a sentence at the top end of the Guidelines range is warranted in this case.

### A. The Need to Promote Respect for the Law

Collins is wrong to assert that "[s]ociety . . . will gain no benefit" from incarcerating an extraordinarily sophisticated and powerful businessman and politician who twice made the choice, notwithstanding the absence of any material want, to commit a serious crime. (Collins Br. 4.) A sentence at the top end of the Guidelines range is required in this case to promote respect for the law. As a member of Congress at the time that he committed the offenses in this case (PSR ¶ 109; *see* Collins Br. 13 (emphasizing Collins's role in drafting legislation)), Collins was better situated than almost anyone else to understand the societal importance of following the law and of not actively impeding the work of law enforcement through lies. Yet he flouted both of these responsibilities. In committing insider trading and later lying to federal agents to cover it up, and in continuing to actively serve in the House of Representatives during that time period, Collins came to embody the cynical idea that those in power who make the laws are not required to follow them. This surely was not lost on him, but it did not cause him to hesitate in making the choice to commit multiple crimes while holding one of the most visible and prestigious jobs in the United States. It is critically important that the sentence imposed on Congressman Collins drive home the message that status does not constitute a basis for leniency. Collins's decision to break the law while making the law – a decision that he made twice, ten months apart – was brazen. A sentence at the top end of the Guidelines range is necessary to assure the public that those in power do not

stand above the law.  The numerous letters that Congressman Collins's former constituents have submitted to the Court expressing their deep frustration and disappointment with Collins's secret illegal behavior reinforce the need for a substantial period of incarceration to promote respect for the law.

The cynicism of Collins's conduct – his decision to repeatedly violate federal law while continuing to accept the trust of the public to draft it – is exacerbated by its total gratuitousness.  Collins committed a financial crime without having any financial need.  This is noted even in one of the letters that has been submitted in support of Collins, by the former CEO of Innate, who remarks that he was "shocked" by Collins's offense in light of his "personal wealth."  Collins Ex. A at 35-36.  Probation calculates that Collins has $13.8 million in assets, a figure that appears not to take into account an additional $6.9 million owed to him.  He has a mere $11,981 in liabilities.  In explaining its reasons for recommending a below-Guidelines sentence of 366 days' imprisonment, Probation cites its "understand[ing] that [Congressman Collins's] motivation in becoming involved in the offense was out of concern for his son."  (PSR page 36.)  This explanation does not withstand even the most glancing look at the Collins family's assets.  Cameron Collins's PSR calculates his total net worth at over $21 million, including over $1.2 million in cash and a residence in Florida valued at nearly $2 million.  (Cameron Collins PSR ¶ 111.)  Congressman Collins's personal assets include, among other things, a baseball card collection and a coin collection each of which is worth $1 million.  Collins could have ameliorated any concern he had that Cameron would lose money in Innate by simply gifting Cameron money.  His choice to commit fraud instead, as if the two options were morally equivalent, bespeaks a total disregard for the rules that are intended to govern everyone's actions.  His subsequent lies to the FBI indicate the same disregard.  There is plainly a need for the sentence imposed in this case to be substantial enough that it will promote respect for the law, in light of the lack of respect that Collins has shown for it and the importance of making clear that conduct of this kind, by anyone, is not tolerated.

Collins's lifetime of success in the business world, which he repeatedly cites in his sentencing submission (*see, e.g.*, Collins Br. 8), does not militate in favor of leniency.  The Government does not contest that Collins has had a productive career in business.  But this made him particularly well situated to understand the deleterious effect that fraud has on entrepreneurship.  As a person who spent decades in business before serving in Congress – indeed, as someone who served on the Federal Reserve Bank of New York (Collins Br. 18) – Collins knew well that financial crimes have harmful ramifications and can destabilize businesses and markets.  He chose to commit one anyway.  Similarly, the emphasis in Collins's sentencing submission on his strong moral compass, including repeated reference to his membership in the Boy Scouts, only underscores that he was well positioned to know better.

