

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 16, 2020

<u>BY ECF</u>

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re:  *United States v. Christopher Collins,*
       S1 18 Cr. 567 (VSB)

Dear Judge Broderick:

  The Government respectfully writes in response to certain of the inquiries raised in the Court's January 15, 2020 Order in advance of Christopher Collins's sentencing.  The numbered paragraphs below correspond to the numbered inquiries in the Court's Order.

1. Please find enclosed copies of FBI 302s documenting interviews with Christopher Collins, Cameron Collins, Stephen Zarsky, Lauren Zarsky, and Dorothy Zarsky.  (Exhibit A)

2. According to information provided to the Government by Cameron Collins's attorneys, the cost basis for Cameron's shares was approximately $730,000. Funds from other investments were used to purchase these shares.

3. In addition to Christopher Collins's guilty plea allocution, the bases for the statement in paragraph 27 of the PSR are:

  a. An inference from the entire body of evidence gathered during the investigation, including (a) the timing of Collins's phone calls to Cameron in relation to Collins's learning that the MIS416 trial had failed and (2) the trading in Innate stock that Cameron and other members of Collins's extended family undertook immediately following, and during, communications between Collins and Cameron, all of which took place before the news of the MIS416 trial results became public; and

  b. Information provided by a witness ("Witness-1") to the Government that, in substance and in part, Collins told Witness-1 that Collins had tipped Cameron with the results of the MIS416 trial at the time Collins learned the results, and that Collins believed that his tipping Cameron was what prompted the insider trading investigation.

4. The basis for the statement in paragraph 28 of the PSR regarding Cameron's effort to space out his sale of Innate shares is information provided by a witness ("Individual-5") to the Government that, in substance and in part, Stephen Zarsky told Individual-5 that Cameron told Zarsky that Cameron would let Zarsky sell Zarsky's Innate shares before Cameron sold his, in order to avoid depressing the price of the shares. The bases for the statement in paragraph 28 of the PSR regarding Cameron and Lauren Zarsky telling Stephen Zarsky and Dorothy Zarsky that the MIS416 trial had failed are:

   a. An inference from the entire body of evidence gathered during the investigation, including the fact that Cameron and Lauren Zarsky traveled to the home of Stephen Zarsky and Dorothy Zarsky after Cameron was informed of the MIS416 trial results by Christopher Collins, and that Dorothy Zarsky undertook to begin selling her Innate shares that same evening, shortly followed by other members of the extended Collins family; and

   b. Information provided by Individual-5 to the Government that, in substance and in part, on June 23, 2017, Stephen Zarsky told Individual-5 that Cameron had already told Zarsky that the MIS416 results were negative.

5. Avoided losses for each individual who sold Innate shares during the trading halt were calculated by taking the weighted average of the following: the price of Innate stock when the individual sold it during the trading halt, subtracted by the price of Innate stock on the morning after the news of the negative MIS416 results was released (June 27, 2017), multiplied by the number of shares that the individual sold.

6. Stephen Zarsky paid approximately $137,239.92 for his shares of Innate. In addition to the information about Cameron Collins contained in paragraph (2) above, he purchased shares of Innate on the OTC market at a cost of approximately $9,306.02 on or about June 15, 2017.

7. Based on public reporting, on June 22, 2017 the closing price of Innate's stock was $0.52; on June 23, 2017 it was approximately $0.547; and on June 26, 2017 it was approximately $0.455.

8. As of the market close on June 22, 2017, Cameron Collins held shares in Innate worth approximately $2,712,584.16, and Stephen Zarsky held shares in Innate worth approximately $157,562.60.

9. Other than Cameron, the only person that Christopher Collins called on the night of June 22, 2017, after receiving the news about Innate's failed drug trial, was Mary Collins, his wife. They spoke at 7:23 PM for five minutes and 21 seconds and at 9:04 PM for about three minutes.

10. The Government respectfully encloses in response to this inquiry a chronology that it prepared in connection with this investigation (*see* Exhibit B).

11. The Government respectfully encloses in response to this inquiry a chronology that it prepared in connection with this investigation (*see* Exhibit B).

12. The basis for the statement in paragraph 38 of the PSR that Christopher Collins and Cameron Collins agreed, in advance of their respective interviews with the FBI, that they would use the fact of the trading suspension as cover if they were ever questioned by law enforcement agents about the timing of Cameron Collins's sale of his Innate shares, is the fact that Christopher Collins, Cameron Collins, and Lauren Zarsky were each interviewed separate by the FBI on the same day, and each falsely attributed Cameron's sale of his Innate shares (and in the case of Lauren Zarsky, the sale of her own Innate shares), to the fact of the trading suspension.

13. The basis for this statement in paragraph 41 of the PSR is information provided by Individual-5 to the Government that, in substance and in part, Stephen Zarsky told Individual-5 that Cameron Collins told Zarsky that Cameron was purchasing an expensive piece of real estate so that if Cameron were ever asked about his sale of Innate shares, he could say that it was to purchase this real estate.

14. An analysis of phone records undertaken following the issuance of the Court's January 15 Order indicates the following:

   a. In the 18-month time period from January 1, 2016 to June 21, 2017, Christopher Collins placed approximately 24 phone calls to Cameron Collins.  During that same time period, Cameron Collins placed approximately 23 phone calls to Christopher Collins.

   b. In the five-day period from June 22, 2017 to June 26, 2017, Christopher Collins placed approximately 15 phone calls to Cameron Collins, and Cameron Collins placed approximately 11 phone calls to Christopher Collins.

   c. From January 1, 2016 to June 21, 2017, there were approximately 9 phone calls placed from Cameron Collins's phone to Dorothy Zarsky, and approximately 4 phone calls placed from Dorothy Zarsky to Cameron Collins's phone.

   d. From January 1, 2016 to June 21, 2017, approximately 7 phone calls were placed from Cameron Collins's phone to Stephen Zarsky, and approximately 14 phone calls were placed from Stephen Zarsky to Cameron Collins's phone.

   e. From June 22, 2017 to April 24, 2018,[1] Christopher Collins placed approximately 43 phone calls to Cameron Collins, and Cameron Collins placed approximately 44 phone calls to Christopher Collins.

---

[1] Although the Court's order specifies August 24, 2018, we have provided data through April 24, 2018, the day before Chris and Cameron were interviewed.

15. An analysis of phone records undertaken following the issuance of the Court's January 15 Order indicates that on April 25, 2018, Christopher Collins placed 3 phone calls to Cameron Collins; Cameron Collins placed 2 phone calls to Christopher Collins; and Christopher Collins placed 1 phone call to Dorothy Zarsky.

16. Please find enclosed copies of the settlements with the Securities and Exchange Commission referred to in paragraph 47 of the PSR. (Exhibit C)

17. The Government does not contend that Christopher Collins participated in an insider trading conspiracy that pre-dated the timeframe charged in the Indictment.  However, in an effort to be responsive to the Court's inquiry, we disclose the following facts: On August 23, 2016, in the context of a conversation about Innate, Lauren Zarsky texted to another person that "we'll always keep in touch with Cam's dad who I'm guessing would know how things are looking as we get closer to the end of the trial."  On August 29, 2016, in the context of a conversation about Innate, Lauren Zarsky texted to another person that she would make sure "Cam's dad keeps us in the loop."  On September 7, 2016, in the context of a conversation about Innate, Lauren Zarsky texted to another person that "Cam is also going to call his dad to see if he has any updates."[2]

18. The Government does not have information on whether Christopher Collins left the picnic early on June 22, 2017.

19. The day that he was arrested, Christopher Collins held a press conference at which he stated, in part, "The charges that have been levied against me are meritless.  I will mount a vigorous defense in court to clear my name.  I look forward to being fully vindicated, and exonerated, ending any and all questions relating to my affiliation with Innate."

