UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        -against-<br><br>CHRISTOPHER COLLINS,<br>CAMERON COLLINS, and<br>STEPHEN ZARSKY,<br><br>                    Defendants. | 18 Cr. 567 (VSB) |

**REPLY IN FURTHER SUPPORT OF CHRISTOPHER C. COLLINS'
EMERGENCY MOTION TO EXTEND REPORT DATE OR, IN THE ALTERNATIVE,
FOR MODIFICATION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)**

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
*Attorneys for Christopher Collins*

As Dr. Fauci, one of the country's foremost infectious disease experts, recently warned, the country is "not in a good place" and an additional wave of the pandemic is imminent. Prisons are a hot spot. No matter what the level of precautions, there is a significant and unjustifiable risk that Mr. Collins will contract COVID-19 in prison. If he does, his age alone makes him at least five times more likely to be hospitalized and *ninety times* more likely to die than someone in their 20s. His various pre-existing comorbidities further heighten these risks. The Government does not and cannot dispute these facts. This is a "once-in-a-century health crisis"[1] and it has great potential for disastrous human and economic consequences, many of which, tragically, have already come to pass. The potential of Mr. Collins contracting a life-threatening case of COVID-19 is one such consequence, but one that can and should easily be avoided at no societal cost.

Given the anticipated resurgence of COVID-19 nationwide, and demonstrated recent upswings in Florida and in FPC Pensacola, the Government cannot provide any assurance that Mr. Collins will be safe in prison over the next few months. The requested extension, pending additional developments, is reasonable under the circumstances—particularly given anticipated progress on the development of a vaccine. Nobody should be subject to substantially more severe conditions of confinement and the risk of life-threatening health complications because of an unforeseen, once in a century, pandemic and the Government's desire to "begin [the] prison sentence." Opposition by USA, ECF No. 196 at 5 ("Opp'n"). Justice will not be served by requiring Mr. Collins to report to prison now.

---

[1] Tedros Adhanom Ghebreyesus, Director General, World Health Org., Press Conference, Geneva, Switzerland (Aug. 3, 2020).

In support of its position, the Government cites only the dubious proposition that during a raging pandemic a defendant with multiple underlying risk factors should be required to report immediately because of "[t]he public . . . interest in seeing justice done *in this case* without further delay." *Id.* (emphasis added). As a matter of general application, Mr. Collins does not disagree with this principle—in normal times. In light of a widespread, highly-disruptive, and deadly pandemic, however, a "business as usual" approach is both cavalier and dangerous. On balance, Mr. Collins respectfully submits that the present exigency calls for precisely the discretion that rests with the Court to craft an appropriate and just remedy. The public interest is not served by exposing Mr. Collins to the risk of contracting a serious, potentially life threatening, illness.

Laudably, the Attorney General recognized early in the pandemic the profound obligation of the Bureau of Prisons ("BOP") to protect the health and safety of *all* inmates. *See* Motion, ECF No. 196 ("Mtn.") at 12. Therefore, he ordered BOP to prioritize home confinement, particularly for inmates like Mr. Collins, who are over the age of 65. *Id.* at 9-12. Notably, the findings and directives of the Attorney General remain in full force. *Id.* at 4. They have not been rescinded, abrogated, or modified. Yet, the Government completely ignores the Attorney General's findings in opposing Mr. Collins' request for relief. Nor does the Government have an answer for the fact that, to the extent circumstances have changed, it has been for the worse and conditions are expected to continue to deteriorate over the coming months in the absence of a proven, accessible vaccine. Rather, the Government's opposition is built upon two false premises. First, the Government's Pollyannish picture of COVID-19's effect on prisons and the purported adequacy of BOP's testing and response does not withstand any meaningful scrutiny.

Second, the opposition dramatically understates the risk to Mr. Collins posed by any exposure to COVID-19.

## I. There Can Be Little Serious Doubt that the BOP is Falling Short

The Government submits that FPC Pensacola "maintains a rigorous system of testing and quarantine." Opp'n at 1. However, nothing about the BOP's procedures can be considered "rigorous," and the information provided by the Government casts substantial doubt on the ability of the BOP to protect Mr. Collins. According to the Government's representations, only fifty prisoners in total have been tested from a population of more than 300 over a period of more than six months—an average of one test administered approximately every three-and-a-half days. Moreover, the bulk of these tests appear to be new prisoner arrivals or prisoners departing the facility, *id.* at 2, and not the general population. It also appears that asymptomatic prisoners in the general population are not tested routinely, contrary to CDC guidelines. *See, e.g.,* CDC, Coronavirus Disease 2019 (COVID-19), "Testing Overview" (Sept. 18, 2020) ("Due to the significance of asymptomatic and pre-symptomatic transmission, this guidance further reinforces the need to test asymptomatic persons."). Thus, it cannot be determined to what extent COVID-19 is already present in the general population at FPC Pensacola. Asymptomatic carriers of the disease, of course, pose a particularly significant risk of infecting others.

