18-cr-567 (VSB)
*United States v. Collins, et al.*

# EXHIBIT A

# United States Senate
WASHINGTON, DC 20510

October 2, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Michael Carvajal
Director
Federal Bureau of Prisons
U.S. Department of Justice
320 First Street NW
Washington, D.C. 20534

Dear Attorney General Barr and Director Carvajal:

You must do more to protect Bureau of Prisons (BOP) staff and vulnerable inmates from infection due to the coronavirus (COVID-19). Too many have died, and too many are suffering needlessly.

On March 23, 2020 – when there were just three inmates and three staff members who had tested positive – a bipartisan group of 14 senators wrote to you, expressing serious concern for the health and wellbeing of federal prison staff and inmates and urging you to take necessary steps to protect them, particularly by using existing authorities under the First Step Act of 2018 to release or transfer to home confinement the most vulnerable inmates.[1] On June 2, 2020, Director Carvajal testified before the Senate Judiciary Committee to explain the BOP's response to the pandemic. By that time, 68 inmates had died, more than 5,200 inmates and 600 staff had tested positive, and the rate of infection within BOP was more than six times higher than in the general population, yet you had transferred just two percent of inmates to home confinement. At the hearing, many Senators expressed concern that the Department of Justice (DOJ) and BOP were not doing enough to contain the virus and protect those most vulnerable to infection. Nonetheless, Director Carvajal assured the Committee that BOP had a "robust pandemic plan in place" and the "plan evolves as information about the nation's COVID response measures are updated."[2] Director Carvajal said that BOP had "positive cases in less than half of [its] prisons,

---

[1] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.

[2] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

with less than 20 facilities having a significant presence of COVID" and "in fact, two-thirds of [BOP's] positive cases are located in just seven of 122 BOP institutions."[3]

Since the date of Director Carvajal's testimony, the virus has spread to almost every BOP institution and dozens of federal halfway houses. At least 133 inmates and two staff members have died due to the coronavirus, and these deaths have occurred in more than 40 facilities.[4] Almost 17,000 inmates and staff have tested positive since the pandemic began and currently there are active cases at more than 150 BOP institutions and halfway houses. More than 50 facilities currently have more than five active inmate or staff cases, which is undoubtedly a "significant presence," given the ease with which this disease spreads. Based on BOP statistics, the rate of infection within BOP remains nearly four and a half times higher than in the general population.[5]

This is mounting evidence that efforts to contain the virus within BOP facilities are failing. As Director Carvajal recognized when he testified in June, the best way to reduce the spread of the virus is through social distancing, but "prisons by design are not made for social distancing."[6] In fact, social distancing is virtually impossible to maintain inside prison facilities absent substantial population reductions, but DOJ and BOP continue to make only minimal use of its authority to release inmates to home confinement. While decisions to release inmates are no doubt complex, you must do more to release inmates.

BOP became aware of the dangers of the pandemic nine months ago. As Director Carvajal testified in June, "BOP's response to COVID-19 began in January."[7] At that time, BOP had the authority to release vulnerable inmates under the compassionate release and elderly home confinement provisions of the First Step Act. Six months ago, under the CARES Act, Congress expanded BOP's authority to transfer incarcerated individuals to home confinement during the pandemic, which was a bipartisan recognition of the need to reduce prison populations to reduce the spread of the virus. On March 26, 2020, Attorney General Barr issued a memo, directing BOP to prioritize the use of statutory authorities to grant home confinement for inmates during the pandemic.[8] Notwithstanding this broad statutory authority and the Attorney General's direction, BOP has transferred only about four percent of the prison population to home confinement, while thousands more eligible inmates could safely be released. In a report of an inspection of the pandemic response at the Federal Correctional Complex Lompoc, the DOJ Office of Inspector General (OIG) found that BOP "did not fully leverage" its authority to transfer inmates to home confinement, and the use of home confinement as a mechanism to

---

[3] Director Carvajal provided no information about positive cases at BOP halfway houses.
[4] https://www.bop.gov/coronavirus/index.jsp.
[5] These statistics likely significantly underestimate the extent of the virus in BOP facilities, given the limited testing and BOP's decision to report cases and deaths only when there is a positive test.
[6] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[7] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[8] https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

reduce inmate population was "extremely limited."[9] The same appears to be true at many other facilities.