### B.     The Need to Provide Just Punishment for the Offense

The need to provide just punishment for the offense also militates in favor of a sentence at the top end of the Guidelines range in this case.  Insider trading is a serious crime. A fundamental purpose of the securities laws is to outlaw deceptive practices in the securities markets. Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets to the extent they are abused by well-connected individuals who

are willing to provide an unfair informational advantage to their associates, or in this case to their family members.[4]

Of crucial importance to the determination of an appropriate sentence here is Congressman Collins's decision to double down on his criminal conduct by committing the crime of making materially false statements to law enforcement agents after he had already committed the crime of insider trading. Collins committed the second crime in order to get away with the first one. It is no exaggeration to say that having committed fraud once, Collins made the calculated choice to engage in additional criminal behavior. He had ten months to reflect on his original crime, and then engaged in additional criminal conduct in order to avoid the professional and penal consequences that he knew his initial offense warranted. Collins's obstruction of the investigation of his family's illegal trading in Innate is, by itself, a powerful reason to impose a sentence that carries a substantial period of incarceration. *See United States v. Mui*, 214 F. App'x 40, at *5 (2d Cir. Jan. 18, 2007) (approving district court's consideration of defendant's obstruction of investigation under Section 3553(a) and consequent imposition of higher sentence); *United States v. Vogler*, 763 F. App'x 18, at *19-20 (2d Cir. Feb. 26, 2019) (same); *United States v. Butters*, 588 F. App'x 12, at *13 (2d Cir. Dec. 11, 2014) (approving district court's consideration of defendant's false statements to law enforcement officials as evidence of his dishonesty which the district court viewed as discounting his after-the-fact statements of remorse).

Collins's lies to the FBI also defeat the notion that his criminal conduct can be viewed as a one-off mistake in judgment. Collins repeatedly tries to cast his conduct in this mitigating light in the statement he provided to Probation, describing himself as "[o]vercome with emotion" when he tipped Cameron with information that would affect the price of Innate's stock (PSR ¶ 55) and calling his conduct "extreme[ly] aberrational," Collins Br. 1, 26. Collins also blamed "emotion" and irrational thinking in accounting for his conduct to Innate's former CEO. Collins Ex. A 35-36. Probation seems to adopt Collins's characterization of his conduct in describing its reasons for recommending a below-Guidelines sentence of 366 days' imprisonment, calling Collins's offense a "moment of weakness" and "bad judgment." (PSR page 36.) This characterization is unsupportable in light of Collins's lies to the FBI. In Collins's statement to the FBI he provided a detailed false narrative that was calculated to fool law enforcement agents and insulate him and his family from facing any consequences for their criminal behavior. The lie that Collins told had been coordinated with Cameron. Collins had ten months after committing fraud to reflect on his conduct, and the decision that he came to in that time was to up the ante by committing a second crime.

---

[4] *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044, ("Insider trading damages the legitimacy of the capital market and diminishes the public's faith . . . . [T]he small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him."); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading, in Vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

Indeed, even the manner in which Collins committed insider trading – prior to his attempt to cover it up – belies the assertion that he acted out of a moment of weakness. After receiving the news of Innate's drug trial results from the company's CEO, Collins immediately called Cameron; but when he failed at first to reach Cameron and was thus given a pause to reflect, he chose to continue trying to call Cameron until they finally connected. The next morning, June 23rd, having again had time to reflect, Collins again spoke with Cameron, this time on several occasions while Cameron and other extended family members furiously traded their Innate shares. His conduct cannot be written off as a mere incident of bad judgment. Nor should his decision to tip Cameron be considered an "emotional" one. Although no one disputes Collins's commitment to the worthy project that Innate was working on, his call to Cameron on June 22 was about helping a man worth $21 million avoid $500,000 in losses. The discussion Collins had with Cameron – as reflected in his own plea allocution – was that Cameron would trade shares in Innate ahead of the news being made public, if possible. This was not a crime of passion.