20. The Government intends to address this question at Christopher Collins's sentencing proceeding.

21. Based on a review of records in a law enforcement database, the Government's understanding is that the property in Marco Island, Florida was purchased in or about 2011 in the names of Cameron and Caitlin Collins, and that there was no mortgage. Information provided by counsel for Cameron Collins indicates that the home was purchased using the proceeds of other investments owned by Cameron and Caitlin.

22. The Government does not have information in response to this inquiry.

23. The Government is not aware of any practical impediment to Cameron Collins purchasing Innate stock on the OTC market between June 23 and June 26, 2017.

24. The Government does not have information in response to this inquiry.

---

[2] There also exists a text message exchange from the summer of 2016 in which Dorothy Zarsky expressed concern that information provided by Christopher Collins may be confidential, and Lauren Zarsky assured her that it was not.

25. The Government intended the term "select insiders" to refer to Innate board members and one outside consultant to Innate.

26. The Government's views on this inquiry are set forth in its January 13, 2020 sentencing submission.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

_____/s/_____

Scott Hartman
Max Nicholas
Damian Williams
Assistant United States Attorneys
(212) 637-2357/1565/2298

FD-302 (Rev. 5-8-10)

- 1 of 3 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/02/2018

    CHRISTOPHER COLLINS (COLLINS), date of birth (DOB) ▆▆▆▆▆▆▆▆ cellular telephone ▆▆▆▆▆▆▆ home address ▆▆▆▆▆▆▆▆▆▆, ▆▆▆▆▆▆▆▆▆▆, was interviewed at his residence.  After being advised of the identities of the interviewing Agents and the nature of the interview, COLLINS provided the following information:

    COLLINS confirmed that he was represented by legal counsel during an investigation by the Office of Congressional Ethics but that he was not represented for any other matters.  COLLINS was not represented regarding the sale of INNATE IMMUNOTHERAPEUTICS (INNMF), as COLLINS had not sold any of his shares of INNMF.

    COLLINS has been associated with INNMF since approximately 2005 and was on the  board of the company.  COLLINS was the largest shareholder of INNMF and held approximately 28,000,000 shares, that he had purchased during a private placement.

    INNMF had acquired AMPLIA THERAPEUTICS (AMPLIA) on April 24, 2018.  The acquisition of AMPLIA restarted cancer trial research of two molecules for the company.  The acquisition was completed with  400,000,000 shares that were put through a reverse split to 40,000,000 shares, to which COLLINS then owned nine percent of INNMF.  After the purchase was completed COLLINS left the board of INNMF.

    The clinical trial for a multiple sclerosis drug produced by INNMF was conducted as a double blind trial.  INNMF and the doctors that were a part of the trial did not know which patients were using the drug.  There were 93 patients as a part of the trial.  The last patient started the trial in April of 2016 and completed the trial in April of 2017.  A third-party company did a review at the completion of the trial and presented the results to INNMF.

    COLLINS was informed of the trial results during a board call on a Thursday night.  COLLINS believed all members of the board were on the call, but could specifically remember FNU WILKINSON, FNU QUINN, ANDREW LNU the secretary, and the chief science person.  COLLINS described the trial

---

Investigation on  04/25/2018  at  Washington, District Of Columbia, United States (In Person)

File # ▆▆▆▆▆▆▆▆▆▆▆▆▆

Date drafted  04/29/2018

by  BITTERMAN MATTHEW EDWARD, SCHILL KRISTEN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of  (U) Interview of Christopher Collins                , On  04/25/2018  , Page   2 of 3

results as "shocking news" and that nobody saw it coming.  COLLINS did not
believe he ever received an email detailing the trial results.

Since INNMF is a publicly traded company in Australia, trading was
suspended Friday until market opening on Tuesday.  Trading is suspended
prior to a major announcement from a company; the announcement could be
positive or negative.  A public announcement regarding the results of the
trial was made Tuesday just prior to the opening of trading.  COLLINS
could not recall exactly how the press release was worded regarding the
trial results on Tuesday morning.  INNMF stock dropped from approximately
$0.50 a share to approximately $0.03 or $0.04 a share.  Trading on the
stock was not suspended on markets in the United States.  COLLINS had tons
of calls from people he knew that held stock in INNMF after the trading
was suspended in Australia.

COLLINS first explained that he had not told anyone about the trial
results after receiving them on Thursday, but later explained that he had
told his wife about the trial results after the call with the board.

COLLINS said that trading for stocks is suspended pending big
announcements, whether the news was good or bad.

COLLINS had attempted to move his shares of INNMF from Australia to
the United States on multiple occasions.  COLLINS attempted to move his
shares prior to the completion of the trial because he anticipated the
trial going well and would want to sell his shares.  COLLINS also
attempted to move his shares after the trial.  COLLINS could not remember
the specific dates he attempted to move his shares.  No brokers were
willing to take in COLLINS shares.  COLLINS believed it was due to the
fact that INNMF was a penny stock and that he was a 20% owner of the
company. COLLINS was still hoping to move his shares to the United States
so he could trade away his shares of the company after the acquisition of
AMPLIA and lock in a stock loss.

COLLINS knew approximately 40 or 50 people that held shares of
INNMF.  COLLINS' son, CAMERON, and his daughter,           both owned
shares.  CAMERON's fiance LAUREN LNU owned shares.  COLLINS' current and
former Chiefs of Staff           and           owned shares of
INNMF.  Neighbors and golfing buddies of COLLINS also owned shares of
INNMF.  COLLINS explained he was proud of INNMF and talked about the
company a lot prior to the trial so people close to him decided to
purchase shares based on his excitement.

COLLINS first explained that he did not know anyone that had moved
their shares from Australia to the United States, but later explained that
CAMERON had moved his shares from Australia to the United States.  COLLINS

Continuation of FD-302 of  (U) Interview of Christopher Collins          , On  04/25/2018  , Page  3 of 3

could not remember when CAMERON moved his shares and believed he was able
to move his shares to the United States because he had a different broker
than COLLINS tried to use.

CAMERON may hold other socks, but INNMF was the majority of his stock
investments.  COLLINS did not believe CAMERON trades very often.

COLLINS speaks to CAMERON daily, often on his cell phone. COLLINS
spoke to CAMERON after the conference call regarding the trial results,
but didn't remember who called whom.  COLLINS never conveyed to his son
that he should sell his stock, but did not attempt to talk him out of
trading.  COLLINS did not tell CAMERON about the trial results, but
CAMERON told COLLINS that he was going to trade his shares in the United
States.  COLLINS knew CAMERON traded on Friday, Monday, and Tuesday in the
United States because he was concerned about what was going on with the
trading suspension.  CAMERON talked about how sophisticated stock blogs
generally say that stock suspensions indicate negative news, so CAMERON
wanted to hedge against any bad news and take money off the table prior to
the announcement.  CAMERON traded his remaining shares in Australia when
the markets opened on Tuesday.

COLLINS received a lot of phone calls after the stock was suspended
and COLLINS explained that an announcement was coming.  COLLINS was in
shock of the trial results news, but did not believe he explicitly
indicated the results of the trials to anyone.  COLLINS may have
insinuated that the trial results were going to be bad news based on his
tone or speech.  COLLINS described himself as a transparent person, so he
believed that anyone who knew him could tell the results of the trial were
going to be bad news based on his demeanor and lack of excitement,
especially based on how excited he was before the trial when talking about
the stock.

[Agent note: At this point in the interview, SA Bitterman, with SA Schill
as a witness, served COLLINS a Grand Jury subpoena issued by the Southern
District of New York.]