Asymptomatic-carrier risk is of particular concern with regard to staff who cycle in and out of the facility. The Government notes that FPC Pensacola has a strict requirement that only "symptomatic individuals be tested." Opp'n at 2. This policy seems to cover *both* staff and inmates. The necessary implication is that staff who are not obviously symptomatic are not subject to any testing or controls. Further, for those staff who have tested positive, the diagnostic test was performed *at the facility* meaning that even if "separated from the prisoner population"

3

once identified, *id.* n.2, they had already carried the virus into the facility. It is impossible to say how long a contagious staff member worked at the facility before showing symptoms and being tested, or how many inmates and staff he or she may have come in contact with during that period. *See, e.g.,* Harvard Health Publishing, Harvard Medical School, "If You've Been Exposed to the Coronavirus" ("We know that a person with COVID-19 may be contagious 48 to 72 hours before starting to experience symptoms. Emerging research suggests that people may actually be most likely to spread the virus to others during the 48 hours before they start to experience symptoms.").[2] FPC Pensacola's failure to test asymptomatic guards at all, let alone regularly, means that the threat of infection to prisoners and other guards is constant and unrelenting. Simply, the controls in place are insufficient to catch COVID-19 cases early enough or—for those who remain asymptomatic—at all.

Moreover, conditions at FPC Pensacola have apparently changed for the worse over the past eight weeks since the parties submitted the joint letter to the Court. The Government now reports four active staff cases and three positive prisoner positives tests. Apparently under the strain of controlling the spread of the virus, FPC Pensacola has been forced to change its protocols. Buried in a footnote in the Government's submission is the disturbing revelation that **all new prisoners who test negative face two weeks of solitary confinement to begin their sentence**, without regard to term, designation or conduct. *Id.* at 2 n.1. The sole basis for this extraordinarily harsh treatment is BOP's insufficient resources to manage the crisis.[3] In addition, this mandatory isolation cannot even be implemented at FPC Pensacola. When new prisoners

---

[2] *Available at* https://www.health.harvard.edu/diseases-and-conditions/if-youve-been-exposed-to-the-coronavirus
[3] This appears to be part of a larger, troubling trend. *See, e.g.,* NPR, "As COVID-19 Spreads in Prisons, Lockdowns Spark Fear of More Solitary Confinement" (June 15, 2020) *available at* https://www.npr.org/2020/06/15/877457603/as-covid-spreads-in-u-s-prisons-lockdowns-spark-fear-of-more-solitary-confinemen

4

arrive at FPC Pensacola—assuming they test negative—they are then subject to movement (presumably on buses) to another facility, FCI Marianna, a medium security prison, and then shuttled back two weeks later after they are forced to serve in solitary confinement. Such additional, unnecessary movements only risk further exposure and spread.

Nor is FPC Pensacola's "remarkable track record" a cause célèbre. Woefully inadequate testing means that cases have gone unidentified, asymptomatic prisoners or staff have been missed, and avoiding a discovered outbreak at FPC Pensacola is likely the result of inadequate testing and luck as much as anything. *See* Mtn. at 18 n.25. Rather than wholesale testing at a large prison facility over more than seven months, only those with "credible" symptoms or those entering and leaving are tested. Opp'n at 2. Administering fifty tests under these circumstances is far short of the widespread testing that is critical. *See, e.g.,* NPR, "Which States are Doing Enough Testing? This Benchmark Helps Settle the Debate" (Apr. 22, 2020).[4] In any event, past performance is never an indication of future results and, with a new wave and a dire winter expected, FPC Pensacola's past negative tests are cold comfort against a potential future outbreak or the dramatic trend currently gripping the country. The statistical snapshot provided in the Opposition is already outdated.