       The failure to release more inmates has cost lives, including the life of Andrea High Bear, who tragically died after giving birth while on a ventilator. At the time of her death, she was the only known positive case at the Federal Medical Center (FMC) Carswell. Since then, five more women have died at FMC Carswell and more than 500 have been infected.[10] Others have died at BOP facilities within months of their full term release date for nonviolent offenses, while BOP failed to respond to their requests for compassionate release.[11] While some of the 133 who have died may garner less sympathy because of the nature of their offenses, none of these men and women were sentenced to die in prison. Nearly all of those who have died in custody had long term pre-existing conditions that put them at risk, and thus BOP was on notice that they were vulnerable.[12]

       In addition, there are disturbing reports that BOP has invested in unproven and potentially dangerous treatments, including spending almost three million dollars on ultraviolet sanitizing devices, which the World Health Organization says should not be used on humans,[13] and sixty thousand dollars on hydroxychloroquine, which the Food and Drug Administration has cautioned against using for the treatment of COVID-19.[14] In contrast, BOP reportedly has not consistently maintained proven preventative measures, such as social distance and the use of hand sanitizer.[15]

       In June, Director Carvajal testified that testing resources were "extremely limited at the beginning of this pandemic," but claimed that "as testing resources have become more widely available," BOP was "expanding testing to [the] inmate population which [was] helping [BOP] to quickly identify and isolate positive cases to flatten the curve when an outbreak occurs."[16] In response to questioning at the hearing, BOP added testing numbers to its website. These numbers show that BOP is not making widespread use of testing to control the spread of the virus, but rather has tested only 40 percent of the inmate population.[17] BOP also reportedly does not test

---

[9] https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc.
[10] https://www.bop.gov/coronavirus/index.jsp.
[11] https://www.washingtonpost.com/local/public-safety/frail-inmates-could-be-sent-home-to-prevent-the-spread-of-covid-19-instead-some-are-dying-in-federal-prisons/2020/08/02/992fd484-b636-11ea-9b0f-c797548c1154_story.html.
[12] https://www.bop.gov/resources/press_releases.jsp.
[13] https://abcnews.go.com/Politics/bureau-prisons-spends-million-uv-sanitizing-gates-contracts/story?id=72234824.
[14] https://www.forbes.com/sites/walterpavlo/2020/04/07/bureau-of-prisons-recently-purchased-hydroxychloroquine-controversial-covid-19-treatment/#29cec4942839.
[15] https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.
[16] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[17] https://www.bop.gov/coronavirus/index.jsp.

staff, but requires staff to find testing resources in the community.[18] Thus, BOP is not always aware, and does not always report, when staff test positive. Without BOP testing staff and more widespread testing of inmates, asymptomatic employees and staff are almost certainly spreading the virus within BOP facilities.

Staffing shortages also are contributing to the insufficient response to the pandemic. The OIG inspection of Lompoc found that both a preexisting shortage of medical staff and insufficient correctional staffing interfered with the pandemic response at the facility, where nearly 1,000 inmates have been infected and several inmates have died as a result of exposure to COVID-19.[19] Similar staffing shortages at other facilities, including the United States Penitentiary Thomson, could have similarly devastating outcomes.

During this crisis, transparency is critical to maintaining public confidence. Tracking the number of inmates and staff who test positive on the public website is useful, but BOP does not publicize the number of those who are symptomatic and presumptive positives. BOP also reports deaths of inmates who tested positive, but may not be reporting the deaths of presumptive positive inmates who did not test positive.