The fact that Collins did not personally profit from his insider trading activity is not mitigating. *Cf.* Collins Br. 3. Collins was not *able* to trade his own shares because they were tied up with a transfer agent. He did the next best thing, which was to tip Cameron. It is not as if Collins resisted the impulse to make money by violating the law. Rather, the only way he could monetize the information he had was by allowing his family to trade on it, and that is precisely what he did. For similar reasons, Collins's argument that he should receive a below-Guidelines sentence because the Guidelines are unduly driven by loss amount, Collins Br. 29-32, is unpersuasive. This is not a case where an exorbitant loss amount has generated a draconian Guidelines range. Moreover the Guidelines range stems in part from Collins's efforts to obstruct justice and from his abuse of trust, neither of which factors is tied to loss amount. A sentence at the top end of the Guidelines range is appropriate here.

### C. The Need to Afford Adequate Deterrence

The need to afford adequate deterrence likewise weighs heavily in favor of a sentence at the top end of the Guidelines range. The legislative history of Section 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 382, 3259); *see also United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when

you get caught, you will go to jail."). As the *Martin* Court noted: "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *Martin*, 455 F.3d at 1240 (citation omitted); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation marks and citation omitted).

The need for general deterrence is acute here. The specifics of Congressman Collins's insider trading put into relief the social and economic costs of that crime and the importance of dissuading potential offenders from engaging in similar conduct. First, Collins's cheating took place in connection with a company's efforts to develop a treatment for a serious medical condition. The stakes of deterring illegal trading in such circumstances are significant, as actions like the ones Congressman Collins and his family took in this case are likely to dissuade people from investing in the financial markets and thereby funding precisely the types of medical research and development that Innate was engaged in with respect to MIS416. Congressman Collins himself makes much of the worthiness of Innate's efforts to develop a drug for multiple sclerosis, noting among other things that the disease has a devastating effect on families. (PSR ¶¶ 52-54.) While the Government completely agrees about the merit of seeking to develop a drug to treat multiple sclerosis, this fact underlines the negative impact of insider trading. Investors may be reluctant to participate in financial markets that they believe to be fundamentally unfair. Collins's conduct in this case undermines investor confidence in the financial community and destabilizes the way that markets work. It is vital that conduct of this kind be deterred.

Second, Collins's sentence must reflect an emphasis on general deterrence that is commensurate with the difficulty of detecting his conduct. *See Gupta*, 904 F. Supp. 2d at 355 (noting that because insider trading is a difficult crime to detect, putative offenders must be made to understand that there are serious consequences to getting caught). Without a significant sentence attached to insider trading, the relative simplicity of committing the crime and the challenge of detecting it would incentivize insiders similarly situated to Collins to engage in similar conduct. Indeed, the circumstances of Collins's participation in insider trading illustrate the difficulty of detecting the crime and the importance of having a strong deterrent counterweight. Collins did not trade his own shares; Collins provided the illegal tip over the phone in a private phone call to his son to which law enforcement agents were not privy; and Collins took part in a coordinated effort to cover up the crime by lying, together with others, about what had actually happened when asked about it by law enforcement agents. All of these facts complicated the task of detecting the crime. Moreover, Cameron and the individuals he tipped saved a combined hundreds of thousands of dollars through minimal effort – all they had to do was sell shares of stock. In order to have a strong deterrent effect, a substantial sentence is required to balance out the ease and profitability of insider trading and the difficulty of its detection.