ZEPTOMETRIX is COLLINS' company, that he became involved with in
1999.  ZEPTOMETRIX is not associated with INNMF.

[Agent note: During the interview, COLLINS received a phone call from
████████████████.  ██████ informed COLLINS that FBI Agents were at his
residence, and COLLINS explained that he was currently speaking with FBI
Agents and would call ██████ back.]



FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    05/01/2018

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.


        CAMERON C. COLLINS, date of birth (DOB) ██████████ telephone
██████████ was interviewed at his residence located at ██████████
██████████. After being advised of the
identities of the interviewing Agents and the nature of the interview,
COLLINS provided the following information:

        COLLINS had an engineering background and wanted to start a home
automation company. COLLINS was from Clarence, NY.

        LAUREN ZARSKY worked at PwC.

        COLLINS came to own INNATE IMMUNOTHERAPEUTICS LTD. (INNATE) through
his father. COLLINS' father CHRISTOPHER COLLINS was involved with a
company named ZEPTOMETRICS. INNATE's predecessor company raised money
through the sale of shares of stock so both COLLINS and ZARSKY purchased
shares. COLLINS did not know who the initial custodian of the shares he
purchased was. AT&T started a Fidelity account for COLLINS and COLLINS
transferred his shares to the Fidelity account in approximately late May
2017.

        INNATE switched from being based in New Zealand to being based in
Australia prior to the initial public offering (IPO). COLLINS shares were
not able to be sold on the stock exchange until approximately a week or
two before COLLINS sold the INNATE shares.

        COLLINS decided it was a good idea to have his INNATE shares held in
the United States as INNATE's trials were coming to an end. COLLINS father
discussed COLLINS moving his INNATE shares to the United States and
suggested COLLINS do so.

        COLLINS knew who ██████████ was.

        [Agent Note: COLLINS was presented with the Stock Transfer Document
attached as 1A package to this serial.]



Investigation on    04/25/2018    at    Morristown, New Jersey, United States (In Person)

File #    ██████████                                    Date drafted    04/26/2018

by    Jordan R. Anderson, NICHOLAS ANDERSON

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

Continuation of FD-302 of  (U) Interview of Cameron Collins                      , On  04/25/2018  , Page  2 of 3

The signature on the document presented was COLLINS' and COLLINS acknowledged that the document was his. COLLINS did not remember if he was in the Buffalo, New York area when he signed the document. There was a annual garage sale in the Buffalo, New York area around the time the document was signed, so COLLINS may have been in the Buffalo, New York area.

COLLINS did not know if his sister ████████████ or his father CHRISTOPHER COLLINS tried to transfer shares, but thought his father tried to do so.

COLLINS sold more than approximately 10% of his INNATE shares. COLLINS wanted to sell approximately $1 million worth of shares prior to the news regarding the trial became public. INNATE was running a trial and if it went well shareholders would make money, if the trial went poorly shareholders would lose money. "Everyone" knew the INNATE trial was ending and COLLINS thought he would rather have some money rather than none. If COLLINS sold approximately $1 million of his INNATE stock prior to the announcement of the trial results and the stock went up after the announcement of the trial results the difference in value of his INNATE stock holdings would be approximately $5 million, which was the difference between $25 million and $20 million.

COLLINS had no discussions with his father CHRISTOPHER regarding INNATE's trial results until after COLLINS sold his shares.

COLLINS sold his shares in multiple orders because COLLINS had a large portion of stock and did not want to crash the stock's price. COLLINS had a goal of selling approximately $1 million but was not able to sell enough shares to reach that goal.

COLLINS purchased a residence in Asbury Park, NJ and began the process of moving, but his residence in Morristown, NJ was his primary residence.

COLLINS canceled his pending McLaren purchase after the news regarding INNATE's trials was released.

ZARSKY owned INNATE shares, but "not a lot". ZARSKY knew about INNATE through COLLINS. COLLINS was not sure if ZARSKY's parents bought INNATE shares, but thought they might have. ZARSKY's parents knew about INNATE.

COLLINS did not know of anyone that purchased INNATE shares because of COLLINS.

The "cause of all this" was the trading halt, which did not sound good. COLLINS was able to trade INNATE shares under a different ticker

Continuation of FD-302 of   (U)  Interview of Cameron Collins                    , On  04/25/2018  , Page   3 of 3

after the trading halt. COLLINS found out about the trading halt from
online forums, not from his father. COLLINS told ZARSKY's parents about
the trading halt, but did not know how many innate shares they owned. The
visit to ZARSKY's parents house was not planned. COLLINS and ZARSKY
visited ZARSKY's parents often, approximately weekly.

COLLINS talks to his father approximately weekly. COLLINS' father said
nothing about the trial results to COLLINS. COLLINS' conversation with his
father was about the trading halt. COLLINS asked his father what the
trading halt meant. COLLINS' father responded that the trading halt meant
there was probably news coming. COLLINS did not learn from his father
whether the news or trial results were good or bad. COLLINS said "Maybe he
knew about the trading halt and shouldn't have told me or maybe he just
told me the trial was over". COLLINS' father did not tell COLLINS to do
anything. COLLINS' "main takeaway" from the conversation was the trading
halt.

COLLINS had an iPhone X and no longer had an iPhone 7.

[Agent Note: At approximately 6:52am COLLINS voluntarily consented to
his iPhone X being imaged onsite by FBI CART.]

COLLINS did not have computers in Asbury Park, NJ and ZARSKY did not
own a computer. COLLINS had an iPad and one computer.

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/02/2018

        STEPHEN ZARSKY, born ▓▓▓▓▓▓▓ was interviewed at his place of
residence, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ his cellular telephone
number is ▓▓▓▓▓▓▓▓. After being advised of the identity of the
interviewing agents and the nature of the interview, ZARSKY provided the
following information:

        ZARSKY heard about Innate Immunotherapeutics (INNATE) approximately one
(1) year ago, through the media.  It was a high risk, biotech stock that
ZARSKY had a sizeable position in - over $100,000.  ZARSKY viewed himself
to be a more speculative trader, with short term holdings.  ZARSKY had
friends who either had positions in INNATE and/or researched the company.

        INNATE had a clinical trial underway for a Multiple Sclerosis (MS)
treatment, the results of which were to be released any day.  ZARSKY
eventually sold all of his position, in INNATE, prior to the results of
the trial, since he could not afford to lose his money.  ZARSKY initially
felt that the MS drug treatment would work, but eventually succumbed to
his fear of losing his money.  The entire position was funded through
ZARSKY's retirement (401K) account.

        ZARSKY's brokerage account was with Fidelity and he mainly used the
Fidelity smartphone App, online trading and customer service to place
orders.  ZARSKY was the only one with access to his Fidelity account, via
his phone app or web log-in.

        ZARSKY liked mostly what he heard about INNATE and the marketing
material was appealing, but in the end, ZARSKY did not have the appetite
for the risk involved.  ZARSKY recalled the announcement for the results
of the clinical trials were not good, and he was happy to be out (of
INNATE).  ZARSKY's friends had warned him that biotech companies are too
risky and that 90% result in bankruptcy.  ZARSKY had previously invested
in pharmaceutical stocks, but never biotech stocks. ZARSKY had also
invested in "blue chip" stocks.  ZARSKY had no additional information,
prior to selling, and his decision was based on his (lack of) risk
tolerance.  ZARSKY sold all of his shares of INNATE, through Fidelity.com.