Moreover, the Government's suggestion that Mr. Collins would be safer at FPC Pensacola, rather than isolating in his home defies logic. The Opposition's reference to COVID-19 rates in Collier County is a false equivalency. First, Mr. Collins is not actively out on the streets of Collier County or forced into close cohabitation with 299 neighbors. Rather, he remains sheltered in place with his family. *See* Mtn. at 10. To remove him from a safe environment where he controls the precautions and attendant risk, and place him into one where

---

[4] *Available at* https://www.npr.org/sections/health-shots/2020/04/22/840526338/is-the-u-s-testing-enough-for-covid-19-as-debate-rages-on-heres-how-to-know.

he cannot, defies common sense. Further, Collier County has performed tens of thousands of tests. It does not follow that "it is unlikely that the availability or frequency of testing accounts for the difference, given the BOP's strict requirement that symptomatic individuals be tested." Opp'n at 2. As noted above, widespread testing—including of asymptomatic—individuals is critical, which Collier County has recognized. BOP's meager testing regime is apples to oranges.

When examined closely, the Government's explication of the BOP process is also important for what it does not say. It leaves open crucial questions, including:

- Why is BOP not making broader use of testing as a tool to contain the virus?

- Is BOP making testing available to staff, and if not, why not?

- What is BOP doing to address the staffing shortages that are interfering with BOP's ability to respond to the pandemic?

- Will BOP commit to publicly reporting the number of inmates who are symptomatic and presumptive positives, and the deaths of any of these inmates?

These poignant questions are not, however, crafted by Mr. Collins. Rather, these are precisely some of the same questions that two U.S. Senators posed to Attorney General Barr and BOP Director Carvajal less than a week ago. *See* Ex. A, Letter, Hon. Richard J. Durbin & Hon. Elizabeth Warren to Hon. William P. Barr & Michael Carvajal (Oct. 2, 2020). That same letter, imploring that more must be done to protect BOP staff and vulnerable inmates, observes that "the rate of infection within BOP remains nearly four and a half times higher than in the general population" and that such statistics "likely significantly underestimate the extent of the virus in BOP facilities." *Id.* at 2 & n.5. Simply stated, there is "mounting evidence that efforts to contain the virus within BOP facilities are failing." *Id.* at 2. In cases of COVID-19 deaths among the prison population "none of these men and women were sentenced to die in prison." *Id.* at 3.

Mr. Collins respectfully submits that—in the face of pointed and crucial questions that remain unanswered—the situation may be "remarkable" but not for the reasons the Government posits. Opp'n at 2. In the absence of actual evidence that the pandemic is under control, Mr. Collins should not be subject to unnecessary and potentially deadly risk—particularly where there is no prejudice to society from the additional requested delay. The Court should exercise its reasoned discretion to grant the relief requested.

## II.     The Opposition Dramatically Understates the Risks

The Government seeks to downplay the serious risks to somebody with Mr. Collins' age and health characteristics. Yet an individualized assessment is fundamental to rendering a just result. *Cf. Gall v. United States*, 552 U.S. 38 (2007). First, the Opposition emphasizes that asthma and hypertension have not been "definitively" shown to be aggravators. Opp'n at 3. Still, it recognizes that CDC guidance states that "adults of any age with the following conditions might be at an increased risk for severe illness." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Respectfully, any *potential* increased risk is a factor that must be considered and not merely dismissed. Further, the fact is that hypertension is among the most common COVID-19 comorbidities, and asthma is also understood to amplify risks. *See, e.g.,* https://hub.jhu.edu/2020/09/01/comorbidities-and-coronavirus-deaths-cdc/ *and* Mtn. at 16-17 (collecting cases where compassionate release was granted and asthma was one factor).

Further, while the Opposition recognizes that age is a substantial risk factor, it suggests that an individual aged 70 is only slightly worse off than one aged 50-64, and significantly better off than one aged 85-plus. Opp'n at 3. These cherry-picked statistics significantly misconstrue the relevant evidence. All of those age groups are at significantly increased risk. Indeed, CDC

data shows that compared to those in the 18-29 control bracket, hospitalization for Mr. Collins' cohort is 5 times higher, and death is 90 times higher:



Source: CDC, COVID-19 Hospitalization and Death by Age https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html

The Government cannot avoid the unescapable truth that since the beginning of the pandemic, those over age 65 have been recognized consistently as the population most vulnerable.[5] Moreover, piecemeal consideration of each of Mr. Collins' significant risk factors in isolation presents a misleading assessment of the significant risk Mr. Collins faces. The Court should consider these serious risk factors in aggregate, which subject Mr. Collins to an unacceptably high risk of death should he contract the disease in prison.

---

[5] As an aside, some of the "factors that increase community spread and individual risk" identified in the same chart include "crowded situations," "close / physical contact," and "enclosed space." Those items are certainly an accurate depiction of prison.