The transfer of inmates from sites with outbreaks, to sites with no outbreaks, without first testing inmates and limiting transfers to inmates who test negative, also raises serious concerns because asymptomatic inmates can carry the virus and these transfers could spread the disease to facilities and communities that may otherwise be unaffected. A recent report indicated that BOP is permitting the U.S. Marshals Service to transfer inmates between BOP facilities, and from private facilities to BOP facilities, without first testing these inmates and assuring they are not carrying the virus, once again raising concerns about spreading the virus to otherwise unaffected communities.[20]

At the June hearing, Senators raised concerns about BOP's use of the PATTERN risk assessment tool to make home confinement decisions. This tool was developed pursuant to the First Step Act, but to this day, the tool itself has not been posted to the BOP website, as required by the First Step Act, leading to widespread confusion and leaving offenders and their families in the dark as to the scoring system. Moreover, this tool was not developed to make assessments regarding medical vulnerability or suitability for transfer to home confinement, and the accuracy of PATTERN has not yet been studied or tested, making it particularly inappropriate for use in making these life-or-death decisions.

Equally concerning is the DOJ data suggesting that the tool would produce racially disparate results.[21] Although some changes were made to the tool in response to these concerns,

---

[18] https://www.federaltimes.com/management/2020/06/05/bop-pushes-staff-covid-testing-responsibility-onto-outside-programs/.

[19] https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc.

[20] https://www.themarshallproject.org/2020/08/13/con-air-is-spreading-covid-19-all-over-the-federal-prison-system.

[21] https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf at 62.

no evidence was produced to demonstrate that these changes would reduce racial disparities, and thus far DOJ has not released demographic data from the implementation of PATTERN.

At the June hearing, Director Carvajal testified that the racial breakdown of transfers to home confinement "mirror[s]" the racial breakdown within the prison population.[22] Following the hearing, BOP provided Congressional staff with demographic data for all inmates on home confinement, purporting to support the assertion that there has been no racial disparities created by the use of PATTERN for home confinement decisions. The data provided, however, is based on everyone on home detention, not just those who were placed on home detention based on PATTERN during the pandemic, as was requested at the hearing.

At the hearing in June, Director Carvajal asked that Congress come directly to BOP for answers regarding BOP's response to the pandemic, rather than relying on news reports, which he described as "misunderstandings" of BOP operations.[23] To ensure an accurate understanding of BOP's pandemic response, please provide answers to the following:

- Why has BOP not transferred more inmates to home confinement under the CARES Act?

- Why is BOP not placing more inmates in home confinement under the Elderly Home Confinement program?

- Why is BOP opposing nearly every request for compassionate release under the First Step Act?

- Has BOP exposed any inmates or staff to ultraviolet light, and if so, how many? Please provide details.

- Has BOP given hydroxychloroquine to inmates or staff for the treatment of COVID-19 and if so how many? Please provide details.

- Why is BOP not making broader use of testing as a tool to contain the virus?

- Is BOP making testing available to staff, and if not, why not?

- What is BOP doing to address the staffing shortages that are interfering with BOP's ability to respond to the pandemic?

- Will BOP commit to publicly reporting the number of inmates who are symptomatic and presumptive positives, and the deaths of any of these inmates?

---

[22] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[23] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

- Why has BOP not required the testing of inmates before or when the United States Marshals Service transfers them to BOP facilities and permitted the transfer of only those who test negative for COVID-19?

- Why is DOJ using PATTERN to deny home confinement placement, when the tool is not tested, may produce racially disparate results, and is not designed for such assessments?

- Please provide a copy of the current Program Statement regarding the use of PATTERN and the version of the assessment tool currently in use at BOP facilities.

- Please provide demographic data for all of the risk assessments conducted using PATTERN, including race and gender for each risk category.

- Please provide demographic data for inmates who have been placed on home confinement based on criteria that include PATTERN, or alternatively, the demographic data for inmates placed on home confinement after March 26, 2020.

- The First Step Act requires BOP to provide programing opportunities to inmates and to award inmates earned time credits for program completion. Is BOP providing these opportunities and awarding credits during the pandemic?

You have the discretion to significantly reduce the risk the pandemic poses to BOP staff, inmates, and the surrounding communities, by reducing prison populations. Every day that you fail to do so, more people are at risk. We look forward to your prompt response.

Sincerely,

Richard J. Durbin
United States Senator

Elizabeth Warren
United States Senator