Third, unlike many other cases involving financial crimes, the sentence imposed on Congressman Collins must be fashioned to deter not only that conduct, but also the deception of law enforcement agents. Separate and apart from the need for individuals situated similarly to Congressman Collins to understand that committing fraud would carry severe consequences, there

is a need to send the message that lying to federal law enforcement agents in an attempt to divert them from the truth is a serious crime. The manner in which Collins lied to the FBI in this case suggests that at least he did not view it as a particularly weighty step to take. He told not one lie during his interview but several; he amplified the lie with fake details; he coordinated with his son Cameron so that he, too, could lie; and his statement to Probation about committing his criminal conduct in the context of feeling overcome by emotion completely fails to account for the falsehoods he told the FBI, which occurred ten months later and in a totally different context. (PSR ¶ 55.) It is critical that the sentence imposed on Congressman Collins not send the message that choosing to provide an affirmatively false narrative to law enforcement agents about one's criminal conduct is functionally the same as remaining silent, or that lying in this way is implicitly expected or accepted as part and parcel of the initial offense. The result of that message would be that individuals who have committed crimes and are approached about their conduct would believe that they might as well seek to cover it up through lies. Throwing obstacles in the way of law enforcement agents is wholly distinct from the crime those obstacles are intended to obscure. The sentence imposed should reflect that distinction.

### D. A Sentence at the Top End of the Guidelines Range Would Avoid Unwarranted Sentencing Disparities

Finally, a sentence at the top end of the Guidelines range would avoid unwarranted sentencing disparities. Collins seeks to suggest otherwise by referring the Court to cases where insider trading defendants received sentences below the Guidelines range of 46-57 months' imprisonment in this case. Collins Br. 46-49. As an initial matter, there are insider trading cases on both sides of that range. For example, Billy Walters, who was a year older than Collins at the time of his sentencing, was recently sentenced to 60 months' imprisonment for insider trading offenses. *See United States v. Walters*, 16 Cr. 338 (PKC), Docket 201. While Walters, who went to trial, engaged in insider trading for years and made millions of dollars from it, as a private citizen he was not affirmatively holding himself out to the public as a lawmaker even as he committed federal crimes. Collins was. Nor did Walters make false statements to federal agents in an attempt to obstruct their investigation. Collins did.

In any event, the cases cited by Collins do not present the risk of an unwarranted sentencing disparity should a sentence at the top end of the Guidelines range be imposed here. The circumstances of Collins's insider trading are unique: at the time he committed that crime, he held not only the trust of Innate's shareholders, but also the trust of the public as their elected official. He violated both trusts when he committed insider trading and when he then committed a second crime to cover it up. Moreover, the cases relied upon by Collins have additional distinguishing factors, as even a brief review of his two chief precedents illustrates. Collins's first precedent is *United States v. Peterson*, 11 Cr. 664 (RPP) (S.D.N.Y. 2012), where the defendant received a non-custodial sentence. Collins Br. 46. In that case, though, the defendant pleaded guilty at arraignment after waiving indictment. *Peterson* Docket 3, 4. There is no comparison between the extraordinary degree of acceptance of responsibility exhibited in that case and the guilty plea in this case that followed intensive discovery, motion practice, and oral arguments, and occurred over a year after charging. Moreover, Peterson did not commit a second crime in order to cover up the first one, as Collins did. And Peterson was not an elected official who wrote laws while breaking them.

Likewise, in *United States v. Stewart*, 15 Cr. 287 (LTS) (S.D.N.Y. 2016), the second precedent proffered by Collins, Collins notes that Robert Stewart received a non-custodial sentence for participating in an insider trading scheme.  Collins Br. 47.  But Judge Swain made clear at the sentencing proceeding for Stewart that "but for [Stewart's wife's] urgent medical and personal care needs," Stewart would have received "a custodial term of significant length."  *Stewart* Docket 95 at 31.  Judge Swain's comments at the *Stewart* sentencing thus support a substantial custodial sentence here, not the reverse.  There is no case that Collins cites, and no insider trading case of which the Government is aware, in which the circumstances call as clearly as they do here for a sentence that carries a sufficient term of incarceration to ensure respect for the law.

## CONCLUSION

For the reasons discussed above, the Government respectfully submits that a sentence at the top end of the Guidelines range should be imposed on Congressman Collins.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

   /s/
Scott Hartman
Max Nicholas
Damian Williams
Assistant United States Attorneys
(212) 637-2357/1565/2298