---

Investigation on   04/25/2018   at   Summit, New Jersey, United States (In Person)

File #   ▓▓▓▓▓▓▓▓▓▓▓▓                                   Date drafted   04/30/2018

by   Bempsey G. Co, MCLAUGHLIN KEITH JOHN

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Continuation of FD-302 of  (U) Interview of Stephen Zarsky                        , On  04/25/2018 , Page   2 of 4

ZARSKY's wife, DOROTHY, also had a small position in INNATE.  DOROTHY learned about INNATE, through him (ZARSKY).  ZARSKY and his wife decided to sell, when the risk became too great.  ZARSKY stated that no one else in the family invested in INNATE.  ZARSKY then recalled that his brother, also invested in INNATE.  ZARSKY's brother learned about INNATE through him.  ZARSKY would later talk his brother into selling all of his position.  ZARSKY recalled that he told his brother and sister, before he sold.  ZARSKY reconfirmed that no one else in his family had a position in INNATE.

ZARSKY's position in INNATE was very risky, however he (ZARSKY) had a friend (UNSUB), from Connecticut, who had made a lot of money from the stock market, recommend INNATE.  ZARSKY's maximum positions are usually $40,000 to $50,000, with an average hold time of three (3) months - however he (ZARSKY) may go in and out of the stock.  ZARSKY confirmed the INNATE trade was much larger than usual.

ZARSKY had been retired for about a year and is on disability.  ZARSKY has a small pension with MetLife and his wife works for AT&T.  ZARSKY did not understand the mechanism of trading stocks on the Australian Stock Exchange versus the Over-the-Counter (OTC) market.  ZARSKY was aware that stocks can be halted for specific reasons, however he (ZARSKY) did not recall much about the trading halt on INNATE, shortly after he sold all of his shares.

ZARSKY did not recall a visit from his daughter, LAUREN ZARSKY, and her "boyfriend", CAMERON COLLINS (CAMERON), on the evening of June 22nd, 2017.

After agents mentioned LAUREN ZARSKY's visit on the evening of June 22nd, 2017, ZARSKY believed his daughter, held shares of INNATE, but can't recall if he told her about the stock.  ZARSKY did not want to continue the discussion of his daughter and INNATE.

ZARSKY had no information on how LAUREN paid for her stock purchases or what she owned.  ZARSKY had no access to LAUREN's brokerage account.  LAUREN is an accountant at PricewaterhouseCoopers (PWC) and CAMERON is an electric engineer at AT&T.  ZARSKY now stated that CAMERON also invested in INNATE.  ZARSKY knew that CAMERON's father, CHRISTOPHER COLLINS, is a congressman for New York.  ZARSKY met CHRISTOPHER COLLINS once and knew he owned shares of INNATE.  ZARSKY never spoke to CHRISTOPHER COLLINS about INNATE.  ZARSKY had conversations with CAMERON about INNATE, and CAMERON would provide his feedback.  ZARSKY stated that CAMERON owned shares of INNATE years before he (ZARSKY) decided to invest in INNATE himself or even discuss INNATE with CAMERON.

Continuation of FD-302 of  (U) Interview of Stephen Zarsky _____ , On 04/25/2018 , Page 3 of 4

ZARSKY knew CHRISTOPHER COLLINS was involved with INNATE, from a Google search.  ZARSKY stated that he was aware that CHRISTOPHER COLLINS owned shares of INNATE.  ZARSKY was not aware of what CHRISTOPHER COLLINS' involvement, if any, was with INNATE, nor if he had ownership interest in INNATE.  ZARSKY had no business relationships or dealings with CHRISTOPHER COLLINS.  ZARSKY simply knew CHRISTOPHER COLLINS as the father of LAUREN's boyfriend.  LAUREN and CAMERON COLLINS had been together for approximately three (3) years, after meeting at Villanova University.

ZARSKY thinks that LAUREN and CAMERON sold their shares of INNATE around the same time he (ZARSKY) did, however he did not know when they actually sold it - or even if they did.  ZARSKY was not aware if CHRISTOPHER COLLINS sold his INNATE shares or if he still owned them.

ZARSKY kept following INNATE, through news and research.  ZARSKY watched /listened to interviews of INNATE's Chief Executive Officer (CEO), however ZARSKY grew to dislike the direction of the company, information he (ZARSKY) had heard and a general distrust of the CEO.

ZARSKY had trepidation prior to selling all of his shares of INNATE and instructed writer, several times, to memorialize that he sold all of his shares of INNATE on his (ZARSKY) own volition.  ZARSKY stated that he was either going to be a Millionaire or be "broke" (ZARSKY clarified that "broke" was an exaggeration).

ZARSKY thought LAUREN and CAMERON would hold their position in INNATE, but he (ZARSKY) also knew they (LAUREN and CAMERON) were interested in purchasing a home and did not want to take the risk.

ZARSKY knew the stock (INNATE) "tanked", after the clinical trial results were announced, however he did not know by how much.  ZARSKY knew the clinical trial announcement was imminent, but he (ZARSKY) had no knowledge of when it would happen.

ZARSKY initially disagreed with writer's description, that his wife, DOROTHY, had "desperately" tried to unload her shares of INNATE, on the evening of June 22nd, 2017 - after LAUREN and CAMERON's visit, but did not dispute the description when told of the details of her attempts.

ZARSKY mentioned that, due to recent current events, the Federal Bureau of Investigation, cannot be trusted these days.

ZARSKY was not provided with any "insider" information, prior to selling all of his shares in INNATE.  ZARSKY stated that he never spoke to anyone about the clinical trial results, prior to the announcement.

Continuation of FD-302 of  (U) Interview of Stephen Zarsky                    , On  04/25/2018 , Page  4 of 4

    ZARSKY recalled that he did not discuss INNATE with LAUREN and CAMERON,
when they visited his wife and him (ZARSKY) at their home, the evening of
June 22nd, 2017.

    ZARSKY ended the interview and asked agents to leave his home, after
being confronted with inconsistencies and overall logic in his story.

    ZARSKY was then served with a Federal Search and Seizure Warrant and a
Federal Grand Jury Subpoena, for documents.

FD-302 (Rev. 5-8-10)

- 1 of 3 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/02/2018

LAUREN ZARSKY, date of birth ▓▓▓▓▓ social security number ▓
home address ▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓ cellular telephone number ▓▓▓▓▓ was interviewed at
her residence. After being advised of the identities of the interviewing
Agents and the nature of the interview, ZARSKY voluntarily provided the
following information:

ZARSKY's fiancé was CAMERON COLLINS. ZARSKY was aware that COLLINS and
members of his family invested in INNATE IMMUNOTHERAPEUTICS (INNATE).
ZARSKY thought INNATE was possibly a treatment for one of the phases of
Multiple Sclerosis. ZARSKY believed the COLLINS family had been involved
with INNATE for approximately ten years, and ZARSKY heard the COLLINS
family discuss INNATE over family dinners. ZARSKY believed she learned
about COLLINS' investment in INNATE approximately five years ago, or a
couple years after she and COLLINS began dating. COLLINS and ZARSKY began
dating while both were students at VILLANOVA.

At some point, ZARSKY owned INNATE stock, which she purchased through
FIDELITY. ZARSKY thought she possibly held the stock for approximately one
week or one month. ZARSKY invested in INNATE because there was "a lot of
talk about it" during dinners with the COLLINS family.

ZARSKY purchased INNATE stock with her savings, which she had accumulated
from her salary and kept in a Bank of America account. ZARSKY was
currently on sabbatical from her job at PricewaterhouseCoopers, where she
was an accountant.

ZARSKY believed she could access FIDELITY online but had to call to
purchase the INNATE stock because it was on an Over The Counter (OTC)
market. ZARSKY believed she had to call FIDELITY to make any significant
transactions, and someone else could not call on her behalf because the
person calling had to provide personal information to discuss a FIDELITY
account. ZARSKY believed she likely needed a username and password to log
into the account.