8

Finally, the Government cites to a single example—Sheldon Silver—that is neither equivalent nor informative. The underlying conduct, the charges of conviction after trial, the sentence, restitution, and fines, are all dramatically different. In seizing upon an extreme case, the Government glosses over the myriad defendants who have appropriately been granted delayed sentences or compassionate relief. Notably, these defendants include Billy Walters, who was released early from *the very same facility* to which Mr. Collins has been designated, who was also sentenced for insider trading (albeit, substantially more egregious), who, at 73, was nearly the same age, and who had nearly 24 months remaining on his sentence. Paul Manafort was released to home confinement after serving only about two years from his seven 7 ½ year sentence. Michael Cohen, another example, had served only twelve months and had twenty-four remaining. Other defendants in this District have likewise been released with substantial time remaining and, indeed, more than Mr. Collins' total sentence. *See, e.g., United States v. Williams-Bethea*, No. 18-cr-78, 2020 WL 2848098, at *4 (S.D.N.Y. June 2, 2020) (bribery and wire fraud charges, 29 months remaining); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (tax fraud in the millions of dollars, nearly three years remaining); Mtn. at 15-18 (collecting cases). Pointing to Sheldon Silver out of the many cases is directly contrary to the need to consider Mr. Collins' individualized case.

### III. Sentence Modification Comports with Both Parties' Positions

As demonstrated above, there is a high risk for great harm to Mr. Collins if the Government's position is adopted. On the other side of the ledger is the nebulous position that "it is time," Opp'n at 5, notwithstanding the raging and worsening pandemic. The Government has not demonstrated any compelling prejudice from an additional delay. However, to the extent that the Court decides that Mr. Collins should begin serving his sentence immediately, then the

9

solution that marries the position of the Government and of Mr. Collins is for Mr. Collins to commence his sentence on home confinement.[6]

The Government recognizes that "the world has changed significantly since January" and also correctly recognizes that "the need to deter this conduct and to see justice done" has not. *Id.* at 4. Life threatening incarceration, in the face of grave danger, however, is neither the only nor the appropriate measure of justice. As explained in Mr. Collins' motion in great detail, the pandemic has wrought a sea change since the time of his sentencing. Mtn. at 18-20. Under the present unique circumstances now facing the country, a term of home confinement would serve as a meaningful deterrent and provide a just punishment. *Id.* The Government's only answer is intransigence, which is no answer at all. Twenty-six months of home confinement, with significant restrictions, and the fine that Mr. Collins has already paid, is substantial punishment. Respectfully, the risks are simply too high, and the relative benefit to the community too little.

Incarceration at this time, under current conditions, with a period of solitary confinement and the risk of permanent (or life-threatening) health impairments, is not the sentence the Court imposed. It would be substantially more severe; it is only appropriate for the Court to make a modification. *See, e.g., United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020).

---

[6] The position that "the weight of authority indicates that a sentenced defendant who, like Collins, is not yet in BOP custody cannot avail himself of Section 3582(c)" is inaccurate. *See* Opp'n at 3. As identified in the Motion, at 12 n.20, there is substantial support for the position that nothing in the statute requires a petitioner to first be incarcerated prior to seeking relief from BOP. It would defy common sense to require an inmate to first subject himself or herself to the unnecessary risk of a COVID-19 infection before being able to seek redress to avoid that same harm. Moreover, the reasoning of *United States v. Austin*, No. 06-cr-991 (JSR), 2020 WL 3447521, at *2 (S.D.N.Y.) is one of statutory construction. While there the defendant had served time, the "only absolute requirement" remains the same, namely "that a defendant be subject to a federal sentence." *See also United States v. Proudfoot*, No. 15-cr-427, 2020 WL 4284128 at * (D. Ore. July 27, 2020) (citing *Austin* and concluding that the Court could "assume" the correctness of the defendant's position and reach the merits) and concluding that "the ends of justice will best be served by postponing Mr. Proudfoot's date of self-surrender during the pendency of the COVID-19 pandemic.").

Mr. Collins respectfully requests that the Court extend the Report Date to December 8, 2020 or, in the alternative, modify his sentence to time-served plus a period of supervised release with the special condition of home confinement.

                                  Respectfully submitted,

New York, NY
October 8, 2020

                              BAKER HOSTETLER LLP
By: /s/ *Jonathan B. New*
Jonathan B. New
45 Rockefeller Plaza
14th Floor
New York, NY 10111
T: 212.589.4200
F: 212.589.4201
jnew@bakerlaw.com

Jonathan R. Barr
Kendall E. Wangsgard
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036
T: 202.861.1500
F: 202.861.1783
jbarr@bakerlaw.com
kwangsgard@bakerlaw.com