ZARSKY knew INNATE was available for sale on two markets: OTC and another
market. ZARSKY recalled that INNATE had two different tickers that could

Investigation on   04/25/2018   at   Morristown, New Jersey, United States (In Person)

File # ▓▓▓▓▓▓▓                                      Date drafted   04/26/2018

by   BERESFORD MELISSA, GARDOCKI MARY E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

Continuation of FD-302 of  (U) Lauren Zarsky 04/25/2018     , On  04/25/2018   , Page  2 of 3

both be purchased through FIDELITY. INNATE was an Australian Company, and ZARSKY thought a company purchased and resold the Australian INNATE stock. The company was in the business of purchasing stock and placing it for sale. ZARSKY did not know details and could not recall which version she purchased; however, ZARSKY thought she possibly purchased on the OTC market. ZARSKY understood OTC to be a way in which trading was conducted.

ZARSKY believed trading on the Australian Stock Exchange (ASX) was complicated, and ZARSKY did not think she had traded on the ASX except possibly with INNATE.

ZARSKY was nervous to purchase INNATE stock because ZARSKY was not the person close to the company. ZARSKY's purchase and sale were based on emotion. ZARSKY was first excited to purchase INNATE stock, but ZARSKY became spooked and sold her (ZARSKY's) INNATE stock.

ZARSKY recalled some announcements about the drug but did not recall which announcement was made by the FDA. ZARSKY knew there was some type of activity relating to the ASX but could not recall details. ZARKSY thought the activity was possibly that INNATE could no longer be sold on the ASX.

ZARSKY became nervous because the Australian market "halted something." ZARSKY guessed that a trading halt meant that a stock could not be traded in certain markets.

ZARSKY recalled an announcement made after the clinical trial saying that the drug did not work. However, ZARSKY sold her INNATE shares before ZARSKY knew about the announcement that the drug did not work. Nobody talked to ZARSKY about selling her INNATE stock before ZARSKY ultimately sold her INNATE stock.

ZARSKY thought the sale of her INNATE stock was neutral; she did not recall making or losing a significant amount of money on the sale. ZARSKY stopped using her FIDELITY account.

Although ZARSKY was a Certified Public Accountant (CPA), ZARSKY thought she would probably consult someone before making significant financial decisions. However, ZARSKY did not consult anyone before purchasing or selling INNATE stock because she thought the amount was "very small." However, ZARSKY later said she thought she invested a "decent amount of money," or approximately $15,000 to $25,000. An amount of $15,000 to $25,000 was a significant amount of money to ZARSKY, and ZARSKY did not want to lose the money because she had worked hard to accumulate it.

Continuation of FD-302 of <u>(U) Lauren Zarsky 04/25/2018</u> , On <u>04/25/2018</u> , Page <u>3 of 3</u>

ZARSKY did not know how often COLLINS spoke with his father, but ZARSKY knew they sometimes spoke. ZARSKY did not know whether COLLINS traded stock, nor did ZARSKY know whether COLLINS still owned INNATE stock.

ZARSKY went to her parents' home often but could not recall any specific instances around the time of the INNATE stock sale. ZARSKY probably told her parents that she purchased INNATE stock, but ZARSKY did not know whether her parents purchased INNATE stock. If her parents did purchase INNATE stock, ZARSKY did not think they still owned any INNATE stock.

ZARSKY had always used her family's accountant to do her taxes. The accountant was a male individual that ZARSKY believed was located in New Providence, New Jersey. ZARSKY did not talk to the accountant regarding buying or selling her INNATE stock.

The password for ZARSKY's Apple watch was

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry          05/02/2018

      DOROTHY ZARSKY (DOROTHY), date of birth (DOB): ███████████
place of birth (POB): █████████████ address: █████████████
████████ telephone: █████████████ was interviewed at her residence. The
interview began at approximately 6:00am and ended at approximately 7:
30am.  After being advised of the identities of the interviewing Agents,
DOROTHY provided the following information:

      DOROTHY was employed as a technical manager with AT&T in Middletown,
NJ. She had been with AT&T for 45 years.  DOROTHY had a FIDELITY
INVESTMENTS (FIDELITY) account for approximately 30 or 40 years. Within
that account was a retirement account and a trading account. She had an
online account using a FIDELITY username and password that only she knew
and also had the ability to call to FIDELITY to conduct
transactions.  Within the trading account, she held approximately ten
different company stocks that she traded.  DOROTHY was pretty risk averse
as she had bought and lost on stocks in the past. If she heard news about
the company from others, DOROTHY would move in and out of certain stocks.
DOROTHY said most of her trading activity was performed online using her
work laptop, which only she has access to.

      DOROTHY learned of INNATE IMMUNOTHERAPEUTICS (INNATE) approximately a
year and a half ago through her daughter, LAUREN ZARSKY (LAUREN) or
LAUREN'S boyfriend, CAMERON COLLINS (CAMERON). CAMERON and LAUREN later
became engaged to be married.  CAMERON told DOROTHY he initially invested
in INNATE because he thought the company was going to have a
breakthrough.  STEPHEN ZARSKY (STEPHEN), DOROTHY'S husband, bought INNATE
stock a while before she did and she had heard CAMERON and STEPHEN talking
about it in the past.  CAMERON was an engineer, so his demeanor generally
did not change and did not change when he specifically spoke of INNATE.
CAMERON told DOROTHY that it was up to her whether or not she wanted to
invest in INNATE. It was not uncommon for her and CAMERON to talk about
technology stocks and TESLA.  DOROTHY invested approximately $50,000 to
$100,000 in INNATE last year.  At first, DOROTHY thought she may have
invested in INNATE through her BANK OF AMERICA (BOA) brokerage account,
however, she later recalled that the investment may have been through her
FIDELITY account. DOROTHY explained that a friend of the family was
diagnosed with multiple sclerosis, which made her interested in the fact

---

Investigation on   04/25/2018   at   Summit, New Jersey, United States (In Person)

File # ████████████████                              Date drafted   04/30/2018

by   CACIOPPO CARMEN ANTHONY, LIRO JON JOSEPH

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

Continuation of FD-302 of   (U) Interview - Dorothy Zarsky                    , On  04/25/2018  , Page   2 of 3

that INNATE was developing a drug that may have been a cure for the disease.

   DOROTHY recalled getting an alert related to INNATE in regards to a FEDERAL DRUG ADMINISTRATION announcement.  DOROTHY interpreted the news to be positive, however, she only purchased the stock once last year and did not purchase again in relation to the announcement.  DOROTHY was unaware of a trading halt on the INNATE stock.  DOROTHY thought she sold her INNATE stocks around the fall of 2017. She was nervous about the investment and decided to sell. She said she may have done it online, through the broker on the telephone, or both.

   DOROTHY was asked by the interviewing agents to recall a visit from CAMERON and LAUREN on June 22, 2017. DOROTHY remembered the visit. CAMERON and LAUREN were having dinner or were at a mall in the area and they visited the ZARSKY residence. DOROTHY typically sees LAUREN and CAMERON on a weekly basis. During the visit, CAMERON and LAUREN told her she may not want to keep the INNATE stocks she purchased anymore because they did not think the company was going to happen. Once CAMERON said he was getting out of the investment, DOROTHY decided to do the same.  Since CAMERON initially told her about the investment, he thought she should know he was selling. DOROTHY acknowledged that CAMERON probably received information in regards to INNATE from his father, CHRIS COLLINS (CHRIS). CHRIS was somehow invested in INNATE. When DOROTHY made the call to FIDELITY to sell the INNATE stocks that evening, the individuals that were with her included CAMERON, LAUREN and STEPHEN.  DOROTHY did whatever the FIDELITY representative suggested when selling INNATE.  DOROTHY did not share the information provided to her by CAMERON with anyone else. However, STEPHEN told a bunch of people.

   DOROTHY acknowledged that CAMERON may have come over to her residence the next day, June 23, 2017, however, she could not recall specifically. She said CAMERON and LAUREN often dropped their dog off. After that, she probably saw CAMERON and LAUREN the next week when they went to Florida for the July 4th weekend.

   DOROTHY did not believe that LAUREN owned shares of INNATE because she was not interested in the investment and also because the investment was speculative. She was employed by PWC and had to be careful with her investments. Both of ZARSKY'S children, including LAUREN, had trading accounts set up in their names from when they were children. The accounts were with BOA and were set up to address interest issues. Once LAUREN graduated from VILLANOVA, DOROTHY transferred the funds in LAUREN'S account to her own. DOROTHY did not know if LAUREN also had a FIDELITY account or if she owned shares in INNATE.

Continuation of FD-302 of  (U) Interview - Dorothy Zarsky          , On  04/25/2018  , Page  3 of 3

 

   CAMERON was a smart kid. CAMERON and CHRIS, his father, were involved
in business together as DOROTHY observed CAMERON taking business calls
from his father in the past. She acknowledged that CHRIS probably gave
CAMERON information in regards to INNATE. CAMERON could have talked to
CHRIS about INNATE and then passed information along to her.  She took
CAMERON'S advice and sold the INNATE stock.

   DOROTHY was then informed by the interviewing Agents that CHRIS was a
board member of INNATE. She was previously unaware of his role at
INNATE.  DOROTHY acknowledged that as a board member of INNATE, CHRIS
possibly could have had insight about the company.

   DOROTHY had only met CHRIS and his wife, ████████████████, a couple
of times. LAUREN and CAMERON both went to VILLANOVA, so the parents of
each met there at graduation and then again after they got engaged.
DOROTHY never discussed INNATE with CHRIS.

| Event | Date (EDT) | Time (EDT) | Name | Terminating Name/Sell | Duration/Quantity/Content | Limit Price/Execution Price |
|---|---|---|---|---|---|---|
| Email | Thursday, June 22, 2017 | 6:55:00 PM | Innate CEO | Innate Board (including Collins) | Transmits the Topline Results | |
| Email | Thursday, June 22, 2017 | 7:10:54 PM | Chris Collins | Innate CEO and others | "Wow. Makes no sense. How are these results even possible???" | |
| Phone | Thursday, June 22, 2017 | 7:11:00 PM | Chris Collins | Cameron Collins | 0:00 minutes | |
| Phone | Thursday, June 22, 2017 | 7:11:23 PM | Chris Collins | Cameron Collins | 5 seconds - VM | |
| Phone | Thursday, June 22, 2017 | 7:14:16 PM | Cameron Collins | Chris Collins | 5 Seconds - VM | |
| Phone | Thursday, June 22, 2017 | 7:14:51 PM | Cameron Collins | Chris Collins | 5 Seconds - VM | |
| Phone | Thursday, June 22, 2017 | 7:15:27 PM | Cameron Collins | Chris Collins | 3 seconds - VM | |
| Phone | Thursday, June 22, 2017 | 7:15:50 PM | Chris Collins | Cameron Collins | 7 Seconds - VM | |
| Phone | Thursday, June 22, 2017 | 7:16:19 PM | Chris Collins | Cameron Collins | 6:08 minutes | |
| Text | Thursday, June 22, 2017 | 9:28:14 PM | Lauren Zarsky | Dorothy Zarsky | "We're here." | |
| Phone | Thursday, June 22, 2017 | 9:34:50 PM | Dorothy Zarsky | Fidelity Investments | 28:37 minutes | |
| Order Entry | Thursday, June 22, 2017 | 9:58:39 PM | Dorothy Zarsky | | 30, 250 shares on ASX before halt | |
| News | Thursday, June 22, 2017 | 10:53:00 PM | Trading Halt Notice Received -- Bloomberg | | | |
| | | | | | | |
| Text | Friday, June 23, 2017 | 7:37:00 AM | Stephen Zarsky | Individual-4 | "Call me asap!" | |
| Order Entry | Friday, June 23, 2017 | 7:42:11 AM | Cameron Collins | Sell | 16,508 | $0.46 |
| Text | Friday, June 23, 2017 | 7:44:00 AM | Stephen Zarsky | Individual-4 | "Call me immediately." | |
| Order Entry | Friday, June 23, 2017 | 7:52:18 AM | Stephen Zarsky | Sell | 303,005 | $0.41 |
| Phone | Friday, June 23, 2017 | 9:36:25 AM | Stephen Zarsky | Individual-3 | 3 seconds | |
| Order Entry | Friday, June 23, 2017 | 9:37:52 AM | Lauren Zarsky | Sell | 40,464 | $0.45 |
| Phone | Friday, June 23, 2017 | 9:40:24 AM | Individual-3 | Stephen Zarsky | 57 seconds | |
| Phone | Friday, June 23, 2017 | 9:42:02 AM | Cameron Collins | Chris Collins | 8:24 minutes | |
| Phone | Friday, June 23, 2017 | 9:42:29 AM | Stephen Zarsky | Individual-4 | 45 seconds | |
| Order Entry | Friday, June 23, 2017 | 9:43:33 AM | Individual-3 | Sell | 9,000 | 0.00 |
| Phone | Friday, June 23, 2017 | 9:43:46 AM | Individual-4 | Stephen Zarsky | 3 seconds | |
| Phone | Friday, June 23, 2017 | 9:43:58 AM | Stephen Zarsky | Individual-5 | 4 seconds | |
| Phone | Friday, June 23, 2017 | 9:47:31 AM | Stephen Zarsky | Individual-4 | 1:04 minutes | |
| Phone | Friday, June 23, 2017 | 9:52:06 AM | Individual-4 | Stephen Zarsky | 0 seconds | |
| Phone | Friday, June 23, 2017 | 9:53:37 AM | Individual-4 | Stephen Zarsky | 4:25 minutes | |
| Order Entry | Friday, June 23, 2017 | 9:54:23 AM | Cameron Collins | Sell | 100,000 | $0.50 |
| Order Entry | Friday, June 23, 2017 | 9:57:48 AM | Cameron Collins | Sell | 100,000 | $0.51 |
| Phone | Friday, June 23, 2017 | 10:01:10 AM | Stephen Zarsky | Individual-5 | 33 seconds | |
| Execution | Friday, June 23, 2017 | 10:04:00 AM | Individual-5 | Sell | 2,500 | $0.50 |
| Execution | Friday, June 23, 2017 | 10:04:00 AM | Individual-5 | Sell | 800 | $0.49 |
| Execution | Friday, June 23, 2017 | 10:07:00 AM | Individual-5 | Sell | 11,500 | $0.49 |
| Order Entry | Friday, June 23, 2017 | 10:28:06 AM | Zarsky, Dorothy | Sell | 19,750 | $0.48 |
| Order Entry | Friday, June 23, 2017 | 10:42:05 AM | Cameron Collins | Sell | 100,000 | $0.00 |
| Order Cancel | Friday, June 23, 2017 | 10:49:20 AM | Cameron Collins | Sell | 100,000 | $0.51 |
| Order Entry | Friday, June 23, 2017 | 10:49:20 AM | Cameron Collins | Sell | 100,000 | $0.50 |
| Phone | Friday, June 23, 2017 | 11:32:33 AM | Chris Collins | Cameron Collins | 6:56 minutes | |
| Order Entry | Friday, June 23, 2017 | 11:41:15 AM | Cameron Collins | Sell | 50,000 | $0.00 |
| Order Entry | Friday, June 23, 2017 | 11:46:40 AM | Cameron Collins | Sell | 50,000 | $0.46 |
| Order Cancel | Friday, June 23, 2017 | 11:46:59 AM | Cameron Collins | Sell | 100,000 | $0.50 |
| Order Entry | Friday, June 23, 2017 | 12:55:03 PM | Cameron Collins | Sell | 25,000 | $0.52 |

| Event | Date (EDT) | Time (EDT) | Name | Terminating Name/Sell | Duration/Quantity/Content | Limit Price/Execution Price |
|---|---|---|---|---|---|---|
| Order Entry | Friday, June 23, 2017 | 1:37:02 PM | Cameron Collins | Sell | 25,000 | $0.509 |
| Order Cancel | Friday, June 23, 2017 | 2:43:51 PM | Cameron Collins | Sell | 25,000 | $0.52 |
| Phone | Friday, June 23, 2017 | 3:12:32 PM | Cameron Collins | Chris Collins | 5:05 minutes | |
| Order Entry | Friday, June 23, 2017 | 3:15:56 PM | Cameron Collins | Sell | 50,000 | $0.45 |
| Order Cancel | Friday, June 23, 2017 | 3:19:49 PM | Cameron Collins | Sell | 19,000 | $0.509 |
| Order Entry | Friday, June 23, 2017 | 3:19:49 PM | Cameron Collins | Sell | 19,000 | $0.46 |
| Order Entry | Friday, June 23, 2017 | 3:22:32 PM | Cameron Collins | Sell | 25,000 | $0.45 |
| Order Entry | Friday, June 23, 2017 | 3:29:40 PM | Cameron Collins | Sell | 25,000 | $0.43 |
| Order Entry | Friday, June 23, 2017 | 3:37:22 PM | Cameron Collins | Sell | 25,000 | $0.43 |
| Order Entry | Friday, June 23, 2017 | 3:41:49 PM | Cameron Collins | Sell | 50,000 | $0.00 |
| Order Entry | Friday, June 23, 2017 | 3:51:00 PM | Cameron Collins | Sell | 30,000 | $0.00 |
| Order Entry | Friday, June 23, 2017 | 3:58:02 PM | Cameron Collins | Sell | 50,000 | $0.00 |
| Phone | Friday, June 23, 2017 | 4:48:58 PM | Cameron Collins | Chris Collins | 7:00 minutes | |
| Phone | Friday, June 23, 2017 | 8:20:05 PM | Chris Collins | Cameron Collins | 3 seconds | |
| Phone | Friday, June 23, 2017 | 8:22:07 PM | Cameron Collins | Chris Collins | 19:30 minutes | |
| Phone | Saturday, June 24, 2017 | 1:08:52 PM | Chris Collins | Cameron Collins | 4:16 minutes | |
| Phone | Sunday, June 25, 2017 | 2:49:50 PM | Cameron Collins | Chris Collins | 18 seconds | |
| Phone | Sunday, June 25, 2017 | 2:50:39 PM | Chris Collins | Cameron Collins | 2 seconds | |
| Phone | Sunday, June 25, 2017 | 2:51:01 PM | Cameron Collins | Chris Collins | 1:58 minutes | |
| Phone | Monday, June 26, 2017 | 9:01:03 AM | Cameron Collins | Individual-6 | 3 seconds | |
| Text | Monday, June 26, 2017 | 9:02:00 AM | Individual-6 | Cameron Collins | "Sorry, on a conference call right now. Doing a little phone tag – what's going | |
| Text | Monday, June 26, 2017 | 9:02:00 AM | Cameron Collins | Individual-6 | "Give me a call when you get a free | |
| Order Entry | Monday, June 26, 2017 | 9:08:24 AM | Cameron Collins | Sell | 50,000 | $0.50 |
| Order Cancel | Monday, June 26, 2017 | 9:09:06 AM | Cameron Collins | Sell | 50,000 | $0.50 |
| Order Entry | Monday, June 26, 2017 | 9:09:06 AM | Cameron Collins | Sell | 50,000 | $0.52 |
| Phone | Monday, June 26, 2017 | 9:14:54 AM | Individual-6 | Cameron Collins | 51 seconds | |
| Order Entry | Monday, June 26, 2017 | 9:35:56 AM | Cameron Collins | Sell | 50,000 | $0.50 |
| Order Entry | Monday, June 26, 2017 | 9:40:27 AM | Cameron Collins | Sell | 10,000 | $0.48 |
| Order Entry | Monday, June 26, 2017 | 9:44:33 AM | Cameron Collins | Sell | 25,000 | $0.47 |
| Order Entry | Monday, June 26, 2017 | 9:54:30 AM | Individual-6 | Sell | 1,600 | $0.46 |
| Order Entry | Monday, June 26, 2017 | 10:14:17 AM | Cameron Collins | Sell | 20,000 | $0.49 |
| Order Entry | Monday, June 26, 2017 | 10:27:23 AM | Cameron Collins | Sell | 25,000 | $0.47 |
| Order Entry | Monday, June 26, 2017 | 10:47:58 AM | Cameron Collins | Sell | 8,000 | $0.46 |
| Order Entry | Monday, June 26, 2017 | 10:49:54 AM | Cameron Collins | Sell | 15,000 | $0.460 |
| Order Entry | Monday, June 26, 2017 | 11:17:44 AM | Cameron Collins | Sell | 7,500 | $0.450 |
| Order Entry | Monday, June 26, 2017 | 11:20:00 AM | Cameron Collins | Sell | 6,500 | $0.4500 |
| Order Entry | Monday, June 26, 2017 | 11:21:11 AM | Cameron Collins | Sell | 10,000 | $0.4500 |
| Order Entry | Monday, June 26, 2017 | 11:28:10 AM | Cameron Collins | Sell | 7,000 | $0.4500 |
| Order Entry | Monday, June 26, 2017 | 11:30:13 AM | Cameron Collins | Sell | 20,000 | $0.4480 |
| Order Entry | Monday, June 26, 2017 | 11:32:37 AM | Cameron Collins | Sell | 25,000 | $0.4480 |
| Order Entry | Monday, June 26, 2017 | 11:34:10 AM | Cameron Collins | Sell | 40,000 | $0.4450 |
| Order Entry | Monday, June 26, 2017 | 11:43:53 AM | Cameron Collins | Sell | 12,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 11:50:51 AM | Cameron Collins | Sell | 30,000 | $0.00 |

| Event | Date (EDT) | Time (EDT) | Name | Terminating Name/Sell | Duration/Quantity/Content | Limit Price/Execution Price |
|---|---|---|---|---|---|---|
| Phone | Monday, June 26, 2017 | 11:51:40 AM | Chris Collins | Cameron Collins | 2:46 minutes | |
| Order Entry | Monday, June 26, 2017 | 11:59:03 AM | Cameron Collins | Sell | 25,000 | $0.4000 |
| Order Entry | Monday, June 26, 2017 | 12:03:46 PM | Cameron Collins | Sell | 40,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 12:06:51 PM | Cameron Collins | Sell | 30,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 12:34:42 PM | Cameron Collins | Sell | 20,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 12:37:13 PM | Cameron Collins | Sell | 30,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 1:07:49 PM | Cameron Collins | Sell | 50,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 1:17:12 PM | Cameron Collins | Sell | 50,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 1:56:24 PM | Cameron Collins | Sell | 50,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 1:57:22 PM | Cameron Collins | Sell | 50,000 | $0.4100 |
| Order Entry | Monday, June 26, 2017 | 1:59:07 PM | Cameron Collins | Sell | 35,900 | $0.4100 |
| Order Entry | Monday, June 26, 2017 | 2:05:12 PM | Cameron Collins | Sell | 50,000 | $0.4100 |
| Order Entry | Monday, June 26, 2017 | 2:34:47 PM | Cameron Collins | Sell | 25,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 2:58:51 PM | Cameron Collins | Sell | 25,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 3:10:58 PM | Cameron Collins | Sell | 25,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 3:45:39 PM | Cameron Collins | Sell | 20,000 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 3:45:46 PM | Cameron Collins | Sell | 20,100 | $0.00 |
| Order Entry | Monday, June 26, 2017 | 3:56:25 PM | Cameron Collins | Sell | 25,000 | $0.480 |
| Order Entry | Monday, June 26, 2017 | 3:59:55 PM | Cameron Collins | Sell | 25,000 | $0.00 |
| Phone | Monday, June 26, 2017 | 4:05:55 PM | Chris Collins | Cameron Collins | 27 seconds | |
| Order Cancel | Monday, June 26, 2017 | 4:11:00 PM | Cameron Collins | Sell | 17,000 | $0.47 |
| Order Cancel | Monday, June 26, 2017 | 4:11:56 PM | Cameron Collins | Sell | 50,000 | $0.52 |
| Order Cancel | Monday, June 26, 2017 | 4:11:56 PM | Cameron Collins | Sell | 50,000 | $0.50 |
| Order Cancel | Monday, June 26, 2017 | 4:11:56 PM | Cameron Collins | Sell | 20,000 | $0.49 |
| Order Cancel | Monday, June 26, 2017 | 4:11:56 PM | Cameron Collins | Sell | 25,000 | $0.48 |
| Phone | Monday, June 26, 2017 | 4:33:53 PM | Cameron Collins | Chris Collins | 8:17 minutes | |
| News | Monday, June 26, 2017 | 7:11:32 PM | Bloomberg reports on negative trial results | | | |
| Phone | Monday, June 26, 2017 | 7:24:56 PM | Chris Collins | Cameron Collins | 2:58 minutes | |
| Order Entry | Monday, June 26, 2017 | 7:50:32 PM | Cameron Collins | Sell | 100,000 | $0.50 |
| Phone | Monday, June 26, 2017 | 7:51:13 PM | Cameron Collins | Chris Collins | 2:28 minutes | |
| Order Entry | Monday, June 26, 2017 | 7:53:31 PM | Cameron Collins | Sell | 500,000 | $0.32 |
| Phone | Monday, June 26, 2017 | 8:24:19 PM | Cameron Collins | Chris Collins | 2:12 minutes | |
| Order Entry | Monday, June 26, 2017 | 8:27:09 PM | Cameron Collins | Sell | 500,000 | $0.03 |
| Order Entry | Monday, June 26, 2017 | 8:30:16 PM | Cameron Collins | Sell | 500,000 | $0.0300 |
| Order Entry | Monday, June 26, 2017 | 8:41:42 PM | Cameron Collins | Sell | 1,000,000 | $0.0400 |
| Order Cancel | Monday, June 26, 2017 | 8:42:34 PM | Cameron Collins | Sell | 100,000 | $0.50 |
| Order Cancel | Monday, June 26, 2017 | 8:42:49 PM | Cameron Collins | Sell | 500,000 | $0.32 |
| Order Entry | Monday, June 26, 2017 | 8:43:46 PM | Cameron Collins | Sell | 1,000,000 | $0.060 |
| Phone | Monday, June 26, 2017 | 8:44:41 PM | Cameron Collins | Chris Collins | 2:13 minutes | |
| Order Entry | Monday, June 26, 2017 | 8:48:13 PM | Cameron Collins | Sell | 825,000 | $0.065 |
| Phone | Monday, June 26, 2017 | 8:57:11 PM | Cameron Collins | Chris Collins | 2:36 minutes | |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | **1:18-cv-07128-KPF-KNF** |
| | : | |
| **CHRISTOPHER COLLINS, CAMERON COLLINS, STEPHEN ZARSKY, and** | : | |
| | : | |
| **Defendants.** | : | |

---

### FINAL JUDGMENT AS TO DEFENDANT CAMERON COLLINS

The Securities and Exchange Commission having filed a Complaint, and Defendant Cameron Collins ("Defendant") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 promulgated thereunder [*17 C.F.R. § 240.10b-5*], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)      to employ any device, scheme, or artifice to defraud;

1

(b)     to make any untrue statement of a material fact or to omit to state a material fact

        necessary in order to make the statements made, in the light of the circumstances

        under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would

        operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

(the "Securities Act") [*15 U.S.C. § 77q(a)*] in the offer or sale of any security by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of material fact or

        any omission of a material fact necessary in order to make the statements made,

        in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or

        would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $570,900, representing losses avoided as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $63,399. Defendant shall satisfy this obligation by paying $634,299 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Cameron Collins as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment,

3

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 30 days following entry of this Final Judgment. Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

## IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

## V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code [*11 U.S.C. §523*], the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code [*11 U.S.C. §523(a)(19)*].

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated:  December 10, 2019
        New York, New York

_____

UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | : | |
|---|---|---|
| UNITED STATES SECURITIES AND | : | |
| EXCHANGE COMMISSION | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 1:18-cv-07128-KPF-KNF |
| | : | |
| CHRISTOPHER COLLINS, | : | |
| CAMERON COLLINS, and | : | |
| STEPHEN ZARSKY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## FINAL JUDGMENT AS TO DEFENDANT CHRISTOPHER COLLINS

The Securities and Exchange Commission having filed a Complaint, and Defendant Christpher Collins having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 promulgated thereunder [*17 C.F.R. § 240.10b-5*], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [*15 U.S.C. § 77q(a)*] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

2

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, pursuant to Section 21(d)(2) of the Exchange Act [*15 U.S.C. § 78u(d)(2)*] and Section 20(e) of the Securities Act [*15 U.S.C. § 77t(e)*], Defendant is permanently prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*].

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code [*11 U.S.C. §523*], the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal

3

securities laws or any regulation or order issued under such laws, as set forth in Section
523(a)(19) of the Bankruptcy Code [*11 U.S.C. §523(a)(19)*].

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain
jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil
Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.


Dated:  December 10, 2019
        New York, New York

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION | : | |
|  | : | |
| Plaintiff, | : | |
|  | : | |
| vs. | : | 1:18-cv-07128-KPF |
|  | : | |
| CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, | : | |
|  | : | |
| Defendants. | : | |

---

## FINAL JUDGMENT AS TO DEFENDANT STEPHEN ZARSKY

The Securities and Exchange Commission having filed a Complaint, and Defendant

Stephen Zarsky having entered a general appearance; consented to the Court's jurisdiction over

Defendant and the subject matter of this action; consented to entry of this Final Judgment;

waived findings of fact and conclusions of law; and waived any right to appeal from this Final

Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5

promulgated thereunder [*17 C.F.R. § 240.10b-5*], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in

connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)      to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [*15 U.S.C. § 77q(a)*] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)      to employ any device, scheme, or artifice to defraud;

(b)      to obtain money or property by means of any untrue statement of material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $143,900, representing losses avoided as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $15,980. Defendant shall satisfy this obligation by paying $159,880 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.

Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center
Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Stephen Zarsky as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment,

Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 30 days following entry of this Final Judgment. Defendant shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code [*11 U.S.C. §523*], the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code [*11 U.S.C. §523(a)(19)*].

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

Dated:  December 10, 2019
      New York, New York

_____
UNITED STATES DISTRICT JUDGE